IN THE UNITED STATES COURT
OF INTERNATIONAL TRADE

| | |
|---|---|
| GELLERT GLOBAL GROUP CORP.,<br><br>Plaintiff,<br><br>v.<br><br>DONALD J. TRUMP, *in his official capacity as President of the United States*; EXECUTIVE OFFICE OF THE PRESIDENT; the UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, *in his official capacity as Commissioner of United States Customs and Border Protection;* JAMIESON GREER, *in his official capacity as United States Trade Representative*; *and* OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE;<br><br>Defendants. | Case No. 26-cv-04636<br><br>**Complaint**<br><br>Three-Judge Panel Requested |

1. This action challenges tariffs imposed on products of Canada under Section 338 of the Tariff Act of 1930, 19 U.S.C. § 1338. On July 20, 2026, the President issued three proclamations—Proclamation 11046, *Imposing Additional Duties to Offset Canadian Discrimination Against the Commerce of the United States with Respect to Alcoholic Beverages*, 91 Fed. Reg. 46,639 (July 23, 2026) (the "Alcohol Proclamation"); Proclamation 11047, *Imposing Additional Duties to Offset Canadian Discrimination Against the Commerce of the United States with Respect to Dairy*, 91 Fed. Reg. 46,653 (July 23, 2026) (the "Dairy Proclamation"); and Proclamation 11048, *Imposing Additional Duties to Offset Canadian Discrimination Against the Commerce of the United States with Respect to Motor Vehicles*, 91 Fed.

Reg. 46,663 (July 23, 2026) (the "Motor Vehicles Proclamation")—each imposing an additional 50 percent ad valorem duty on Canadian products listed in an annex to the proclamation.

2. After a three-day suspension, see Proclamation 11056, 91 Fed. Reg. 54,789 (Aug. 24, 2026), the duties took effect on August 22, 2026. On September 8, 2026, the President modified the lists of products subject to the duties, Proclamations 11064 and 11065, 91 Fed. Reg. 58,331, 58,339 (Sept. 14, 2026), and excluded certain Canadian products from importation into the United States altogether, Proclamations 11061, 11062, and 11063, 91 Fed. Reg. 58,311, 58,319, 58,325 (Sept. 14, 2026).[1]

3. This Court has recently considered similar assertions of unilateral executive branch tariff authority by these Defendants. Last year, a three-judge panel of this Court found that the President's claimed authority to impose unilateral and unlimited tariffs at his personal discretion exceeded any possible authority under the International Emergency Economic Powers Act ("IEEPA"). *V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350, 1370 (Ct. Int'l Trade 2025). Ultimately, the Supreme Court agreed, invalidating the President's IEEPA tariff regime. *Learning Res., Inc. v. Trump*, 607 U.S. 229 (2026). The Administration immediately imposed replacement tariffs under Section 122 of the Trade Act of

[1] This Complaint refers to Proclamations 11046, 11047, and 11048, as suspended by Proclamation 11056 and modified by Proclamations 11064 and 11065, as the "Section 338 Proclamations"; to the duties imposed under them as the "Section 338 Tariffs"; and to the Section 338 Proclamations, the Section 338 Tariffs, and CBP's implementation of them, collectively, as the "Section 338 Action."

1974—which this Court has also held unlawful. *Oregon v. United States*, Slip Op. 26-47, Nos. 26-01472-3JP, 26-01606-3JP, 2026 Ct. Int'l. Trade LEXIS 57 (Ct. Int'l Trade May 7, 2026), *appeal docketed*, No. 2026-1804 (Fed. Cir. May 8, 2026).

4. The Section 338 Tariffs are the Administration's latest attempt to exercise, through a statute never designed for the purpose, the tariff power that the Constitution assigns to Congress. Section 338 is a provision of the Smoot-Hawley Tariff Act of 1930. Until July 2026, no President had used it to impose a tariff in the 96 years since its enactment.

5. Section 338 is a relic of the retaliation-based tariff policy that Congress abandoned four years after Smoot-Hawley became law. Beginning with the Reciprocal Trade Agreements Act of 1934 and culminating in Section 301 of the Trade Act of 1974, 19 U.S.C. § 2411 et seq., Congress built a comprehensive scheme for responding to foreign discrimination against American commerce, one that requires investigation, consultation, public comment, deadlines, action equivalent in value to the burden imposed, and periodic review. Section 338 has been impliedly repealed or, at a minimum, is controlled by Section 301 where, as here, the President targets conduct that Section 301 governs.

6. Even if Section 338 survives, it is narrow. It permits the President to act only upon finding "as a fact" that a foreign country imposes on United States products an "unreasonable charge, exaction, regulation, or limitation which is not equally enforced upon the like articles of every foreign country," or that it "[d]iscriminates in fact against the commerce of the United States" through customs

and similar measures "in such manner as to place the commerce of the United States at a disadvantage compared with the commerce of any foreign country." 19 U.S.C. § 1338(a). Even then, the President may impose only such duties "as he shall determine will offset such burden or disadvantage," not to exceed 50 percent ad valorem. *Id.* § 1338(d).

7. The Section 338 Proclamations do not satisfy those requirements. The Canadian measures they cite do not discriminate against the United States. Two are Canada's responses to the President's own tariffs, including tariffs the Supreme Court has held unlawful, and retaliation is not discrimination. The third concerns dairy quota terms that the United States itself negotiated in the United States-Mexico-Canada Agreement ("USMCA"), that Congress approved, and that give American cheese better access to Canada than the cheese of most of the world receives. Nor do the duties "offset" anything. Each proclamation imposes the statutory maximum rate of 50 percent without tying that rate to any measured burden, and the President has since taxed Canadian cheese to "offset" Canadian liquor policies and a Canadian surtax on automobiles.

8. The President also disregarded Section 338's own waiting period. Section 338 permits duties to be collected only "thirty days after the date of" the proclamation that enumerates the articles subject to them. 19 U.S.C. § 1338(d). Yet when the President added products, including the cheeses Plaintiff Gellert Global Group Corp. imports, on September 8, 2026, he directed that duties on them be collected beginning September 15, 2026, seven days later.

9. Defendants' contrary reading would permit the President to find "discrimination" whenever a trading partner grants any third country a preference it does not grant the United States, or responds to tariffs the President himself imposed, and then to tax any of that country's products at up to 50 percent, or exclude them altogether, without measuring any burden. Courts do not presume that Congress conferred a power of that magnitude without clear authorization, and if Congress had conferred it, the delegation of its core Article I tariff power would be unconstitutional.

10. The Court should declare the Section 338 Tariffs unlawful, enjoin their enforcement and collection, and order Defendants to refund, with interest, the duties unlawfully collected.

## Jurisdiction

11. The Court has exclusive jurisdiction under 28 U.S.C. § 1581, because this action arises out of laws of the United States providing for tariffs and revenue from imports, and out of the administration and enforcement of those laws. 28 U.S.C. § 1581(i)(1)(A), (B), and (D).

12. The Court possesses all the powers in law and equity of, or as conferred by statute upon, a district court of the United States. 28 U.S.C. § 1585. The Court may enter a money judgment for or against the United States in any civil action commenced under 28 U.S.C. § 1581 or 28 U.S.C. § 1582 and may also order any other form of relief that is appropriate in a civil action, including but not limited to

declaratory judgments, orders of remand, injunctions, and writs of mandamus and prohibition. 28 U.S.C. § 2643(a)(1), (c)(1).

13. In reviewing a presidential tariff action, this Court determines whether there has been "a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority." *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985); *see Learning Res.,* 607 U.S. at 240 n.1.

## Parties

14. Plaintiff Gellert Global Group Corp. is a New York corporation headquartered in Elizabeth, New Jersey, specializing in imported food products. In operation for over 100 years, Gellert is one of the leading food importers in the United States, with over $1.7 billion in annual revenue. It imports Canadian cheese covered by the Section 338 Tariffs.

15. Defendant Donald J. Trump is the President of the United States and is sued in his official capacity.

16. Defendant Executive Office of the President is the federal agency that oversees core functions of the executive branch, including the Office of the United States Trade Representative. It is headquartered in Washington, D.C.

17. Defendant United States of America is the federal government of the United States of America.

18. Defendant United States Customs and Border Protection ("CBP") is a federal agency, and a component of the Department of Homeland Security,

responsible for, *inter alia*, securing ports of entry and collecting tariffs on imported goods. It is headquartered in Washington, D.C.

19. Defendant Rodney S. Scott is the Commissioner of CBP. He is sued in his official capacity.

20. Defendant Jamieson Greer is the United States Trade Representative and is sued in his official capacity.

21. Defendant Office of the United States Trade Representative ("USTR") is the federal agency responsible for developing United States trade policy. It is headquartered in Washington, D.C.

## Facts

22. The Constitution vests all legislative Powers in Congress, beginning with the foundational "Power To lay and collect Taxes" and "Duties." U.S. Const. art. I, § 1; *id.* § 8, cl. 1. Because the President possesses no independent authority to impose tariffs, he may do so only when exercising specific, limited power delegated by Congress under strictly defined conditions. *See generally Learning Res.*, 607 U.S. 229.

**The Prior Executive Actions**

23. On April 2, 2025, "Liberation Day," the President issued Executive Order 14257, *Regulating Imports with a Reciprocal Tariff to Rectify Trade Practices that Contribute to Large and Persistent Annual United States Goods Trade Deficits*, 90 Fed. Reg. 15,041 (Apr. 7, 2025) (the "Liberation Day Order"). That Order imposed sweeping new tariffs at rates not seen since the Great Depression—including a

global 10 percent tariff on nearly every country in the world, regardless of whether that country imposes tariffs on United States products, the rates at which it does so, or the existence of any trade agreements governing the relationship.

24. In addition to the global 10 percent tariff, the Liberation Day Order levied much higher tariff rates on dozens of countries based on what the Administration claimed to be an estimate of "tariff and nontariff barriers," but which ultimately turned out to be a simple ratio of the trade deficit in goods (excluding services) as a percentage of total U.S. imports from the given country—not an accepted methodology for calculating trade barriers.

25. As a statutory basis, the Liberation Day Order, and the subsequent orders modifying that tariff regime, cited the International Emergency Economic Powers Act, 50 U.S.C. § 1701 *et seq.*; the National Emergencies Act, 50 U.S.C. § 1601 *et seq.*; Section 604 of the Trade Act of 1974, as amended, 19 U.S.C. § 2483; and 3 U.S.C. § 301.

26. On February 20, 2026, the United States Supreme Court held that the Liberation Day tariffs were *ultra vires*, because IEEPA does not grant the President tariff authority. *Learning Res.*, 607 U.S. at 255. As the Court explained, "[w]hen Congress grants the power to impose tariffs, it does so clearly and with careful constraints." *Id.* at 251.

27. The same day, the President, in a press conference and in posts on social media, objected to the Supreme Court's decision and announced that he would be issuing new replacement tariffs under other statutory authorities. Also on that day,

the U.S. Trade Representative explained that, despite the Supreme Court decision, the Administration would "continue implementing the President's trade policy" including by "[i]mmediately impos[ing] a temporary 10 percent surcharge" pursuant to Section 122 and by initiating "several investigations under Section 301."[2]

28. Later that day, the President issued Proclamation 11012, *Imposing a Temporary Import Surcharge to Address Fundamental International Payments Problems*, 91 Fed. Reg. 9,339 (Feb. 25, 2026).

29. The President imposed, based on claimed authority in Section 122, a surcharge of 10 percent on goods imported into the United States—the same amount as the baseline global reciprocal tariff rate imposed under the original Liberation Day Order—subject to various exemptions and carve-outs, for 150 days, the maximum duration allowed by Section 122 without congressional approval.

30. This Court found those Section 122 tariffs *ultra vires*—a decision currently on appeal in the Federal Circuit. *See Oregon,* 2026 Ct. Int'l. Trade LEXIS 57.

31. In the meantime, in March 2026, USTR formally initiated Section 301 investigations on an unprecedented scale, including (a) an investigation into "structural excess capacity and production in manufacturing sectors" concerning 16

[2] Press Release, Off. of the U.S. Trade Representative, *Ambassador Greer Issues Statement on Supreme Court IEEPA Decision* (Feb. 20, 2026), https://ustr.gov/about/policy-offices/press-office/press-releases/2026/february/ambassador-greer-issues-statement-supreme-court-ieepa-decision.

economies accounting for more than 75 percent of United States imports,[3] and (b) an investigation concerning 60 economies' failure to prohibit imports of goods with forced labor (the "Forced Labor Investigation"), covering nearly all United States imports.[4]

32. On June 2, 2026, USTR determined that certain acts, policies, and practices of each of the 60 investigated economies relating to the failure to impose or effectively enforce prohibitions on the importation of goods made with forced labor were unreasonable and burdened or restricted U.S. commerce.[5]

33. On July 23, 2026, three days after the original Section 338 Proclamations and approximately 133 days after initiating the Forced Labor Investigation, USTR imposed Section 301 tariffs on a wide range of countries covering nearly all U.S. imports, including a 10 percent duty on products of Canada, effective July 24, 2026 (the "Section 301 Action"). Notice of Actions in Section 301 Investigations of Acts, Policies, and Practices of Various Economies Related to the Failure of Each Economy to Impose and Effectively Enforce a Prohibition on the Importation of

---

[3] Initiation of Section 301 Investigations: Acts, Policies, and Practices of Certain Economies Relating to Structural Excess Capacity and Production in Manufacturing Sectors, 91 Fed. Reg. 12,886 (Mar. 17, 2026).

[4] Initiation of Section 301 Investigations of Acts, Policies, and Practices of Various Economies Related to the Failure To Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced With Forced Labor, 91 Fed. Reg. 12,884 (Mar. 17, 2026).

[5] Press Release, Off. of the U.S. Trade Representative, *USTR Makes Findings and Proposes Action in 60 Section 301 Investigations Relating to Failures to Take Action on Trade in Forced Labor Goods* (June 2, 2026), https://ustr.gov/about/policy-offices/press-office/press-releases/2026/june/ustr-makes-findings-and-proposes-action-60-section-301-investigations-relating-failures-take-action.

Goods Produced with Forced Labor, 91 Fed. Reg. 47,318, 47,319–20, 47,322 (July 28, 2026).

34. The Section 301 Action is the subject of a set of separate challenges in this Court. *In re Section 301 Forced Labor Cases*, Court No. 26-cv-03555-3JP. The plaintiffs in those cases do not contend that Section 301 confers no tariff authority, but that USTR used it as a pretext to reimpose near-worldwide tariffs without making the country-by-country findings Section 301 requires. See 19 U.S.C. § 2411(b). On September 30, 2026, this Court heard oral arguments regarding the Section 301 Action. As of this filing, a decision from this Court regarding Section 301 remains pending.

**Section 338 of the Tariff Act of 1930**

35. Section 338 is part of the Tariff Act of 1930, ch. 497, 46 Stat. 590, commonly known as the Smoot-Hawley Tariff Act. It re-enacted, in substantially identical terms, Section 317 of the Tariff Act of 1922, ch. 356, 42 Stat. 858, 944–46.

36. Section 338 authorizes the President, "when he finds that the public interest will be served," to proclaim new or additional duties on the products of a foreign country "whenever he shall find as a fact" that the country either "[i]mposes, directly or indirectly, upon the disposition in or transportation in transit through or reexportation from such country of any article wholly or in part the growth or product of the United States any unreasonable charge, exaction, regulation, or limitation which is not equally enforced upon the like articles of every foreign country," or "[d]iscriminates in fact against the commerce of the United States,

directly or indirectly, by law or administrative regulation or practice, by or in respect to any customs, tonnage, or port duty, fee, charge, exaction, classification, regulation, condition, restriction, or prohibition, in such manner as to place the commerce of the United States at a disadvantage compared with the commerce of any foreign country." 19 U.S.C. § 1338(a).

37. Where the President finds such a burden or disadvantage, he may "specify and declare such new or additional rate or rates of duty as he shall determine will offset such burden or disadvantage, not to exceed 50 per centum ad valorem or its equivalent." 19 U.S.C. § 1338(d). Those duties may be collected only beginning "thirty days after the date of such proclamation." *Id.* If the country "maintain[s] or increase[s]" its discrimination after a proclamation, the President may exclude its products altogether. *Id.* § 1338(b). And he may "suspend, revoke, supplement, or amend any such proclamation." *Id.* § 1338(c).

38. When Congress enacted Section 338, the United States itself granted Cuba, by treaty, rates of duty that were "preferential in respect to all like imports from other countries," and the same Act provided that "[n]othing in this Act shall be construed to abrogate or in any manner impair or affect" that treaty. Tariff Act of 1930, ch. 497, § 316, 46 Stat. 590, 695; *see Faber, Coe & Gregg, Inc. v. United States*, 97 F.2d 115, 117 (C.C.P.A. 1938) (quoting Convention of Commercial Reciprocity, U.S.-Cuba, art. VIII, Dec. 11, 1902, 33 Stat. 2136).

39. Section 338(g) requires the Tariff Commission, the predecessor to the United States International Trade Commission ("ITC"), "to ascertain and at all

times to be informed whether any of the discriminations against the commerce of the United States enumerated in [Section 338] are practiced by any country; and if and when such discriminatory acts are disclosed, it shall be the duty of the commission to bring the matter to the attention of the President, together with recommendations." 19 U.S.C. § 1338(g).

40. Before July 2026, no President had ever imposed a tariff under Section 338. *See* Kyla H. Kitamura, Cong. Rsch. Serv., R49349, *U.S. Tariffs on Canadian Imports: Section 338 of the Tariff Act of 1930*, at 1 (Sept. 14, 2026).[6]

41. Beginning in 1934, Congress abandoned the Smoot-Hawley model and repeatedly rebuilt the statutory framework governing the President's authority to respond to foreign trade practices.

42. In the Reciprocal Trade Agreements Act of 1934, ch. 474, 48 Stat. 943, Congress replaced Smoot-Hawley's model of high unilateral tariffs with reciprocal, negotiated tariff reductions applied on a most-favored-nation basis, and built its own discrimination remedy into the new scheme, authorizing the President to suspend trade-agreement rates as to any country "because of its discriminatory treatment of American commerce." *Id.* § 1, 48 Stat. at 944 (adding Tariff Act of 1930 § 350(a)). When the President found in 1935 and 1936 that Germany and Australia discriminated against American commerce, he did not impose Section 338 duties; he withheld trade-agreement benefits. U.S. Tariff Comm'n, 20th Ann. Rep. 47 (1936).[7]

---

[6] https://www.congress.gov/crs_external_products/R/PDF/R49349/R49349.2.pdf.
[7] https://www.usitc.gov/publications/year_in_review/fy_1936_annual_report.pdf.

43. The United States has been a party to the General Agreement on Tariffs and Trade ("GATT") since 1947. The GATT made unconditional most-favored-nation treatment the foundation of the postwar trading system while recognizing that free-trade areas and customs unions, in which members grant each other preferences they do not extend to others, are a legitimate feature of that system. GATT arts. I:1, XXIV:4–8, Oct. 30, 1947, 61 Stat. A-11, 55 U.N.T.S. 194. Congress has since approved numerous preferential free-trade agreements, including three with Canada.

44. Section 252 of the Trade Expansion Act of 1962, Pub. L. No. 87-794, 76 Stat. 872, authorized the President to respond to foreign import restrictions that discriminate against United States commerce. Section 301 of the Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. 1978 (codified as amended at 19 U.S.C. §§ 2411–2420), replaced that provision with a detailed framework for responding to foreign acts, policies, and practices that are "unreasonable or discriminatory and burden[] or restrict[] United States commerce." 19 U.S.C. § 2411(b)(1).

45. Section 301 reaches every foreign practice Section 338 reaches. It authorizes action against any act, policy, or practice of a foreign country that is "unreasonable or discriminatory and burdens or restricts United States commerce," 19 U.S.C. § 2411(b)(1), and provides that discriminatory practices include, "when appropriate," the denial of "national or most-favored-nation treatment to United States goods," *id.* § 2411(d)(5). Its remedies include those Section 338 provides: duties and other import restrictions. *Id.* § 2411(c)(1)(B). But unlike Section 338,

Section 301 conditions action on a formal investigation, consultations with the foreign country, public comment and a hearing, and determinations within statutory deadlines, *id.* §§ 2412–2414; requires that action be "equivalent in value to the burden or restriction being imposed by that country on United States commerce," *id.* § 2411(a)(3); requires a preference for duties over other import restrictions, *id.* § 2411(c)(5); and terminates action after four years absent a request for continuation and a review, *id.* § 2417(c). And where a trade-agreement dispute panel finds that a foreign practice does not violate the rights of the United States, Section 301 makes any response discretionary and subject to the same procedures and limits. *Id.* § 2411(a)(2)(A), (b). Congress revised Section 301 in 1979, 1984, 1988, and 1994, each time refining its procedures and limits.

46. Since 1930, Presidents confronting foreign discrimination against American commerce have relied on the reciprocal trade agreements authority, Section 252, Section 301, or other later statutes; until July 2026, none had imposed a duty under Section 338.

**The Section 338 Action**

47. Canada is one of the United States' largest trading partners. In 2025, the United States imported approximately $382 billion in goods from Canada. Census Bureau, 2025: *U.S. trade in goods with Canada*, accessed October 19, 2026.[8] Most Canadian goods that satisfy the USMCA's rules of origin are eligible to enter the United States duty-free.

---

[8] https://www.census.gov/foreign-trade/balance/c1220.html.

48. Beginning in 2025, the President imposed a series of tariffs on Canadian goods. Invoking IEEPA, the President imposed tariffs of 25 percent on most products of Canada, Executive Order 14193, Imposing Duties to Address the Flow of Illicit Drugs Across Our Northern Border, 90 Fed. Reg. 9,113 (Feb. 7, 2025), later raising the rate to 35 percent on goods that did not qualify for USMCA treatment. The President also imposed tariffs under Section 232 of the Trade Expansion Act of 1962, 19 U.S.C. § 1862, on Canadian steel, aluminum, motor vehicles, and auto parts, among other products.

49. Canada responded. Beginning March 4, 2025, the day the IEEPA tariffs on Canadian goods took effect, nearly all Canadian provincial and territorial governments stopped purchasing, distributing, or selling United States alcoholic beverages through their liquor authorities. And in April 2025, in response to the President's 25 percent Section 232 tariffs on Canadian motor vehicles, Canada imposed a 25 percent surtax on United States motor vehicles that do not satisfy USMCA rules of origin and on the non-Canadian and non-Mexican content of those that do, together with a remission framework for automakers that maintain production in Canada.

50. On July 20, 2026, the President signed the Alcohol, Dairy, and Motor Vehicles Proclamations. Each proclamation found that a Canadian measure constituted an unreasonable imposition not equally enforced on like articles from every foreign country, or discrimination against the commerce of the United States, and each imposed an additional 50 percent ad valorem duty—the statutory

maximum—on the Canadian products listed in its annex. Each was scheduled to take effect on August 19, 2026, 30 days after it issued.

51. The Section 338 Tariffs apply regardless of whether a product qualifies for preferential treatment under the USMCA. As originally issued, they applied in addition to other duties, taxes, and fees, but did not apply to products covered by Section 232 tariff actions. Kitamura, *supra*, at 3.

52. The products covered by the Section 338 Tariffs extend well beyond alcohol, dairy, and motor vehicles. They include, among other things, hockey sticks, plywood, furniture, seeds, clothing, wigs, swimming pools, honey, plants, household items, beauty products, bags, hides and skins, and dog leashes. *See* Proclamation 11064, Annex I; Proclamation 11065, Annex I.

53. The Alcohol Proclamation rests on the decisions of Canadian provincial and territorial governments, beginning in March 2025, to stop purchasing, distributing, or selling United States alcoholic beverages through their liquor authorities. Those decisions were made in response to the President's IEEPA tariffs on Canadian goods—tariffs that the Supreme Court has since held unlawful.

54. The Dairy Proclamation rests on Canada's administration of its cheese tariff-rate quotas ("TRQs"). It asserts that Canada does not permit retailers to receive TRQ allocations under the USMCA, while permitting retailers to receive cheese TRQ allocations under the Canada-European Union Comprehensive Economic and Trade Agreement. Proclamation 11047 ¶¶ 3–4. But the USMCA TRQ is itself a preference for the United States: it gives U.S. cheese duty-free in-quota

access that Canada does not give to countries outside its trade agreements. The Dairy Proclamation does not claim that Canada treats U.S. cheese worse than cheese from the rest of the world; it objects that Canada grants the European Union a different feature, retailer eligibility, under a different reciprocal agreement. And the USMCA dairy TRQs on which the Dairy Proclamation relies were negotiated by the United States and approved by Congress. *See* United States-Mexico-Canada Agreement Implementation Act, Pub. L. No. 116-113, 134 Stat. 11 (2020). The United States twice challenged Canada's dairy TRQ allocation measures through the USMCA's dispute-settlement mechanism. After a 2021 panel found Canada's practice of reserving allocations for processors inconsistent with the USMCA, *Canada—Dairy TRQ Allocation Measures*, No. CDA-USA-2021-31-01, Final Report (Dec. 20, 2021), Canada revised its measures, and in 2023 a second panel held that Canada's treatment of retailers and other applicants under the revised measures is "not inconsistent with" the USMCA. *Canada—Dairy Tariff-Rate Quota Allocation Measures 2023*, No. CDA-USA-2023-31-01, Final Report ¶¶ 90, 309 (Nov. 10, 2023).

55. The Motor Vehicles Proclamation rests on Canada's 25 percent surtax on United States motor vehicles and the associated remission framework. Canada adopted those measures in response to the President's Section 232 tariffs on Canadian motor vehicles. The Motor Vehicles Proclamation thus treats Canada's response to the tariffs the United States imposed on imported automobiles, including Canadian automobiles, as "discrimination" by Canada against the United States.

56. None of the Alcohol, Dairy, and Motor Vehicle Proclamations ties the duty it imposes to the burden or disadvantage it identifies. The Alcohol and Motor Vehicles Proclamations recite declines in U.S. exports to Canada of roughly $581 million and $5.6 billion, respectively; the Dairy Proclamation does not quantify any burden. Yet all three impose the same rate, the statutory maximum, without stating the value of the Canadian goods subject to the duty or explaining how a 50 percent duty on them corresponds to the burden identified. Instead, each states that the duties will "expand opportunities for U.S. producers to compete within the U.S. market" and "may spur Canada to remove" the challenged measure. Proclamation 11046 ¶¶ 5, 8; Proclamation 11047 ¶ 7; Proclamation 11048 ¶¶ 4, 7.

57. On September 4, 2026—after the original Section 338 Proclamations issued—the ITC requested public comments on how it should carry out its responsibilities under Section 338(g). U.S. Int'l Trade Comm'n, Request for Comments Regarding Implementation of 19 U.S.C. § 1338(g), 91 Fed. Reg. 57,387 (Sept. 9, 2026).

58. The Section 338 Proclamations were issued in the midst of negotiations with Canada over the future of the USMCA. On August 18, 2026, citing progress in those negotiations, the President suspended the Section 338 Tariffs for three days. Proclamation 11056, 91 Fed. Reg. at 54,789. When the negotiations did not produce an agreement, the Section 338 Tariffs took effect at 12:01 a.m. eastern time on August 22, 2026. *See* CBP, CSMS # 69606660, GUIDANCE: Section 338 Additional Duties on Certain Goods of Canada (Aug. 21, 2026).

59. Canada responded with counter-tariffs on approximately C$27.6 billion of United States goods, effective September 8, 2026. Kitamura, *supra*, at 1. Saskatchewan had already imposed a 50 percent levy on American alcohol on August 27, 2026, which the President described as imposed "expressly in response to" the Alcohol Proclamation. Proclamation 11061 ¶ 5. On September 8, 2026, the President issued five further Section 338 proclamations.

60. Two of those proclamations modified the lists of products subject to the Section 338 Tariffs, adding products such as additional dairy and wood products, furniture, all-terrain vehicles, and motorboats, and removing others, effective at 12:01 a.m. eastern time on September 15, 2026—seven days after the proclamations issued. Proclamations 11064 and 11065, 91 Fed. Reg. 58,331, 58,339; Kitamura, *supra*, at 2. Proclamation 11064 added nearly every category of cheese in the tariff schedule to the products subject to the Alcohol Proclamation's duties. Proclamation 11065 added cheese classified in Harmonized Tariff Schedule of the United States ("HTSUS") subheading 0406.90.99 to the products subject to the Motor Vehicles Proclamation's duties. The Dairy Proclamation, the only one directed at a Canadian policy concerning cheese, does not reach cheese at all. Those proclamations also provided that the Section 338 Tariffs apply in addition to Section 232 duties, Proclamation 11064 cl. (1); Proclamation 11065 cl. (1), which, according to the White House, results in combined additional duties of up to 100 percent on certain items. Kitamura, *supra*, at 3.

61. The other three proclamations excluded certain Canadian alcoholic beverages, dairy products, and motor vehicle products from importation into the United States, effective September 29, 2026. Proclamations 11061, 11062, and 11063, 91 Fed. Reg. 58,311, 58,319, 58,325. The President also directed the General Services Administration, working with USTR, to remove Canadian-origin products from the General Services Administration's Multiple Award Schedules.

**The Harm to Plaintiff**

62. Gellert imports Canadian cheese covered by the Section 338 Tariffs and is the importer of record for all its products imported from Canada. Gellert changed its name from Atalanta Corp. to Gellert Global Group Corp. in 2025, and its import records still identify the importer of record as Atalanta Corp. One of Gellert's significant Canadian products is cheese, specifically more than 15 product lines of cheeses, including sheep's milk cheese, mascarpone, borgonzola, chèvre-style goat's milk cheese, brie, and camembert. In 2025, Gellert imported roughly $71 million worth of Canadian cheese.

63. Gellert sources its cheeses from leading Canadian producers in Ontario who have partnered with Gellert for more than 25 years based on a shared commitment to quality products, trust, and collaboration. These relationships have been instrumental in developing and growing these product lines in the U.S. market, as well as establishing strong customer loyalty and confidence in the consistency and quality of the products.

64. Gellert's goat's milk cheese and brie are sourced from Canada because Canadian producers offer the quality standards, expertise, and production capacity required to meet market demand. Given the longstanding supplier partnerships, customer trust, and established market position of these products, they cannot simply be replicated or replaced with U.S.-produced alternatives without significant disruption to customers and the supply chain. Nor are domestically produced options readily available in the quantities U.S. consumers demand.

65. For goat's milk cheese specifically, U.S. consumer demand far exceeds domestic goat's milk production. Gellert's Canadian suppliers play a critical role in ensuring a reliable supply of high-quality goat cheese products for American consumers. As a result, these imports do not displace domestic production but rather complement it to help meet a market demand that cannot be satisfied through the U.S. supply alone.

66. Under the USMCA, there has historically been no duty on Gellert's imports of Canadian cheese. Under the newly imposed Section 338 Tariffs, Gellert now pays a 50 percent duty on the entered value of its Canadian cheese, an estimated $40 million per year. Gellert pays Section 338 duties on its Canadian cheeses under two headings. Its chèvre-style goat's milk cheese, brie, and camembert, classified under HTSUS subheading 0406.90.99, are assessed duties under heading 9903.03.14, which implements the Motor Vehicles Proclamation, as modified by Proclamation 11065. Its sheep's milk cheese, mascarpone, and borgonzola (a hybrid cheese classified under HTSUS subheading 0406.40.54) are

assessed duties under heading 9903.03.12, which implements the Alcohol Proclamation, as modified by Proclamation 11064.

67. For example, on September 28, 2026, Gellert entered a shipment of goat's milk cheese with an entered value of $120,288 and paid a Section 338 duty of $60,144.50. On October 5, 2026, Gellert paid a Section 338 duty of $33,411.50 on a shipment with an entered value of $66,822 that contained borgonzola, brie, and camembert. On just 22 entries of Canadian cheese made between September 16 and October 11, 2026, Gellert paid at least $520,538 in Section 338 duties.

68. Gellert's Canadian cheeses enter the U.S. regularly through Alexandria Bay, New York; Champlain, New York; and Detroit, Michigan. Gellert will continue to pay Section 338 Tariffs upon shipments' arrivals at these crossings.

69. The impact on Gellert's business goes beyond direct tariff costs. Gellert is absorbing the tariff costs through the end of 2026, but that is not sustainable long term. Absorbing these costs means Gellert is delaying hiring and investment, there is pressure on Gellert's working capital, and the higher landed costs dramatically reduce Gellert's margins.

70. If the tariffs continue, Gellert will be forced to raise the prices on its products, resulting in lost or reduced sales, decreased customer loyalty, risk of losing product placements due to higher costs, and supply chain interruptions as producers scale down or go out of business due to increased costs.

71. The tariffs indirectly harm American production as well. Gellert's Ontario-based brie supplier imports cow's milk from dairies in upstate New York.

The brie is processed in Canada, and the finished product is then exported to the United States. Any reduction in Gellert's Canadian trade will also affect domestic production.

72. If there were no Section 338 Tariffs, Gellert would continue to invest in its distribution across the U.S. to maintain and grow its customer base and ensure the supply chain from Canada to the U.S.

73. The U.S. and Canadian cheese markets are incredibly interconnected, with constant cross-border trade. The Section 338 Tariffs go far beyond the cost of paying the duties. Gellert's business has already been affected by lost profits, higher landed costs, and cash flow issues. If the tariffs continue, Gellert will also face supply chain uncertainty, lost customers, and lost decades-long partnerships that provide American consumers with consistent, quality products.

74. The Section 338 Tariffs are the latest in a series of unlawful tariffs, first under IEEPA and then under Section 122, that have imposed severe costs on countless American businesses. For Plaintiff, the Section 338 Tariffs impose substantial and unnecessary costs that will continue as long as they remain in effect.

## Class Allegations

75. Plaintiff brings this action on behalf of itself and, under USCIT Rule 23, on behalf of a class defined as: importers of record that have paid, or will be required to pay, duties imposed under the Section 338 Action on merchandise

entered for consumption, or withdrawn from warehouse for consumption, in the United States on or after August 22, 2026 (the "Class").

76. Plaintiff also brings this action on behalf of a subclass defined as: Class members that paid duties imposed under the Section 338 Action on articles first enumerated in Proclamation 11064 or 11065 and entered for consumption, or withdrawn from warehouse for consumption, on or after September 15, 2026, and before October 8, 2026 (the "30-Day Subclass"). Gellert is a member of, and seeks to represent, the 30-Day Subclass. Members of the Class and the 30-Day Subclass can be identified from CBP's entry records.

77. The Class is so numerous that joinder of all members is impracticable. The Section 338 Tariffs reach a wide range of Canadian products, from cheese and furniture to honey, beauty products, and motorboats, and the Class accordingly includes hundreds, if not thousands, of importers of record nationwide.

78. There are questions of law and fact common to the Class, including whether Section 338 has been impliedly repealed or, at a minimum, is controlled by Section 301 of the Trade Act of 1974; whether Section 338 authorizes the Section 338 Tariffs; whether, if it were read to authorize them, Section 338 would constitute an unconstitutional delegation of legislative power; and, for the 30-Day Subclass, whether Section 338 permitted the collection of duties on articles first enumerated in Proclamations 11064 and 11065 before October 8, 2026. These questions are capable of class-wide resolution because their answers turn on the validity of a

nationwide action and do not depend on the circumstances of any individual Class member.

79. Plaintiff's claims are typical of the claims of the Class: like all Class members, Plaintiff has paid and will continue to pay unlawful duties imposed under the same proclamations, and its claims arise from the same course of conduct and legal theories. Plaintiff seeks the same declaratory, injunctive, and refund relief as the Class.

80. Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no interests antagonistic to those of other Class members and has retained qualified counsel, as described below.

81. Defendants have acted and continue to act on grounds generally applicable to the Class by imposing and administering duties pursuant to the Section 338 Action, so that final injunctive and declaratory relief is appropriate respecting the Class as a whole. The requested return of duties unlawfully collected is incidental to the requested declaratory and injunctive relief. Accordingly, certification under USCIT Rule 23(b)(2) is appropriate.

82. In the alternative, common questions of law and fact predominate over questions affecting only individual Class members, and a class action is superior to other available methods for fairly and efficiently adjudicating this controversy. *See* USCIT Rule 23(b)(3). The central issues concern the lawfulness of the Section 338 Action. Individual Class members' interests in separately litigating those issues are limited, while adjudicating them in one action in this Court promotes consistent

resolution and avoids unnecessary, duplicative litigation. Certification of the 30-Day Subclass, whose claim is for the refund of duties already paid, is appropriate under USCIT Rule 23(b)(3).

83. Plaintiff's counsel is competent and qualified to represent the Class. Plaintiff's attorneys have experience litigating complex constitutional and international-trade matters, including challenges to the IEEPA, Section 122, and Section 301 tariff actions; are well versed in the legal and factual issues presented here; and will fairly and adequately represent the interests of the Class.

## Count I

**Section 338 has been impliedly repealed or, at a minimum, is controlled by Section 301 of the Trade Act of 1974.**

84. The preceding paragraphs are incorporated herein by reference.

85. Where provisions in two acts are in irreconcilable conflict, the later act, to the extent of the conflict, constitutes an implied repeal of the earlier one; and where a later act covers the whole subject of an earlier one and is clearly intended as a substitute, it operates similarly as a repeal. *Posadas v. Nat'l City Bank*, 296 U.S. 497, 503 (1936). And a specific policy embodied in a later federal statute controls the construction of an earlier one even absent express amendment. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000).

86. Section 301 of the Trade Act of 1974, building on Section 252 of the Trade Expansion Act of 1962 and Section 350 of the Tariff Act of 1930, covers the whole subject of Section 338. Section 301 authorizes action in response to foreign acts, policies, and practices that are "discriminatory" and burden or restrict United

States commerce, 19 U.S.C. § 2411(b)(1), and provides that discriminatory practices include, "when appropriate," the denial of national or most-favored-nation treatment to United States goods, *id.* § 2411(d)(5)—the same kind of conduct Section 338 addresses.

87. Congress conditioned that authority on investigation, consultation with the foreign country concerned, notice, public comment, a hearing, and determinations within statutory deadlines, 19 U.S.C. §§ 2412–2414; required that action be equivalent in value to the burden imposed, that duties be preferred over other import restrictions, and that actions terminate after four years absent a request for continuation and review, *id.* §§ 2411(a)(3), (c)(5), 2417(c); and made any response to a foreign practice that a trade-agreement panel has found consistent with the rights of the United States discretionary and subject to those same limits, id. § 2411(a)(2)(A), (b). Congress did not intend to leave in place a parallel authority that would allow the President to impose the same remedies, for the same conduct, free of every one of those safeguards.

88. Each Canadian practice the Section 338 Proclamations target falls within Section 301. The Dairy Proclamation finds that Canada "denies to the United States the favorable treatment that Canada provides to the EU," that the practice is "unreasonable," and that it burdens U.S. commerce. Proclamation 11047 ¶¶ 5–6. And a USMCA panel has found the Canadian rule it targets "not inconsistent with" the USMCA. *See supra* ¶ 54. The Alcohol and Motor Vehicles Proclamations target

measures that allegedly burden or restrict United States commerce. 19 U.S.C. § 2411(b)(1).

89. Section 338 has therefore been impliedly repealed. At a minimum, Section 301 controls where, as here, the President seeks to respond to foreign practices within Section 301's scope, and the President may not impose duties in response to such practices while disregarding the procedures and limits Section 301 imposes. Because the President did not proceed under Section 301, the Section 338 Tariffs are unlawful whether or not Section 338 survives.

90. The Section 338 Tariffs directly and irreparably harm Plaintiff and the Class, who face increased costs for the goods they sell, reduced demand resulting from higher prices, and disrupted supply chains, among other threats to their livelihoods.

## Count II

### The Section 338 Action exceeds the authority granted by Section 338 of the Tariff Act of 1930.

91. The preceding paragraphs are incorporated herein by reference.

92. Section 338 authorizes action only where the President finds as a fact that a foreign country imposes on United States products an unreasonable charge, exaction, regulation, or limitation "which is not equally enforced upon the like articles of every foreign country," or discriminates against United States commerce through customs and similar measures so as to place it "at a disadvantage compared with the commerce of any foreign country." 19 U.S.C. § 1338(a).

93. Section 338 thus addresses discrimination: measures that single out United States commerce for worse treatment than the commerce of the world at large. It is not a general authorization to impose tariffs whenever the President disagrees with a trading partner's policies, or whenever a trading partner responds to tariffs the United States has imposed on it.

94. When Congress enacted Section 338, a preference granted under a reciprocal agreement was not "discrimination." The same Act expressly preserved the United States' own exclusive preference for Cuba. Tariff Act of 1930, ch. 497, § 316, 46 Stat. 590, 695.

95. None of the Canadian measures identified in the Section 338 Proclamations constitutes discrimination within the meaning of Section 338. Canada's motor vehicle surtax and its provinces' alcohol purchasing decisions are responses to tariffs that the United States imposed on Canada, not discrimination by Canada against the United States. And Canada's dairy TRQ administration treats U.S. cheese better than the cheese of most of the world; that Canada grants the European Union a different preference under a different reciprocal agreement, while giving the United States the TRQ terms the United States itself negotiated and Congress approved, is not discrimination against the United States. Nor is it "unreasonable": preferences granted under reciprocal trade agreements are a routine feature of trade law, including that of the United States, and a USMCA panel found Canada's rule "not inconsistent with" the USMCA.

96. Even where its predicates are satisfied, Section 338 authorizes only duties that the President "determine[s] will offset" the burden or disadvantage caused by the foreign country's discrimination. 19 U.S.C. § 1338(d). Whatever products the President chooses to tax, the duty must balance the burden the discrimination places on United States commerce.

97. The Section 338 Tariffs do not. Each proclamation imposes the statutory maximum rate of 50 percent without tying it to any measured burden: the Alcohol and Motor Vehicles Proclamations recite very different export declines, the Dairy Proclamation quantifies none, and all three impose the same rate. Each states that the duties will "expand opportunities for U.S. producers" and "may spur Canada to remove" the challenged measure, which describes protection and leverage, not an offset. *See supra* ¶ 56. Proclamations 11064 and 11065 then substituted substantially different product lists while declaring that the duties "would still offset the burden or disadvantage," and taxed Canadian cheese to "offset" Canadian liquor policies and a Canadian surtax on automobiles. Proclamation 11064 ¶ 5; Proclamation 11065 ¶ 5. They are not offsets; they are general import taxes on selected Canadian goods.

98. Defendants' interpretation of Section 338 also presents a question of vast economic and political significance. Under Defendants' construction, the President may impose tariffs of up to 50 percent on any products of any country that extends better treatment to any other country in any respect—including through any of the hundreds of preferential trade agreements to which the United States is not a

party—or that responds to tariffs the United States has imposed on it. Section 338 contains no clear statement authorizing that power. The major questions doctrine and the canon of constitutional avoidance require Section 338 to be construed not to authorize the sweeping power Defendants claim. *See West Virginia v. EPA*, 597 U.S. 697, 716 (2022); *Learning Res.*, 607 U.S. at 251.

99. The Section 338 Proclamations therefore rest on a clear misconstruction of the governing statute and constitute action outside delegated authority.

100. The Section 338 Tariffs directly and irreparably harm Plaintiff and the Class, who face increased costs for the goods they sell, reduced demand resulting from higher prices, and disrupted supply chains, among other threats to their livelihoods.

## Count III

### If Section 338 authorizes the challenged tariffs, it violates the nondelegation doctrine.

101. The preceding paragraphs are incorporated herein by reference.

102. The nondelegation doctrine requires Congress to supply an intelligible principle that meaningfully guides and constrains the exercise of delegated authority. *See* J.W. Hampton, Jr. & Co. *v. United States*, 276 U.S. 394, 409 (1928); *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 472–76 (2001); *FCC v. Consumers' Rsch.*, 606 U.S. 656, 673 (2025).

103. Section 338 authorizes action only upon a factual finding of discrimination against United States commerce relative to the commerce of other foreign countries

and only through duties calibrated to "offset" the resulting burden or disadvantage. 19 U.S.C. § 1338(a), (d).

104. Defendants' asserted construction of Section 338 eliminates those potential limiting principles. Under that construction, the President may select any products of a foreign country, and tax them at any rate up to 50 percent, without any calculation of the burden to be offset—and may then exclude those products from the United States entirely. And he may do so based on measures that the foreign country adopted in response to tariffs the President himself imposed.

105. Section 301, by contrast, authorizes action only in response to an identified foreign act, policy, or practice that is unreasonable or discriminatory and burdens or restricts United States commerce, 19 U.S.C. § 2411(b), and only after following the procedures, and subject to the limits, described above. Section 338, as Defendants construe it, has no comparable limits.

106. If Section 338 were construed to permit the President to impose duties of that kind, it would supply no intelligible principle constraining the exercise of Congress's power to lay duties, and would convert a narrow, fact-dependent provision into an effectively unrestricted delegation of Congress's tariff power. *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); *Pan. Ref. Co. v. Ryan*, 293 U.S. 388 (1935); *Gundy v. United States*, 588 U.S. 128, 158 (2019) (Gorsuch, J., dissenting).

107. Section 338 should be construed to avoid that serious constitutional question. But if Section 338 authorizes the challenged tariffs, then Section 338, so

construed, is an unconstitutional delegation of legislative power, and the Section 338 Tariffs must be set aside.

108. The Section 338 Tariffs directly and irreparably harm Plaintiff and the Class, who face increased costs for the goods they sell, reduced demand resulting from higher prices, and disrupted supply chains, among other threats to their livelihoods.

## Count IV

### The collection of Section 338 Tariffs on articles first enumerated in Proclamations 11064 and 11065 violated Section 338's 30-day waiting period.

109. The preceding paragraphs are incorporated herein by reference.

110. Section 338 provides that "thirty days after the date of such proclamation there shall be levied, collected, and paid upon the articles enumerated in such proclamation" the new or additional duties. 19 U.S.C. § 1338(d). Section 338 does not authorize the collection of a duty on any article before 30 days have passed from the date of the proclamation that enumerates it.

111. The President observed that requirement in the original Section 338 Proclamations, which issued on July 20, 2026, and were scheduled to take effect on August 19, 2026.

112. Proclamations 11064 and 11065, issued on September 8, 2026, enumerated articles not previously subject to the Section 338 Tariffs, including Canadian cheeses Gellert imports, and directed that duties on those articles be collected beginning September 15, 2026—only seven days later. CBP collected

Section 338 Tariffs on those articles, including from Gellert, on entries made on or after September 15, 2026, and before October 8, 2026. Gellert paid more than $381,000 in Section 338 Tariffs on such entries, and it paid no Section 338 Tariffs on its Canadian cheeses before September 15, 2026.

113. The President's authority to "supplement, or amend" a proclamation, 19 U.S.C. § 1338(c), does not dispense with the 30-day requirement for articles that a supplemental or amending proclamation enumerates for the first time. Otherwise, the President could evade the requirement entirely by proclaiming a duty on a single article and later adding others by amendment.

114. The collection of Section 338 Tariffs on articles first enumerated in Proclamations 11064 and 11065, on entries made before October 8, 2026, was therefore without statutory authority, and Gellert and the other members of the 30-Day Subclass are entitled to a refund of those duties with interest.

## Prayer for Relief

WHEREFORE, Plaintiff, on behalf of itself, the Class, and the 30-Day Subclass, respectfully requests that the Court grant the following relief:

a. Certify the Class and the 30-Day Subclass under USCIT Rule 23, appoint Plaintiff as class representative, and appoint Plaintiff's counsel as class counsel;

b. Declare that Section 338 of the Tariff Act of 1930 has been impliedly repealed or, at a minimum, that Section 301 of the Trade Act of 1974 controls the

President's authority to impose duties in response to the foreign practices at issue;

c. Declare that Section 338 does not authorize the Section 338 Tariffs;

d. Declare that, if Section 338 is construed to authorize the Section 338 Tariffs, it is an unconstitutional delegation of legislative power;

e. Declare that Defendants' collection of Section 338 Tariffs on articles first enumerated in Proclamations 11064 and 11065, on entries made before October 8, 2026, violated 19 U.S.C. § 1338(d);

f. Enjoin Defendants from enforcing or collecting duties imposed under the Section 338 Proclamations, including through liquidation of entries subject to those duties;

g. Order Defendants to refund to Plaintiff (including on entries made under Plaintiff's former name, Atalanta Corp.) and the Class all duties unlawfully collected under the Section 338 Proclamations, together with interest as provided by law, and, at a minimum, to refund to Plaintiff and the 30-Day Subclass the duties described in paragraph (e);

h. Award Plaintiff and the Class their attorneys' fees and costs under the Equal Access to Justice Act, 28 U.S.C. § 2412, and any other applicable law; and

i. Grant other relief that the Court may deem just or proper.

Dated: October 20, 2026

Respectfully submitted,

/s/ Jeffrey M. Schwab

Jeffrey M. Schwab
Reilly Stephens
Liberty Justice Center
1629 K Street N.W.
Suite 300
Washington, D.C. 20006
512-481-4400
jschwab@ljc.org
rstephens@ljc.org

*Counsel for Plaintiff Gellert Global Group Corp.*