IN THE UNITED STATES COURT
OF INTERNATIONAL TRADE

| | |
|---|---|
| GELLERT GLOBAL GROUP CORP.,<br><br>Plaintiff,<br><br>v.<br><br>DONALD J. TRUMP, *in his official capacity as President of the United States*; EXECUTIVE OFFICE OF THE PRESIDENT; the UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, *in his official capacity as Commissioner of United States Customs and Border Protection;* JAMIESON GREER, *in his official capacity as United States Trade Representative*; *and* OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE;<br><br>Defendants. | Case No. 26-cv-04636<br><br>Three-Judge Panel Requested |

**Plaintiff's Motion for Preliminary Injunction and/or Summary Judgment for Permanent Injunction**

In accordance with Rules 7 and 65 of the Rules of the United States Court of International Trade, Plaintiff Gellert Global Group Corp. moves for a preliminary injunction preventing Defendants from imposing or enforcing the tariffs imposed under Section 338 of the Tariff Act of 1930, 19 U.S.C. § 1338, by Proclamation Nos. 11046, 11047, and 11048 (July 20, 2026), 91 Fed. Reg. 46,639, 46,653, 46,663 (July 23, 2026), as suspended, modified, and supplemented by Proclamation No. 11056 (Aug. 18, 2026), 91 Fed. Reg. 54,789 (Aug. 24, 2026), and Proclamation Nos. 11064 and 11065 (Sept. 8, 2026), 91 Fed. Reg. 58,331, 58,339 (Sept. 14, 2026), modifying

the products subject to those tariffs (collectively, the "Section 338 Proclamations"). Plaintiff does not seek relief in this motion with respect to the import prohibitions imposed by Proclamation Nos. 11061, 11062, and 11063 (Sept. 8, 2026), 91 Fed. Reg. 58,311, 58,319, 58,325 (Sept. 14, 2026), which do not currently apply to products Plaintiff imports. In addition, or in the alternative, Plaintiff moves for summary judgment and requests the entry of a permanent injunction, pursuant to Rule 56 of the Rules of the United States Court of International Trade, permanently enjoining Defendants from imposing or enforcing the tariffs imposed by the Section 338 Proclamations.

Plaintiff requests that this Court issue the following relief:

(A) hold that Plaintiff:

(1) has a likelihood of success on the merits of its claims; and/or

(2) is entitled to judgment as a matter of law on its claim that Section 338 of the Tariff Act of 1930 does not authorize the President to impose the tariffs set forth in the Section 338 Proclamations, because Section 338 has been impliedly repealed or, at a minimum, is controlled by Section 301 of the Trade Act of 1974, 19 U.S.C. § 2411, and the later statutes Congress enacted on the same subject; because, in any event, Canada has not discriminated against the commerce of the United States within the meaning of Section 338 and the duties imposed do not offset any burden or disadvantage; and because any other reading of Section 338 would raise grave constitutional concerns; and, independently, on its claim that, under

19 U.S.C. § 1338(d), Defendants could not lawfully collect Section 338 duties on Plaintiff's goods first made subject to those duties by Proclamations 11064 and 11065 before October 8, 2026, 30 days after those proclamations issued;

(B) issue a preliminary injunction preventing Defendants from imposing or enforcing the tariffs set forth in the Section 338 Proclamations; and/or

(C) issue summary judgment in favor of Plaintiff and permanently enjoin Defendants from imposing or enforcing the tariffs set forth in the Section 338 Proclamations;

(D) order the refund, with interest as provided by law, of all duties paid by Plaintiff under the Section 338 Proclamations;

(E) award Plaintiff its attorneys' fees and costs, to the extent permitted by law, under the Equal Access to Justice Act, 28 U.S.C. § 2412, and any other applicable law; and

(F) grant other relief as this Court may deem just or proper.

Plaintiff seeks a preliminary injunction for the duration of this litigation, including all relevant appeals and remands, until such time as a final court decision is rendered. Plaintiff seeks to preliminarily enjoin Defendants' actions imposing and enforcing the Section 338 tariffs, which pose a threat to Plaintiff's business operations. Because the questions presented are purely legal, Plaintiff respectfully submits that the Court can and should resolve this case on summary judgment.

Plaintiff respectfully requests that this action be assigned to a three-judge panel pursuant to 28 U.S.C. § 255(a) and USCIT Rule 77(e)(2), because it challenges the lawfulness of presidential proclamations, raises an issue of the constitutionality of an Act of Congress, and has broad and significant implications for the administration and interpretation of the customs laws. Plaintiff further requests that the Court set an expedited briefing schedule and hear this motion at the earliest practicable date.

In support, Plaintiff relies upon its Complaint, the Memorandum below, the accompanying Statement of Undisputed Material Facts pursuant to USCIT Rule 56.3, and the accompanying Declaration of Thomas S. Gellert, attached as Exhibit A.

Dated: October 23, 2026

Respectfully submitted,

/s/ Jeffrey M. Schwab

Jeffrey M. Schwab
Reilly Stephens
Liberty Justice Center
1629 K Street N.W.
Suite 300
Washington, D.C. 20006
512-481-4400
jschwab@ljc.org
rstephens@ljc.org

*Counsel for Plaintiff Gellert Global Group Corp.*

IN THE UNITED STATES COURT
OF INTERNATIONAL TRADE

| | |
|---|---|
| GELLERT GLOBAL GROUP CORP.,<br><br>Plaintiff,<br><br>v.<br><br>DONALD J. TRUMP, *in his official capacity as President of the United States*; EXECUTIVE OFFICE OF THE PRESIDENT; the UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, *in his official capacity as Commissioner of United States Customs and Border Protection;* JAMIESON GREER, *in his official capacity as United States Trade Representative*; *and* OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE;<br><br>Defendants. | Case No. 26-cv-04636 |

**[Proposed] Order**

Upon consideration of Plaintiff's Motion for Preliminary Injunction and/or Summary Judgment for Permanent Injunction, and after due deliberation, it is hereby:

ORDERED that Plaintiff's Motion for Preliminary Injunction and/or Summary Judgment for Permanent Injunction is granted; and it is further

ORDERED that Defendants are enjoined [pending resolution of this matter/permanently] from imposing or enforcing the tariffs imposed by Proclamation Nos. 11046, 11047, and 11048 (July 20, 2026), 91 Fed. Reg. 46,639,

46,653, 46,663 (July 23, 2026), and all proclamations modifying, supplementing, or implementing those tariffs, including Proclamation No. 11056, 91 Fed. Reg. 54,789 (Aug. 24, 2026), and Proclamation Nos. 11064 and 11065, 91 Fed. Reg. 58,331, 58,339 (Sept. 14, 2026) (collectively, the "Section 338 Proclamations"); and it is further

ORDERED that Defendants shall refund to Plaintiff, with interest as provided by law, all duties paid by Plaintiff under the Section 338 Proclamations, including on entries made under Plaintiff's former name, Atalanta Corp., and shall reliquidate any such entries as necessary to effect that refund; and it is further

ORDERED that, independently of the preceding paragraph, Defendants shall refund to Plaintiff, with interest as provided by law, the duties Plaintiff paid under the Section 338 Proclamations on goods first made subject to those duties by Proclamation No. 11064 or 11065 and entered, or withdrawn from warehouse, for consumption before October 8, 2026, including on entries made under Plaintiff's former name, Atalanta Corp., to the extent not refunded under the preceding paragraph.

__________________________________
Judge, United States Court of International Trade

Dated: __________________
New York, New York

IN THE UNITED STATES COURT
OF INTERNATIONAL TRADE

| | |
|---|---|
| GELLERT GLOBAL GROUP CORP.,<br><br>Plaintiff,<br><br>v.<br><br>DONALD J. TRUMP, *in his official capacity as President of the United States*; EXECUTIVE OFFICE OF THE PRESIDENT; the UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, *in his official capacity as Commissioner of United States Customs and Border Protection;* JAMIESON GREER, *in his official capacity as United States Trade Representative*; *and* OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE;<br><br>Defendants. | Case No. 26-cv-04636<br><br>Three-Judge Panel Requested |

**Memorandum in Support of Plaintiff's Motion for Preliminary Injunction and/or Summary Judgment for Permanent Injunction**

## Table of Contents


Table of Authorities ........ iii

Introduction ........ 1

Facts ........ 4

I. The President turned to Section 338 after courts invalidated his IEEPA and Section 122 tariffs. ........ 4

A. The President has imposed tariffs under IEEPA, Section 122, and Section 301. ........ 4

B. Section 338, enacted in 1930, had never been used to impose a tariff. ........ 6

C. The President issued three Section 338 proclamations, which took effect on August 22, 2026. ........ 9

D. After Canada responded, the President expanded the duties and banned certain imports. ........ 13

II. The Section 338 tariffs are injuring Plaintiff. ........ 14

Legal Standard ........ 17

Summary of the Argument ........ 18

Argument ........ 20

I. The tariffs imposed by the Section 338 Proclamations exceed the President's lawful authority. ........ 20

A. Section 338 has been impliedly repealed or, at a minimum, is controlled by Section 301. ........ 21

1. A later statute displaces an earlier one that it replaces or with which it irreconcilably conflicts. ........ 21

2. Since 1930, Congress has replaced Section 338's model with a comprehensive scheme that culminates in Section 301. ........ 22

3. Section 301 and its predecessors cover the whole subject of Section 338 and were intended as its substitute. ........ 25

4. The government's reading of Section 338 cannot be reconciled with Section 301. ........ 27

5. At minimum, Section 301 controls action against the foreign practices it covers. ........ 31

B. Even if Section 338 has not been displaced, it does not authorize these tariffs. ....32

1. Canada has not discriminated against the commerce of the United States. ....32

2. The duties do not “offset” any burden or disadvantage. ....38

C. Because of their economic and political significance, this Court should not presume that Section 338 authorizes the President to impose the tariffs. ....40

D. The government’s reading of Section 338 would render it an unconstitutional delegation of legislative power. ....43

E. At a minimum, Section 338 did not permit Defendants to collect duties on Plaintiff’s cheese before October 8, 2026. ....46

II. Plaintiff will suffer irreparable harm if the Section 338 tariffs are not enjoined. ....48

III. The balance of interests weighs in favor of enjoining the Section 338 tariffs, and an injunction serves the public interest. ....50

Conclusion.... 52

## Table of Authorities

### Cases

*A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935)........................45

*Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758 (2021) .............................................. 41, 42

*Am. Signature, Inc. v. United States*, 598 F.3d 816 (Fed. Cir. 2010) ..........................50

*Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531 (1987) ............................................17

*Bartram v. Robertson*, 122 U.S. 116 (1887) ..................................................................35

*Biden v. Nebraska*, 600 U.S. 477 (2023)..........................................................................41

*Borlem S.A.-Empreedimentos Industriais v. United States*, 913 F.2d 933 (Fed. Cir. 1990) ..........................................................................................4

*Brown v. GSA*, 425 U.S. 820 (1976)...................................................................................31

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ..............................................................17

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922 (Fed. Cir. 2012) ......................48

*Confederación de Asociaciones Agrícolas del Estado de Sinaloa, A.C. v. United States*, 389 F. Supp. 3d 1386 (Ct. Int'l Trade 2019) .....................................48

*Corley v. United States*, 556 U.S. 303 (2009).................................................. 30, 37, 47

*Crowell v. Benson*, 285 U.S. 22 (1932)........................................................................ 43, 46

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006).............................................17

*Epic Sys. Corp. v. Lewis*, 584 U.S. 497 (2018) ..............................................................22

*Faber, Coe & Gregg, Inc. v. United States*, 97 F.2d 115 (C.C.P.A. 1938)....................35

*FCC v. Consumers' Rsch.*, 606 U.S. 656 (2025) ..............................................................44

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) .............................22

*Field v. Clark*, 143 U.S. 649 (1892) ....................................................................................43

*FTC v. Bunte Bros.*, 312 U.S. 349 (1941) .........................................................................27

*Gundy v. United States*, 588 U.S. 128 (2019) .................................................................44

*Harmoni Int'l Spice, Inc. v. United States*, 211 F. Supp. 3d 1298 (Ct. Int'l Trade 2017)...................................................................................................................48

*Hartranft v. Wiegmann*, 121 U.S. 609 (1887) ........................................... 20–21, 38, 47

*HMTX Indus. LLC v. United States*, 156 F.4th 1236 (Fed. Cir. 2025)..........................6

*In re Section 301 Cases*, 524 F. Supp. 3d 1355 (Ct. Int'l Trade 2021).........................51

*In re Section 301 Forced Labor Cases*, Ct. No. 26-cv-03555-3JP (Ct. Int'l Trade) .......................................................................................................................6

*Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607 (1980)..............42

*J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394 (1928) .......................... 43, 44

*Jennings v. Rodriguez*, 583 U.S. 281 (2018) ......................................................... 43, 46

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016) .....................50

*Learning Res., Inc. v. Trump*, 607 U.S. 229 (2026)...................4, 12, 18, 21, 34, 41, 51

*Maple Leaf Fish Co. v. United States*, 762 F.2d 86 (Fed. Cir. 1985) ................... 18, 40

*Morton v. Mancari*, 417 U.S. 535 (1974) ....................................................................30

*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007)..............21

*Nat'l Treasury Emps. Union v. Trump*, 780 F. Supp. 3d 237 (D.D.C. 2025) .............52

*Oregon v. United States*, Slip Op. 26-47, Nos. 26-01472-3JP, 26-01606-3JP, 2026 Ct. Int'l Trade LEXIS 57 (Ct. Int'l Trade May 7, 2026) ....................................5

*Posadas v. Nat'l City Bank*, 296 U.S. 497 (1936) ........................................... 21, 27–28

*Powers v. Barney*, 19 F. Cas. 1234 (C.C.S.D.N.Y. 1863) (No. 11,361) ........................21

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639 (2012) ....... 30, 31

*Retractable Techs., Inc. v. United States*, 739 F. Supp. 3d 1330 (Ct. Int'l Trade 2024) ........................................................................................... 17, 48, 49

*Sampson v. Murray*, 415 U.S. 61 (1974) ......................................................................48

*Silfab Solar, Inc. v. United States*, 892 F.3d 1340 (Fed. Cir. 2018) ...........................17

*Sumecht NA, Inc. v. United States*, 331 F. Supp. 3d 1408 (Ct. Int'l Trade 2018) ...............................................................................................................48

*Suntec Indus. Co. v. United States*, No. 13-00157, 2016 Ct. Int'l Trade LEXIS 40 (Ct. Int'l Trade Apr. 21, 2016) ..................................................................17

*Trump v. CASA, Inc.*, 606 U.S. 831 (2025) ...................................................................51

*United States v. Estate of Romani*, 523 U.S. 517 (1998) ..............................................22

*United States v. Fausto*, 484 U.S. 439 (1988) ....................................................... 21, 31

*United States v. Isham*, 84 U.S. (17 Wall.) 496 (1873) ........................................ 20, 47

*Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014) ............................................. 40–41

*V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025) .........................................................................................................4

*V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025)...............................4

*West Virginia v. EPA*, 597 U.S. 697 (2022)........................................................... 27, 41

*Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001)................................ 30–31, 45

*Yakus v. United States*, 321 U.S. 414 (1944) ..............................................................43

*Zenith Radio Corp. v. United States*, 710 F.2d 806 (Fed. Cir. 1983)....48

**Constitutional Provisions**

U.S. Const. art. I, § 1 .... 20, 43

U.S. Const. art. I, § 8, cls. 1, 3....1

U.S. Const. art. II, § 1, cl. 1....43

**Statutes**

19 U.S.C. § 1338....1, 7, 8, 25, 27, 33, 37, 38, 41, 42, 45, 46, 47

19 U.S.C. §§ 1671–1677n....25

19 U.S.C. § 1862....25

19 U.S.C. § 2132.... 5, 25

19 U.S.C. §§ 2251–2254....25

19 U.S.C. § 2411....2, 5, 6, 25, 26, 29, 31, 32, 33, 34, 37, 38

19 U.S.C. § 2412.... 5, 28

19 U.S.C. § 2413.... 5, 28

19 U.S.C. § 2414.... 5, 28

19 U.S.C. § 2416....29

19 U.S.C. § 2417....29

19 U.S.C. § 2461....37

19 U.S.C. § 2701....37

19 U.S.C. § 4511....36

28 U.S.C. § 1581.... 18, 47, 51

28 U.S.C. § 1585....51

28 U.S.C. § 2643.... 47, 51

44 U.S.C. § 1507....4

50 U.S.C. § 1701....4

**Session Laws**

Tariff Act of 1922, ch. 356, § 317, 42 Stat. 858.... 6, 7, 35

Tariff Act of 1930, ch. 497, 46 Stat. 590.... 7, 22, 35

Reciprocal Trade Agreements Act of 1934, ch. 474, 48 Stat. 943 .................... 1, 22, 23

Trade Expansion Act of 1962, Pub. L. No. 87-794, 76 Stat. 872.................... 12, 23, 24

Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. 1978.................................. 1, 5, 8, 24

Trade Agreements Act of 1979, Pub. L. No. 96-39, 93 Stat. 144 ...............................24

Trade and Tariff Act of 1984, Pub. L. No. 98-573, 98 Stat. 2948 ..............................24

United States-Canada Free-Trade Agreement Implementation Act of 1988, Pub. L. No. 100-449, 102 Stat. 1851 .........................................................................27

Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, 102 Stat. 1107 ..............................................................................................................25

North American Free Trade Agreement Implementation Act, Pub. L. No. 103-182, 107 Stat. 2057 (1993).........................................................................27

Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994) .........25

United States-Mexico-Canada Agreement Implementation Act, Pub. L. No. 116-113, 134 Stat. 11 (2020)................................. 9, 10, 11, 12, 15, 19, 27, 30, 36, 37

**Presidential Documents**

Exec. Order No. 14193, 90 Fed. Reg. 9,113 (Feb. 7, 2025) .................................... 4, 11

Exec. Order No. 14194, 90 Fed. Reg. 9,117 (Feb. 7, 2025) ..........................................4

Exec. Order No. 14195, 90 Fed. Reg. 9,121 (Feb. 7, 2025) ..........................................4

Exec. Order No. 14197, 90 Fed. Reg. 9,183 (Feb. 10, 2025) .......................................11

Exec. Order No. 14257, 90 Fed. Reg. 15,041 (Apr. 7, 2025) .........................................4

Proclamation No. 10908, 90 Fed. Reg. 14,705 (Mar. 31, 2025)..................................12

Proclamation No. 11012, 91 Fed. Reg. 9,339 (Feb. 25, 2026).......................................5

Proclamation No. 11046, 91 Fed. Reg. 46,639 (July 23, 2026) .........................................................9, 11, 13, 16, 34, 38, 39, 46

Proclamation No. 11047, 91 Fed. Reg. 46,653 (July 23, 2026) ..................................................... 3, 9, 13, 14, 26, 36, 37, 39, 46

Proclamation No. 11048, 91 Fed. Reg. 46,663 (July 23, 2026).............9, 12, 16, 39, 46

Proclamation No. 11056, 91 Fed. Reg. 54,789 (Aug. 24, 2026) ..................................12

Proclamation No. 11061, 91 Fed. Reg. 58,311 (Sept. 14, 2026) ...................... 13, 34, 49

Proclamation No. 11062, 91 Fed. Reg. 58,319 (Sept. 14, 2026) ............... 12–13, 40, 49

Proclamation No. 11063, 91 Fed. Reg. 58,325 (Sept. 14, 2026) ........................... 13, 49

Proclamation No. 11064, 91 Fed. Reg. 58,331 (Sept. 14, 2026) ....13, 14, 16, 39, 46–47

Proclamation No. 11065, 91 Fed. Reg. 58,339 (Sept. 14, 2026) ....13, 14, 16, 39, 46–47

**Administrative Materials**

Notice of Actions in Section 301 Investigations of Acts, Policies, and Practices of Various Economies Related to the Failure of Each Economy to Impose and Effectively Enforce a Prohibition on the Importation of Goods Produced with Forced Labor, 91 Fed. Reg. 47,318 (July 28, 2026) ........................5–6

**Rules**

Fed. R. Evid. 201 ........................................................................................................4

USCIT R. 56........................................................................................................ 4, 17

USCIT R. 65........................................................................................................52

**Other Authorities**

*Canada—Dairy TRQ Allocation Measures*, No. CDA-USA-2021-31-01, Final Report (Dec. 20, 2021)........................................................................................11

*Canada—Dairy Tariff-Rate Quota Allocation Measures 2023*, No. CDA-USA-2023-31-01, Final Report (Nov. 10, 2023) ..................................................11

Christopher T. Zirpoli, Cong. Rsch. Serv., R48435, *Congressional and Presidential Authority to Impose Import Tariffs* (updated Mar. 19, 2026)............8–9

Convention of Commercial Reciprocity, U.S.-Cuba, Dec. 11, 1902, 33 Stat. 2136 ........................................................................................................35

Douglas A. Irwin, *Peddling Protectionism: Smoot-Hawley and the Great Depression* (2011) ........................................................................................7

General Agreement on Tariffs and Trade, Oct. 30, 1947, 61 Stat. A-11, 55 U.N.T.S. 194.............................................................................. 27, 34–35

Harmonized Tariff Schedule of the United States, ch. 99, subch. III, U.S. note 51 ........................................................................... 10, 14, 16, 39

Kyla H. Kitamura, Cong. Rsch. Serv., R49349, *U.S. Tariffs on Canadian Imports: Section 338 of the Tariff Act of 1930* (Sept. 14, 2026)...................... 9, 12, 13

Press Release, Off. of the U.S. Trade Representative, USMCA Panel Releases Canada Dairy Report; Biden-Harris Administration Will Continue Seeking Full USMCA Benefits for U.S. Dairy (Nov. 24, 2023) ................11

Press Release, Off. of the U.S. Trade Representative, *USTR Takes Action in Forced Labor Section 301 Investigations* (July 23, 2026) ...........................................5

Protocol of Provisional Application, Oct. 30, 1947, 61 Stat. A-2051, 55 U.N.T.S. 308.................................................................................. 26–27

Regulatory Impact Analysis Statement, United States Surtax Order (2026), SOR/2026-186, C. Gaz. pt. II, vol. 160, no. 19 (Sept. 23, 2026) (Can.) ............. 12, 13

Regulatory Impact Analysis Statement, United States Surtax Order (Motor Vehicles 2025), SOR/2025-118, C. Gaz. pt. II, vol. 159, no. 9 (Apr. 23, 2025) (Can.) ..........12

S. Rep. No. 93-1298 (1974) ..........24

Treaty of Friendship, Commerce and Consular Rights, U.S.-Ger., Dec. 8, 1923, 44 Stat. 2132..........35

U.S. Tariff Comm'n, 20th Ann. Rep. (1936)..........23

U.S. Tariff Comm'n, 25th Ann. Rep. (1941)..........6–7

*Webster's Revised Unabridged Dictionary (1913)* ..........38

## Introduction

On July 20, 2026, the President did something no President had done in the 96 years since the Smoot-Hawley Tariff Act became law: he invoked Section 338 of that Act, 19 U.S.C. § 1338, to impose tariffs. In three proclamations directed at Canadian dairy products, alcoholic beverages, and motor vehicles, he imposed 50 percent duties on Canadian products, and less than two months later he banned the importation of some of those products altogether.

This is the third time in 18 months that the President has reached for a statute no President had ever used to impose tariffs. First, the President attempted to impose worldwide tariffs under the International Emergency Economic Powers Act of 1977 (IEEPA), which this Court and the Supreme Court found unlawful. Then he attempted tariffs under Section 122 of the Trade Act of 1974, which this Court likewise held were unlawful. Now the President attempts to impose tariffs on Canada up to 50 percent under Section 338—the oldest of the three—which had never once been used to impose a tariff. Each time, the President has claimed to discover in a decades-old statute the power the Constitution gives to Congress: to "lay and collect . . . Duties" and "[t]o regulate Commerce with foreign Nations." U.S. Const. art. I, § 8, cls. 1, 3.

Section 338 cannot bear that weight either. It is a relic of the retaliation-based tariff policy that Congress abandoned four years after Smoot-Hawley became law. Beginning with the Reciprocal Trade Agreements Act of 1934 and culminating in Section 301 of the Trade Act of 1974, Congress built a new, comprehensive scheme for responding to foreign discrimination against American commerce. Section 301

expressly covers foreign practices that are "discriminatory," including the denial of "most-favored-nation treatment to United States goods." 19 U.S.C. § 2411(b), (d)(5). But unlike Section 338, Section 301 requires investigations, consultations, public comment, deadlines, action "equivalent in value to the burden or restriction" imposed on U.S. commerce, a preference for duties over import bans, and periodic review. The government's reading would render every one of those limits irrelevant. Congress did not enact Section 301, and amend it four times, to create a scheme the President could ignore at will. Section 338 has been impliedly repealed or, at a minimum, is controlled by Section 301 where, as here, the President targets conduct that Section 301 governs.

Even if Section 338 survived later congressional action, it does not authorize these tariffs. Section 338 reaches foreign "discrimination" against the commerce of the United States. The alcohol and motor vehicle proclamations target Canadian measures that were themselves responses to American tariffs, including tariffs the Supreme Court has held unlawful. Retaliation is not discrimination. And Canada's dairy policy does not single out the United States: American cheese enters Canada on terms better than most of the world receives, under a tariff-rate quota the United States itself negotiated. The President's theory is that because Canada gives the European Union a different preference under a different agreement, Canada "discriminates" against the United States. But the Congress that enacted Section 338 did not regard every reciprocal preference as discrimination; the same Act protected the United States' own exclusive preference for Cuba. Nor is Canada's

rule "unreasonable": a trade-agreement panel found it "not inconsistent with" the agreement the United States negotiated. And Section 338 authorizes only duties that "offset" a burden. The President never tied the 50 percent rate to any measured burden, and he announced that the duties would "expand opportunities for U.S. producers to compete within the U.S. market" and "spur Canada" to change its policy. Proclamation No. 11047 ¶ 7. He has since taxed Canadian cheese, including the cheese Plaintiff imports, to "offset" Canadian liquor policies and a Canadian surtax on automobiles. That is protection and leverage, not an offset.

Finally, the government's reading would give the President power to impose 50 percent tariffs—and then total bans—on the goods of virtually any country, indefinitely. Courts should not presume Congress hid such a power in a long-dormant statute, and if Congress had granted it, the delegation would be unconstitutional.

Plaintiff Gellert Global Group Corp., a century-old food importer that has paid more than $520,000 in Section 338 duties on just 22 entries of Canadian cheese, respectfully asks this Court to enjoin the Section 338 tariffs and, because the questions presented are purely legal, to do so on summary judgment.

## Facts[1]

### I. The President turned to Section 338 after courts invalidated his IEEPA and Section 122 tariffs.

#### A. The President has imposed tariffs under IEEPA, Section 122, and Section 301.

In 2025, the President invoked IEEPA, 50 U.S.C. § 1701 *et seq.*, to impose tariffs on Canada, Mexico, and China, Exec. Order Nos. 14193, 14194, 14195, 90 Fed. Reg. 9,113, 9,117, 9,121 (Feb. 7, 2025), and then on nearly every country in the world, Exec. Order No. 14257, 90 Fed. Reg. 15,041 (Apr. 7, 2025). This Court held those tariffs unlawful, *V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350, 1370 (Ct. Int'l Trade 2025), *aff'd in part, vacated in part, and remanded sub nom. V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025) (en banc), *aff'd sub nom. Learning Res., Inc. v. Trump*, 607 U.S. 229 (2026). On February 20, 2026, the Supreme Court agreed, holding that IEEPA does not authorize the President to impose tariffs. *Learning Res.*, 607 U.S. at 255. As the Court explained, "[w]hen Congress grants the power to impose tariffs, it does so clearly and with careful constraints." *Id.* at 251.

---

[1] The facts set forth in this section are not likely to be disputed and thus serve as a basis for Plaintiff's motion for preliminary injunction, as well as its motion for summary judgment. The historical and legislative facts are drawn from the Statutes at Large, the United States Code, and official government publications, and the Court may take judicial notice of the proclamations, Federal Register notices, and official government publications cited herein. *See* Fed. R. Evid. 201(b); 44 U.S.C. § 1507; *Borlem S.A.-Empreedimentos Industriais v. United States*, 913 F.2d 933, 940 (Fed. Cir. 1990) (affirming judicial notice of an agency determination "published in the Federal Register"). These facts are also set forth, with record citations, in Plaintiff's Statement of Undisputed Material Facts pursuant to USCIT Rule 56.3.

The same day, the President imposed a 10 percent global surcharge under Section 122 of the Trade Act of 1974, 19 U.S.C. § 2132, which no President had ever invoked. Proclamation No. 11012, 91 Fed. Reg. 9,339 (Feb. 25, 2026). This Court held those tariffs unlawful as well. *Oregon v. United States*, Slip Op. 26-47, Nos. 26-01472-3JP, 26-01606-3JP, 2026 Ct. Int'l Trade LEXIS 57, at *49–52 (Ct. Int'l Trade May 7, 2026), *appeal docketed*, No. 2026-1804 (Fed. Cir. May 8, 2026).

Section 301 of the Trade Act of 1974 authorizes the Trade Representative, after an investigation, consultation with the foreign country, and an opportunity for public comment, to impose duties on the goods of a country whose acts, policies, or practices are unreasonable or discriminatory and burden or restrict United States commerce. 19 U.S.C. §§ 2411–2414. The Administration has used Section 301, including against Canada. At the President's direction, on March 12, 2026, the Trade Representative initiated Section 301 investigations of 60 economies, including Canada, concerning their failure to prohibit imports of goods made with forced labor. Press Release, Off. of the U.S. Trade Representative, *USTR Takes Action in Forced Labor Section 301 Investigations* (July 23, 2026). The Trade Representative held public hearings, consulted with more than 45 of the investigated governments, determined on June 2, 2026, that the practices were actionable under Section 301(b), received more than 1,600 written comments on the proposed action, and heard testimony from more than 100 witnesses. *Id.*; Notice of Actions in Section 301 Investigations of Acts, Policies, and Practices of Various Economies Related to the Failure of Each Economy to Impose and Effectively

Enforce a Prohibition on the Importation of Goods Produced with Forced Labor, 91 Fed. Reg. 47,318 (July 28, 2026). On July 23, 2026, three days after the President issued the original three Section 338 Proclamations, the Trade Representative imposed a 10 percent Section 301 duty, subject to certain exceptions, on products of Canada. 91 Fed. Reg. at 47,319–20, 47,322.[2] The President also used Section 301 in his first term to impose duties on a broad range of Chinese goods. *See HMTX Indus. LLC v. United States*, 156 F.4th 1236 (Fed. Cir. 2025), cert. denied, No. 25-1012 (U.S. June 15, 2026).

### B. Section 338, enacted in 1930, had never been used to impose a tariff.

Section 338 traces to Section 317 of the Fordney-McCumber Tariff Act of 1922. Act of Sept. 21, 1922, ch. 356, tit. III, § 317, 42 Stat. 858, 944–46. Section 317 authorized the President, upon finding that a foreign country discriminated against the commerce of the United States, to impose additional duties to "offset" the burden or disadvantage, up to 50 percent ad valorem, and to exclude the country's products if the discrimination continued. *Id.* No President ever imposed a duty under Section 317. *See* U.S. Tariff Comm'n, 25th Ann. Rep. 44 (1941) (since 1922,

[2] The Section 301 action is the subject of separate challenges in this Court. *In re Section 301 Forced Labor Cases*, Ct. No. 26-cv-03555-3JP (Ct. Int'l Trade). The plaintiffs in those cases do not contend that Section 301 confers no tariff authority, but that the Trade Representative used it as a pretext to reimpose near-worldwide tariffs without making the country-by-country findings Section 301 requires. *See* 19 U.S.C. § 2411(b). This Court heard argument on September 30, 2026, and a decision is pending.

"no action by this Government against foreign discrimination under this law has been carried as far as the imposition of penalty duties").[3]

Eight years later, Congress enacted the Tariff Act of 1930, known as the Smoot-Hawley Tariff Act, which imposed some of the largest duties in American history and provoked retaliation from America's trading partners, including Canada. Act of June 17, 1930, ch. 497, 46 Stat. 590; *see generally* Douglas A. Irwin, *Peddling Protectionism: Smoot-Hawley and the Great Depression* (2011). Section 338 re-enacted Section 317 in substantially identical terms, and Section 317 was repealed. 46 Stat. 704; *see* 19 U.S.C. § 1338 (Prior Provisions note).

Section 338 provides that the President "shall by proclamation specify and declare new or additional duties" on the products of a foreign country "whenever he shall find as a fact" that the country either:

> (1) Imposes, directly or indirectly, upon the disposition in or transportation in transit through or reexportation from such country of any article wholly or in part the growth or product of the United States any unreasonable charge, exaction, regulation, or limitation which is not equally enforced upon the like articles of every foreign country; or
>
> (2) Discriminates in fact against the commerce of the United States, directly or indirectly, by law or administrative regulation or practice, by or in respect to any customs, tonnage, or port duty, fee, charge, exaction, classification, regulation, condition, restriction, or prohibition, in such manner as to place the commerce of the United States at a disadvantage compared with the commerce of any foreign country.

---

[3] https://www.usitc.gov/publications/year_in_review/fy_1941_annual_report.pdf.

19 U.S.C. § 1338(a). The amount of the duty is governed by subsection (d): when the President finds that a foreign country "places any burden or disadvantage upon the commerce of the United States by any of the unequal impositions or discriminations aforesaid," he shall "specify and declare such new or additional rate or rates of duty as he shall determine will offset such burden or disadvantage, not to exceed 50 per centum ad valorem or its equivalent." *Id.* § 1338(d). Subsection (d) also fixes when those duties may be collected: "thirty days after the date of such proclamation there shall be levied, collected, and paid upon the articles enumerated in such proclamation" the new or additional duties. *Id.* If the country "maintain[s] or increase[s] its said discriminations" after a proclamation, the President may exclude its products from the United States entirely. *Id.* § 1338(b). The President may "suspend, revoke, supplement, or amend any such proclamation" whenever "he deems the public interests require." *Id.* § 1338(c). And it is the duty of the Tariff Commission to keep informed of foreign discrimination and to bring it to the President's attention with recommendations. *Id.* § 1338(g). Congress renamed the "Tariff Commission" the "United States International Trade Commission" in 1974. Trade Act of 1974, Pub. L. No. 93-618, § 171, 88 Stat. 1978, 2009.

Section 338 has never been amended. *See* 19 U.S.C. § 1338 (source credit listing only the 1930 enactment). Nothing in Section 338 reflects anything Congress has done in trade policy since 1930. And from 1930 until July 2026, no President invoked Section 338 to impose a duty. *See* Christopher T. Zirpoli, Cong. Rsch. Serv., R48435, *Congressional and Presidential Authority to Impose Import Tariffs* 24

(updated Mar. 19, 2026)[4] ("As of the time of this writing, the United States has never imposed tariffs under Section 338 . . . ."); Kyla H. Kitamura, Cong. Rsch. Serv., R49349, *U.S. Tariffs on Canadian Imports: Section 338 of the Tariff Act of 1930*, at 1 (Sept. 14, 2026)[5] (describing the July 2026 proclamations as "the first time a President has expressly cited this statute to impose tariffs").

### C. The President issued three Section 338 proclamations, which took effect on August 22, 2026.

On July 20, 2026, the President issued three proclamations invoking Section 338, each imposing an additional 50 percent ad valorem duty, the statutory maximum, on certain products of Canada: Proclamation 11046, with respect to alcoholic beverages; Proclamation 11047, with respect to dairy; and Proclamation 11048, with respect to motor vehicles. 91 Fed. Reg. 46,639, 46,653, 46,663 (July 23, 2026). Each was scheduled to take effect on August 19, 2026, 30 days later.

Proclamation 11047, the dairy proclamation, identifies a single Canadian practice as the "discrimination" it targets. Canada maintains a tariff-rate quota (TRQ) for cheeses of all types under the United States-Mexico-Canada Agreement (USMCA), and a separate TRQ for cheeses under the Canada-European Union Comprehensive Economic and Trade Agreement (CETA). Proclamation No. 11047 ¶ 3. Both TRQs "provide duty-free access for the covered dairy products up to specified annual quantities." *Id.* The President's complaint is about who may hold the quota allocations: "[w]hile Canada's eligibility criteria for the USMCA dairy

---

[4] https://www.congress.gov/crs_external_products/R/PDF/R48435/R48435.5.pdf.
[5] https://www.congress.gov/crs_external_products/R/PDF/R49349/R49349.2.pdf.

TRQs . . . do not allow retailers to obtain and use TRQ quantities, the eligibility criteria for the CETA do grant retailers access to the TRQ quantity for cheese of all types." *Id.* ¶ 4. On that basis, the President "f[ou]nd as a fact that Canada is discriminating in fact against the commerce of the United States," that the discrimination "places the commerce of the United States at a disadvantage compared to the commerce of the EU and its member States," and that Canada's imposition "is unreasonable, is not equally enforced upon the like articles of every foreign country, and places a burden on the commerce of the United States." *Id.* ¶ 6.

The proclamation does not quantify the burden, nor state how much American cheese was excluded from Canada because of the retailer-eligibility rule, what share of the USMCA quota went unfilled, or what sales American producers lost. Instead, it explains the purpose of the duties this way: "Imposing additional duties on certain products of Canada will, among other things, expand opportunities for U.S. producers to compete within the U.S. market, enhancing American production and bringing attendant economic and societal benefits, and may spur Canada to remove the discrimination against U.S. cheeses of all types." *Id.* ¶ 7. The President then imposed the maximum duty of 50 percent on the products listed in Annex II and declared, without explanation, that the duties "will offset the burden or disadvantage on U.S. commerce." *Id.* ¶ 8. The products listed in Annex II include products such as whey, lactose, sugar syrups, molasses, and hops. *See* Harmonized Tariff Schedule of the United States (HTSUS) ch. 99, subch. III, U.S. note 51(b)(2); HTSUS heading 9903.03.13.

The retailer-eligibility rule the President now calls "discrimination" has already been adjudicated under procedures the United States itself agreed to. In 2021, a USMCA panel found that Canada's practice of reserving TRQ allocations for processors was inconsistent with the agreement. *Canada—Dairy TRQ Allocation Measures*, No. CDA-USA-2021-31-01, Final Report (Dec. 20, 2021). When Canada revised its measures, the United States challenged them again, arguing that retailers must be eligible. A second panel rejected that claim, holding that the agreement's eligibility provision "is merely the floor of eligibility" and that Canada's treatment of retailers and other types of applicants is not inconsistent with the agreement. *Canada—Dairy Tariff-Rate Quota Allocation Measures 2023*, No. CDA-USA-2023-31-01, Final Report ¶ 90 (Nov. 10, 2023). The Trade Representative acknowledged that "[u]nder the USMCA, the report of the panel is now final." Press Release, Off. of the U.S. Trade Representative, *USMCA Panel Releases Canada Dairy Report; Biden-Harris Administration Will Continue Seeking Full USMCA Benefits for U.S. Dairy* (Nov. 24, 2023).

The other two proclamations target Canadian measures that were responses to American tariffs. Proclamation 11046 targets the removal of American alcoholic beverages from the shelves of Canadian provincial liquor authorities. Proclamation No. 11046 ¶ 4. The proclamation itself dates those measures to March 4, 2025, *id.*, the day the President's IEEPA tariffs on Canadian goods took effect, *see* Exec. Order No. 14193, 90 Fed. Reg. 9,113 (Feb. 7, 2025), *as amended by* Exec. Order No. 14197 § 3(a), 90 Fed. Reg. 9,183, 9,183 (Feb. 10, 2025), tariffs the Supreme Court has since

held unlawful, *Learning Res.*, 607 U.S. at 255. The Government of Canada has said that those restrictions were "implemented in response to the unjustified U.S. tariffs implemented in 2025." Regulatory Impact Analysis Statement, United States Surtax Order (2026), SOR/2026-186, C. Gaz. pt. II, vol. 160, no. 19 (Sept. 23, 2026) (Can.)[6] (hereinafter "2026 Surtax Order RIAS"). Proclamation 11048 targets Canada's "United States Surtax Order (Motor Vehicles 2025)," which has applied since April 9, 2025, to U.S.-origin vehicles that do not meet USMCA rules of origin, and to the non-Canadian, non-Mexican content of those that do. Proclamation No. 11048 ¶¶ 2–3, 5; Kitamura, *supra*, at 6. Canada adopted that surtax in response to the 25 percent tariffs the President imposed on imported automobiles, including Canadian automobiles, under Section 232 of the Trade Expansion Act of 1962. *See* Proclamation No. 10908, 90 Fed. Reg. 14,705 (Mar. 31, 2025); Regulatory Impact Analysis Statement, United States Surtax Order (Motor Vehicles 2025), SOR/2025-118, C. Gaz. pt. II, vol. 159, no. 9 (Apr. 23, 2025) (Can.)[7] ("The objective of Canada's tariffs is to mirror U.S. trade actions on vehicles . . . ."). Neither proclamation acknowledges why Canada acted.

On August 18, 2026, the day before the duties were to take effect, the President temporarily suspended them for three days after Canada "expressed a commitment to remove the discrimination or unreasonable and unequal imposition." Proclamation No. 11056, 91 Fed. Reg. 54,789 (Aug. 24, 2026); *see* Proclamation No.

---

[6] https://gazette.gc.ca/rp-pr/p2/2026/2026-09-23/html/sor-dors186-eng.html.
[7] https://gazette.gc.ca/rp-pr/p2/2025/2025-04-23/html/sor-dors118-eng.html.

11062 ¶ 2, 91 Fed. Reg. 58,319, 58,320 (Sept. 14, 2026). According to the President, on August 21, 2026, Canada "reneged on its commitment, ceased negotiating in good faith, and did not remove the discrimination." Proclamation No. 11062 ¶ 3. The suspension lapsed, and the 50 percent duties took effect at 12:01 a.m. eastern time on August 22, 2026. *Id.* ¶ 4.

### D. After Canada responded, the President expanded the duties and banned certain imports.

Canada responded with counter-tariffs on approximately C$27.6 billion (US$20 billion) of U.S.-origin goods, effective September 8, 2026. Kitamura, *supra*, at 1; 2026 Surtax Order RIAS, *supra*. Saskatchewan had already imposed a 50 percent levy on American alcohol on August 27, 2026, a levy the President himself describes as imposed "expressly in response to" Proclamation 11046. Proclamation No. 11061 ¶ 5, 91 Fed. Reg. 58,311 (Sept. 14, 2026). On September 8, the President escalated again. He issued two proclamations modifying the scope of products subject to the Section 338 duties, effective September 15, 2026, seven days later. Proclamation Nos. 11064, 11065, 91 Fed. Reg. 58,331, 58,339 (Sept. 14, 2026). He also issued three proclamations invoking Section 338(b) to ban the importation of certain Canadian products altogether, effective September 29, 2026. Proclamation Nos. 11061, 11062, 11063, 91 Fed. Reg. 58,311, 58,319, 58,325 (Sept. 14, 2026). The dairy ban rests on the President's finding that Canada "maintained the discriminations" identified in Proclamation 11047. Proclamation No. 11062 ¶ 6, 91 Fed. Reg. at 58,320. The ban proclamation also provides that if the ban is invalidated, the 50

percent duty will apply instead. *Id.* cl. 9(b). The President thus treats duties and outright prohibitions as interchangeable penalties for the same alleged conduct.

The September 8 scope proclamations added cheese to the duties imposed under the alcohol and motor vehicle proclamations. Proclamation No. 11064 extended the alcohol duties to nearly every category of cheese in the tariff schedule: fresh cheese; grated, powdered, and processed cheese; blue-veined cheese and Roquefort; cheddar; Edam and Gouda; Swiss, Emmentaler, and Gruyère-process cheese; Romano, Reggiano, Parmesan, and Provolone; sheep's milk cheese; and other cheese made from cow's milk. Proclamation No. 11064, Annex I, Part A. It also reached hides, upholstery leather, furskins, and motorboats. *Id.* Proclamation No. 11065 extended the motor vehicle duties to cheese classified in HTSUS subheading 0406.90.99. Proclamation No. 11065, Annex I, Part A. It also reached furniture, lamps, golf carts, and paper. Proclamation No. 11065, Annex I, Part A. Canadian cheese is thus taxed to "offset" Canadian measures concerning liquor and automobiles. Meanwhile, the dairy proclamation, the only one directed at a Canadian policy concerning cheese, does not reach cheese at all. *See* Proclamation No. 11047, Annex II.

The Section 338 duties remain in effect, with no stated end date.

## II. The Section 338 tariffs are injuring Plaintiff.

Plaintiff Gellert Global Group Corp. is a New York corporation headquartered in Elizabeth, New Jersey, co-led by Thomas S. Gellert and Andrew Gellert. Decl. of Thomas S. Gellert ("Gellert Decl.") ¶ 2, Ex. A. Gellert comprises many of North America's leading food-importing companies, has been importing food products for

over 100 years, employs more than 700 people across the United States, and generates over $1.7 billion in annual revenue. *Id.* ¶¶ 2–3.

Gellert sources many items from Canada and is the importer of record for all its Canadian products. *Id.* ¶ 4. Gellert changed its name from Atalanta Corp. in 2025, and its import records still identify the importer of record as Atalanta Corp. *Id.* One of its significant Canadian products is cheese, in more than 15 product lines, including sheep's milk cheese, mascarpone, borgonzola, chèvre-style goat's milk cheese, brie, and camembert. *Id.* In 2025, Gellert imported roughly $71 million worth of Canadian cheese. *Id.* ¶ 5. Gellert sources these cheeses from leading producers in Ontario with whom it has partnered for more than 25 years, relationships that have been instrumental in developing these product lines in the U.S. market and establishing customer loyalty. *Id.* ¶ 6. Given these longstanding supplier relationships, customer trust, and established market position, Gellert's goat's milk cheese and brie cannot simply be replaced with U.S.-produced alternatives without significant disruption to customers and the supply chain. *Id.* ¶ 7. For goat's milk cheese in particular, U.S. consumer demand far exceeds domestic goat's milk production; Gellert's Canadian imports complement rather than displace domestic production. *Id.* ¶ 8. Domestically produced options are not readily available in the quantities U.S. consumers demand. *Id.* ¶ 15.

Under the USMCA, Gellert's imports of Canadian cheese have historically been duty-free. *Id.* ¶ 9. Under the Section 338 tariffs, Gellert now pays a duty equal to 50 percent of the entered value of its Canadian cheese, an estimated $40 million per

year. *Id.* Gellert pays Section 338 duties on its Canadian cheeses under two headings. Its sheep's milk cheese, mascarpone, and borgonzola are assessed duties under heading 9903.03.12, which implements Proclamation 11046, the alcohol proclamation, as modified by Proclamation 11064. *Id.* ¶¶ 4, 10; *see* HTSUS ch. 99, subch. III, U.S. note 51(b)(1). Its goat's milk cheese, brie, and camembert are assessed duties under heading 9903.03.14, which implements Proclamation 11048, the motor vehicle proclamation, as modified by Proclamation 11065. *Id.* ¶¶ 4, 10; *see* HTSUS ch. 99, subch. III, U.S. note 51(b)(3).

On September 28, 2026, for example, Gellert entered a shipment of goat's milk cheese with an entered value of $120,288 and paid $60,144.50 in Section 338 duties; on October 5, 2026, it paid $33,411.50 in Section 338 duties on a shipment of borgonzola, brie, and camembert with an entered value of $66,822. *Id.* ¶ 10. On just 22 entries of Canadian cheese made between September 16 and October 11, 2026, Gellert paid more than $520,000 in Section 338 duties, including more than $381,000 on entries made through October 7, 2026, before the 30-day period in Section 338(d) had run. *Id.* Gellert's cheeses enter the United States regularly through Alexandria Bay, New York; Champlain, New York; and Detroit, Michigan, and Gellert will continue to pay Section 338 duties as each shipment arrives. *Id.* ¶ 11.

The harm extends beyond the duties. Absorbing them, which is not sustainable, has forced Gellert to delay hiring and investment, strained its working capital, and dramatically reduced its margins. *Id.* ¶ 12. If the tariffs continue, Gellert will be

forced to raise prices, risking lost sales, customer loyalty, and lost product placements, and will face supply-chain interruptions as its producers scale down or close. *Id.* ¶ 13. The tariffs harm American producers too: Gellert's Ontario brie supplier uses milk from upstate New York dairies. *Id.* ¶ 14.

Gellert's business has already suffered lost profits, higher landed costs, and cash-flow strain; if the tariffs continue, it faces supply-chain uncertainty, lost customers, and the loss of decades-long partnerships. *Id.* ¶ 17.

## Legal Standard

To obtain injunctive relief a party must demonstrate: "(1) likelihood of success on the merits, (2) irreparable harm absent immediate relief, (3) the balance of interests weighing in favor of relief, and (4) that the injunction serves the public interest." *Retractable Techs., Inc. v. United States*, 739 F. Supp. 3d 1330, 1336–37 (Ct. Int'l Trade 2024) (quoting *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1345 (Fed. Cir. 2018)).

The standard for a permanent injunction is essentially the same, except that the movant must show actual success on the merits rather than a likelihood of success. *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 n.12 (1987); *see eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

Summary judgment is appropriate where there are no material facts in dispute and the case hinges on pure questions of law. *Suntec Indus. Co. v. United States*, No. 13-00157, 2016 Ct. Int'l Trade LEXIS 40, at *4 (Ct. Int'l Trade Apr. 21, 2016) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *see also* USCIT R. 56(a).

This case presents only questions of law: whether Section 338 remains a valid source of tariff authority; if so, whether it authorizes the tariffs the President imposed; and whether Defendants could collect those tariffs on Plaintiff's cheese before October 8, 2026. This Court has exclusive jurisdiction over those questions under 28 U.S.C. § 1581(i), *see Learning Res.*, 607 U.S. at 240 n.1, and it may review whether the President's action rests on "a clear misconstruction of the governing statute, a significant procedural violation, or action outside [his] delegated authority." *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985).

**Summary of the Argument**

Once again, this Court is asked to rule on this Administration's imposition of tariffs based on dubious statutory authority. Having lost under IEEPA and Section 122, the President turned to a 96-year-old provision of the Smoot-Hawley Tariff Act that no President had ever used to impose a tariff. Section 338 does not license these tariffs either. And even if it did, Defendants began collecting the duties on Plaintiff's cheese before the statute allowed.

*First*, Section 338 has been impliedly repealed or, at a minimum, is controlled by Section 301. Since 1930, Congress has enacted a series of statutes that cover the whole subject of Section 338, foreign discrimination against American commerce, and that were plainly intended as substitutes for it. Most importantly, the government's reading of Section 338 cannot be reconciled with Section 301, which covers the same conduct but subjects any response to investigations, consultations, public comment, deadlines, an equivalence requirement, a preference for duties over

bans, and periodic review. Section 301 even addresses what happens when a trade-agreement panel rules against the United States, as a USMCA panel did on the very Canadian rule at issue here. If the President can impose the same or greater penalties for the same conduct under Section 338, free of those limits, Section 301's limits mean nothing.

*Second*, even if Section 338 survives, it does not authorize these tariffs. Section 338 reaches foreign measures that single out the United States for disfavored treatment. The alcohol and motor vehicle proclamations target Canadian responses to American tariffs, and retaliation is not discrimination. As for dairy, Canada treats American cheese better than the cheese of most of the world and gives the European Union a different preference under a different reciprocal agreement. The Congress that enacted Section 338 did not regard every such preference as discrimination; the same Act protected America's own exclusive preference for Cuba. Nor is a rule that a trade-agreement panel found consistent with the USMCA "unreasonable." And Section 338(d) authorizes only duties that "offset" a burden. The President never tied the maximum rate to any measured burden and announced protective and coercive purposes. That is not an offset, and neither is a duty on Plaintiff's cheese imposed to "offset" a surtax on cars.

*Third*, because the government reads Section 338 to confer a power of vast economic and political significance, the power to impose 50 percent tariffs and import bans on the goods of virtually any country, indefinitely, the Court should not presume that Congress granted it absent clear authorization, which is lacking.

*Fourth*, if Section 338 did confer that power, it would be an unconstitutional delegation of legislative power: under the government's reading, the statute's only limits, "discrimination" and "offset," limit nothing at all. *Fifth*, Section 338(d) bars the collection of duties until 30 days after the proclamation that declares them. The proclamations that first subjected Plaintiff's cheese to Section 338 duties took effect after only seven days, so Plaintiff is entitled to a refund of the duties it paid on entries made before October 8, 2026.

Plaintiff is suffering irreparable harm, the balance of interests tips sharply in its favor, and an injunction serves the public interest. This Court should enjoin the Section 338 tariffs and, because the issues are purely legal, should do so by entering summary judgment and a permanent injunction.

## Argument

### I. The tariffs imposed by the Section 338 Proclamations exceed the President's lawful authority.

Under the Constitution, Congress holds the powers to "lay and collect Taxes, Duties, Imposts and Excises," and "[t]o regulate Commerce with foreign Nations." U.S. Const. art. I, § 8, cls. 1, 3. The President enjoys no inherent authority to impose tariffs during peacetime. *Learning Res.*, 607 U.S. at 241 ("The Government thus concedes, as it must, that the President enjoys no inherent authority to impose tariffs during peacetime."). He may exercise that authority only if Congress has delegated it to him, and only within the limits Congress has set. And "a tax cannot be imposed without clear and express words for that purpose." *United States v. Isham*, 84 U.S. (17 Wall.) 496, 504 (1873); *see also Hartranft v. Wiegmann*, 121 U.S.

609, 616 (1887) (ambiguity in tariff statutes must "be resolved in favor of the importer, 'as duties are never imposed on the citizen upon vague or doubtful interpretations'" (quoting *Powers v. Barney*, 19 F. Cas. 1234, 1234 (C.C.S.D.N.Y. 1863) (No. 11,361))).

### A. Section 338 has been impliedly repealed or, at a minimum, is controlled by Section 301.

#### 1. A later statute displaces an earlier one that it replaces or with which it irreconcilably conflicts.

The Supreme Court has long recognized "two well-settled categories of repeals by implication—(1) where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one; and (2) if the later act covers the whole subject of the earlier one and is clearly intended as a substitute, it will operate similarly as a repeal of the earlier act." *Posadas v. Nat'l City Bank*, 296 U.S. 497, 503 (1936); *accord Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 662–63 (2007). Although repeals by implication are disfavored, they are not unknown, and both categories apply here.

Congress need not use express words to displace an earlier law; its intention can be shown by the structure and history of a statutory scheme. In *United States v. Fausto*, the Court held that the Civil Service Reform Act of 1978 displaced Tucker Act remedies federal employees had previously enjoyed, though the later statute did not mention them, because its comprehensive and elaborate scheme showed that Congress meant it to be exclusive. 484 U.S. 439, 448, 455 (1988). That is "the classic judicial task of reconciling many laws enacted over time, and getting them to 'make

sense' in combination." *Id.* at 453. And "the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). The party asserting implied repeal must show a "clearly expressed congressional intention" to displace the earlier law and bears a "heavy burden" in doing so, *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (citations omitted), but structure and history of this kind satisfy that standard.

Implied repeal is not the only route to that result. Even where an earlier statute survives, "a specific policy embodied in a later federal statute should control our construction of the [earlier] statute, even though it has not been expressly amended." *Brown & Williamson*, 529 U.S. at 143 (quoting *United States v. Estate of Romani*, 523 U.S. 517, 530–31 (1998)). The question, then, is not only whether Congress repealed Section 338, but whether Congress's later, specific, and comprehensive scheme governs the conduct the President targeted. It does.

**2. Since 1930, Congress has replaced Section 338's model with a comprehensive scheme that culminates in Section 301.**

Congress enacted Section 338 as part of the Smoot-Hawley Tariff Act. *See supra* Facts § I.B. Smoot-Hawley's failure led Congress to reverse course. In the Reciprocal Trade Agreements Act of 1934, Congress added a new Section 350 to the Tariff Act of 1930, authorizing the President to negotiate trade agreements with foreign countries and to proclaim reductions (or increases) in duties of up to 50 percent to carry them out. Reciprocal Trade Agreements Act of 1934, ch. 474, 48 Stat. 943 (adding 19 U.S.C. § 1351). The duties proclaimed under those agreements

applied "to articles the growth, produce, or manufacture of all foreign countries," that is, on a most-favored-nation basis. *Id.* § 1, 48 Stat. at 944. The 1934 Act thus replaced Smoot-Hawley's model of high unilateral tariffs backed by threats of retaliation with a model of reciprocal, negotiated tariff reduction backed by nondiscrimination.

Importantly, Congress built a discrimination remedy into this new scheme. Section 350 authorized the President to suspend the benefit of trade-agreement rates as to the products of any country "because of its discriminatory treatment of American commerce or because of other acts or policies which in his opinion tend to defeat the purposes" of the Act. *Id.* When the President found in 1935 and 1936 that Germany and Australia discriminated against American commerce, he did not impose Section 338 duties; he withheld trade-agreement benefits. U.S. Tariff Comm'n, 20th Ann. Rep. 47 (1936).[8] Congress also recognized that some preferences were not "discrimination" at all: the 1934 Act expressly preserved the United States' own exclusive preferential arrangement with Cuba, notwithstanding the most-favored-nation principle. Reciprocal Trade Agreements Act of 1934, § 1, 48 Stat. 944 (adding § 350(b)).

In the Trade Expansion Act of 1962, Congress replaced the trade agreements program with a new, comprehensive statute. Pub. L. No. 87-794, 76 Stat. 872. Section 252 authorized the President to suspend trade-agreement concessions and impose duties or other import restrictions when a foreign country engaged in

[8] https://www.usitc.gov/publications/year_in_review/fy_1936_annual_report.pdf.

"discriminatory or other acts (including tolerance of international cartels) or policies unjustifiably restricting United States commerce." *Id.* § 252, 76 Stat. at 879–80. Section 252 effectively replaced Section 350. *Id.* § 257, 76 Stat. at 881–82.

Twelve years later, Congress replaced Section 252 with Section 301 of the Trade Act of 1974. Pub. L. No. 93-618, § 301, 88 Stat. 1978, 2041. *See* S. Rep. No. 93-1298, at 163–65 (1974). Section 301 authorized the President to act whenever a foreign country maintained import restrictions that "burden, restrict, or discriminate against United States commerce," or "engage[d] in discriminatory or other acts or policies which are unjustifiable or unreasonable and which burden or restrict United States commerce," including by "impos[ing] duties or other import restrictions on the products of such foreign country." Pub. L. No. 93-618, § 301(a)–(b), 88 Stat. at 2041. Section 301 came with procedures: interested persons could petition for action, and public hearings were required before the President acted. Pub. L. No. 93-618, § 302, 88 Stat. at 2041–43.

Over the years Congress added to Section 301: detailed investigative procedures, deadlines, and mandatory consultations with the foreign country in 1979, Trade Agreements Act of 1979, Pub. L. No. 96-39, § 901, 93 Stat. 144, 295–300; extended Section 301 to services and investment and defined "unreasonable" and "discriminatory" in 1984, Trade and Tariff Act of 1984, Pub. L. No. 98-573, § 304, 98 Stat. 2948, 3002–05; and in 1988 rewrote Section 301 in its present form, transferring the power to act to the Trade Representative, dividing action into mandatory and discretionary categories, tightening deadlines, and adding new

limits, Omnibus Trade and Competitiveness Act of 1988, Pub. L. No. 100-418, § 1301, 102 Stat. 1107, 1164–76. Congress amended it again in 1994. Uruguay Round Agreements Act, Pub. L. No. 103-465, §§ 311–314, 108 Stat. 4809, 4938–43.

Section 301 is part of a broader framework of post-1930 trade statutes, each delegating a limited power to adjust imports with its own procedures and limits. *See, e.g.*, 19 U.S.C. § 1862 (Section 232); *id.* §§ 2251–2254 (Section 201); *id.* § 2132 (Section 122); *id.* §§ 1671–1677n (antidumping and countervailing duties).

**3. Section 301 and its predecessors cover the whole subject of Section 338 and were intended as its substitute.**

The history set out above shows that Congress has occupied the entire field Section 338 once covered, and has done so repeatedly, each time with a new and more comprehensive statute.

*Section 301 covers the same subject.* Section 338 addresses foreign measures that "discriminate[] in fact against the commerce of the United States" or impose an "unreasonable" charge or limitation on American goods "not equally enforced upon the like articles of every foreign country." 19 U.S.C. § 1338(a). Section 301 addresses foreign acts, policies, or practices that are "unreasonable or discriminatory and burden[] or restrict[] United States commerce." 19 U.S.C. § 2411(b)(1). It defines "discriminatory" to include the denial of "most-favored-nation treatment to United States goods," *id.* § 2411(d)(5), which is the same kind of conduct Section 338 addresses. Both statutes authorize the same remedy: duties and other import restrictions on the offending country's goods. *Compare* 19 U.S.C. § 1338(b), (d), *with*

19 U.S.C. § 2411(c)(1)(B). There is no foreign practice that Section 338 reaches that Section 301 does not.

Indeed, the President's own proclamations describe Canada's conduct in Section 301's terms. Proclamation 11047 finds that Canada "denies to the United States the favorable treatment that Canada provides to the EU," Proclamation No. 11047 ¶ 5, which is a claimed denial of most-favored-nation treatment under 19 U.S.C. § 2411(d)(5). It finds that Canada's practice is "unreasonable," *id.* ¶ 6, the operative word in Section 301(b). And it finds that the practice "burdens" U.S. commerce and causes "lost sales or revenues for U.S. dairy producers and exporters," *id.* ¶¶ 5–6, the very showing Section 301(b) requires. The President has described a Section 301 case and then declined to follow Section 301.

*Congress intended each later statute as a substitute.* Each of Congress's enactments since 1930 replaced, rather than supplemented, what came before. In 1934, 1962, and 1974, Congress enacted a new discrimination remedy, each displacing the last, and from 1979 through 1994 it revised Section 301 four times, each time adding procedures and limits. *See supra* § I.A.2. Congress never revisited Section 338. By 1962, it had gone unused for three decades, and every later enactment addressed foreign discrimination through the new scheme.

*The later statutes rest on premises incompatible with Section 338.* Since 1947, the United States has been party to the General Agreement on Tariffs and Trade (GATT), which made unconditional most-favored-nation treatment the foundation of the trading system while recognizing free-trade areas as legitimate, and Congress

has approved preferential free-trade agreements—three with Canada. *See* General Agreement on Tariffs and Trade arts. I, XXIV, Oct. 30, 1947, 61 Stat. A-11, 55 U.N.T.S. 194; Protocol of Provisional Application, Oct. 30, 1947, 61 Stat. A-2051, 55 U.N.T.S. 308; United States-Canada Free-Trade Agreement Implementation Act of 1988, Pub. L. No. 100-449, 102 Stat. 1851; North American Free Trade Agreement Implementation Act, Pub. L. No. 103-182, 107 Stat. 2057 (1993); United States-Mexico-Canada Agreement Implementation Act, Pub. L. No. 116-113, 134 Stat. 11 (2020). A statute that treats any preference given to another country as grounds for a 50 percent penalty tariff or an import ban cannot be squared with that framework.

No President imposed a duty under Section 338 *for 96 years.* Section 338 still assigns its investigative function to "the commission," 19 U.S.C. § 1338(g), an agency Congress renamed in 1974; Section 301 assigns that function to the Trade Representative. Non-use alone does not repeal a statute. But the consistent practice of every President since 1930 of responding to foreign discrimination under the later statutes, and never under Section 338, reflects a shared understanding that the later statutes replaced it. *Cf. West Virginia v. EPA*, 597 U.S. 697, 725 (2022) ("the want of assertion of power by those who presumably would be alert to exercise it" is significant (quoting *FTC v. Bunte Bros.*, 312 U.S. 349, 352 (1941))).

#### 4. The government's reading of Section 338 cannot be reconciled with Section 301.

Implied repeal is independently established because, on the government's reading, Section 338 and Section 301 are in irreconcilable conflict. *Posadas*, 296

U.S. at 503. The two statutes cover the same conduct and authorize the same remedies. But Section 301 conditions the exercise of that power on a detailed set of procedures and limits, while Section 338, as the government reads it, imposes none. Consider what Section 301 requires before the government may impose duties to respond to a discriminatory foreign practice, and what Section 338, on the government's reading, lets the President skip:

- *Investigation and notice.* Section 301 requires a formal investigation, initiated on petition or by the Trade Representative, with notice published in the Federal Register. 19 U.S.C. § 2412. Section 338, the government says, requires only that the President "find as a fact" that discrimination exists.
- *Consultation with the foreign country*. Section 301 requires the Trade Representative to request consultations with the foreign country on the day the investigation begins. *Id.* § 2413(a). Section 338 requires nothing of the kind.
- *Public participation.* Section 301 requires that interested persons, including American importers like Plaintiff, have an opportunity to present their views, including at a public hearing if one is requested, and that the Trade Representative consult private-sector advisory committees. *Id.* § 2414(b). Under Section 338, the President acted by proclamation with no public input at all.
- *Deadlines.* Section 301 requires determinations within statutory deadlines. *Id.* § 2414(a). Section 338 has none.

- *Equivalence.* Where Section 301 mandates action, it requires that the action be devised to affect the foreign country's goods "in an amount that is equivalent in value to the burden or restriction being imposed by that country on United States commerce." *Id.* § 2411(a)(3). And discretionary action must be "appropriate and feasible" action "to obtain the elimination of that act, policy, or practice." *Id.* § 2411(b). The government reads Section 338 to allow the President to impose the statutory maximum without tying the duty to any measured burden.
- *Preference for duties over bans.* Section 301 requires the Trade Representative to "give preference to the imposition of duties over the imposition of other import restrictions." *Id.* § 2411(c)(5). Under Section 338, the President proclaimed outright import bans less than three weeks after the duties took effect.
- *Review and termination.* Section 301 actions terminate after four years unless continuation is requested and are subject to monitoring and review. *Id.* §§ 2416, 2417(c). The Section 338 tariffs have no end date.

If the President may respond to the very same foreign conduct under Section 338 with the very same remedies, free of all of these constraints, then Section 301's constraints are not constraints at all. Any President who finds Section 301's procedures inconvenient, or its equivalence requirement too limiting, or its four-year sunset too short, can simply invoke Section 338 instead. That is exactly what happened here. Canada's TRQ allocation practices have been in place for years, and

the United States twice litigated them before USMCA panels, losing the second time. Nothing prevented the Trade Representative from initiating a Section 301 investigation, consulting with Canada, hearing from American importers and producers, measuring the burden, and taking calibrated action. On the government's reading, Section 338 lets the President avoid all of that.

Courts do not read statutes to produce such results. "[O]ne of the most basic interpretive canons" is that "[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (citation omitted). That canon applies with special force where a general provision would swallow a specific one: "it is a commonplace of statutory construction that the specific governs the general," particularly where "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (citations omitted). And "[w]here there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one, regardless of the priority of enactment." *Morton v. Mancari*, 417 U.S. 535, 550–51 (1974). Here the specific statute, Section 301, is also the later one, so both canons point the same way.

Congress did not spend 50 years building and rebuilding Section 301 only to leave in place a 1930 statute that allows the President to bypass all of it. Congress "does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking*

*Ass'ns*, 531 U.S. 457, 468 (2001). Still less does it carefully construct a detailed scheme while leaving an unregulated back door wide open.

### 5. At minimum, Section 301 controls action against the foreign practices it covers.

Even if this Court does not hold that Section 338 has been repealed, it should hold that Section 301 controls where, as here, the President seeks to respond to foreign practices that fall squarely within Section 301's scope. It follows from the principle that the later, more specific statute governs the matters it specifically addresses, *Brown & Williamson*, 529 U.S. at 133, 143; *RadLAX*, 566 U.S. at 645; *Brown v. GSA*, 425 U.S. 820, 834 (1976) ("[A] precisely drawn, detailed statute pre-empts more general remedies."), and from the Court's duty to read the statutes Congress enacted over time to "make sense in combination," *Fausto*, 484 U.S. at 453. Each Canadian practice the President targeted is a Section 301 practice. The dairy proclamation targets an alleged denial of most-favored-nation treatment, which Section 301 defines as "discriminatory." 19 U.S.C. § 2411(d)(5). The alcohol and motor vehicle proclamations target foreign measures that allegedly "burden[] or restrict[] United States commerce," the core of Section 301. *Id.* § 2411(a)(1)(B)(ii), (b)(1). Section 338 might retain some residual application to foreign practices that Section 301 does not reach, though Plaintiff is aware of none. But the President may not respond to conduct Congress has specifically assigned to Section 301 while disregarding every procedure and limit Section 301 imposes. Because the President did not proceed under Section 301, the tariffs are unlawful whether or not Section 338 survives.

Section 301 also contemplates the precise situation the President faced. Where a trade-agreement dispute-settlement ruling finds that a foreign practice "is not a violation of, or inconsistent with, the rights of the United States," the Trade Representative "is not required to take action under paragraph (1)." 19 U.S.C. § 2411(a)(2)(A)(ii)(I). Congress thus anticipated that a trade-agreement panel might rule against the United States, and it left any response to the discretionary authority of Section 301, with all of Section 301's procedures and limits. *See id.* § 2411(b). Section 338 is not a backstop that frees the President from Section 301 whenever he dislikes the outcome of a dispute Congress has channeled through Section 301 and the trade-agreement process.

### B. Even if Section 338 has not been displaced, it does not authorize these tariffs.

Even if Section 338 remains in force and governs here, the President's tariffs exceed its terms. Section 338 is a narrow remedy for a specific wrong: foreign measures that discriminate against American commerce. And it authorizes a specific response: duties that "offset" the burden or disadvantage the discrimination imposes. The Section 338 Proclamations satisfy neither requirement.

#### 1. Canada has not discriminated against the commerce of the United States.

Section 338 reaches only foreign measures that discriminate against the commerce of the United States. None of the Section 338 Proclamations identifies one. The motor vehicle and alcohol proclamations target Canada's responses to American tariffs, which are retaliation, not discrimination. And the dairy

proclamation rests on a reading of "discrimination" that would condemn every reciprocal trade preference, including those of the United States itself.

*a. Discrimination means singling out the United States.* Section 338 is titled "Discrimination by foreign countries," and each of its triggers turns on unequal treatment of the United States relative to other nations. Paragraph (a)(1) reaches an unreasonable charge or limitation on American goods "which is not equally enforced upon the like articles of every foreign country." 19 U.S.C. § 1338(a)(1). Paragraph (a)(2) reaches measures that "[d]iscriminate[] in fact against the commerce of the United States . . . in such manner as to place the commerce of the United States at a disadvantage compared with the commerce of any foreign country." *Id.* § 1338(a)(2). Subsection (b) allows exclusion only where the country "has not only discriminated against the commerce of the United States, as aforesaid, but has . . . maintained or increased its said discriminations against the commerce of the United States." *Id.* § 1338(b). The statute's object is discrimination *against the United States*: measures that target American commerce for worse treatment than the commerce of the world at large.

The text confirms the point. Paragraph (a)(1) reaches only a charge or limitation that is both "unreasonable" and "not equally enforced upon the like articles of every foreign country," 19 U.S.C. § 1338(a)(1), so Congress did not equate a difference in treatment with actionable discrimination. And when Congress later legislated on the same subject, it provided that the denial of most-favored-nation treatment is "discriminatory" only "when appropriate." *Id.* § 2411(d)(5).

*b. Responses to American tariffs are not discrimination under Section 338.* The alcohol and motor vehicle proclamations target Canadian responses to American tariffs. The provincial liquor measures date to March 4, 2025, the day the President's IEEPA tariffs on Canada took effect, Proclamation No. 11046 ¶ 4, tariffs the Supreme Court has held the President had no power to impose, *Learning Res.*, 607 U.S. at 255; *see supra* Facts § I.C. Canada's motor vehicle surtax answered the President's Section 232 automobile tariffs. *See supra* Facts § I.C. Plaintiff pays duties on its cheese under both proclamations. A country that responds to tariffs imposed on it does not "discriminate[] in fact against" the country that imposed them; it treats a trading partner that acted first differently because that partner acted first. Section 338 does not authorize an escalating cycle in which the President imposes (unlawful) tariffs, treats the foreign response as "discrimination," imposes Section 338 duties, treats the next response as "maintain[ing] or increas[ing]" the discrimination, and imposes import bans under Section 338(b). Yet that is what happened. The President cited Saskatchewan's levy, imposed "expressly in response to" his Section 338 duties, in support of the alcohol ban. Proclamation No. 11061 ¶ 5. On the government's reading, Section 338 is a ratchet with no stopping point, and the President's own unlawful tariffs become the predicate for new ones. Congress's own trade laws reflect the same understanding: Section 301 directs the Trade Representative to respond to a foreign country's burdensome practices with duties on that country's goods, 19 U.S.C. § 2411(a)(1), (c)(1)(B), and the GATT likewise permits a contracting party to suspend concessions

as to the specific contracting party whose measures injure it, General Agreement on Tariffs and Trade, *supra*, arts. XIX:3(a), XXIII:2. Neither treats a country-specific response as discrimination.

*c. The Congress that enacted Section 338 did not treat every reciprocal preference as "discrimination."* Section 317 was enacted in 1922, when the United States still adhered to the conditional form of most-favored-nation treatment, under which a nation that granted a concession to one country in exchange for a reciprocal concession was not obliged to extend it gratuitously to others. The Supreme Court had held that most-favored-nation pledges "were not intended to interfere with special arrangements with other countries founded upon a concession of special privileges." *Bartram v. Robertson*, 122 U.S. 116, 120 (1887). Even after the United States moved to unconditional most-favored-nation treatment, it continued to grant Cuba rates of duty that were, in the treaty's words, "preferential in respect to all like imports from other countries." *Faber, Coe & Gregg, Inc. v. United States*, 97 F.2d 115, 117 (C.C.P.A. 1938) (quoting Convention of Commercial Reciprocity, U.S.-Cuba, art. VIII, Dec. 11, 1902, 33 Stat. 2136). The first major American treaty to adopt unconditional most-favored-nation treatment expressly excepted the Cuban preference. Treaty of Friendship, Commerce and Consular Rights, U.S.-Ger., art. VII, Dec. 8, 1923, 44 Stat. 2132. And the very Act that contains Section 338 provided that nothing in it "shall be construed to abrogate or in any manner impair or affect" that preference. Tariff Act of 1930, ch. 497, § 316, 46 Stat. 590, 695. A Congress that protected an exclusive American preference in Section 316 could not

have meant Section 338 to treat every reciprocal preference granted to a third country as "discrimination" against the United States.

*d. Canada treats American cheese better than it treats the cheese of most of the world.* The government's theory is that Canada discriminates because it gives the European Union one feature of TRQ access, retailer eligibility, that the USMCA cheese TRQ does not include. Proclamation No. 11047 ¶¶ 4–6. But the USMCA TRQ is itself a preference for the United States: it gives American cheese duty-free access, within the quota, that Canada does not give to countries outside its trade agreements. *Id.* ¶ 3. The proclamation does not claim that Canada treats American cheese worse than cheese from Switzerland, Australia, or the rest of the world. A country that grants the United States better treatment than most of the world does not "discriminate[] . . . against the commerce of the United States" merely because it grants a different preference to another partner in exchange for different concessions. And the government's reading would treat the terms of the USMCA TRQ, which the United States itself negotiated and Congress approved, 19 U.S.C. § 4511 *et seq.*, as Canadian discrimination against the United States.

*e. The government's reading would make nearly every country a discriminator, including the United States.* Every country that is party to a free-trade agreement gives its partners something it does not give the United States. Canada alone has free-trade agreements with dozens of countries. Under the government's theory, the President could find that virtually every trading partner "discriminates" against the United States and impose 50 percent tariffs, and then bans, on any of them. The

United States itself has free-trade agreements with 20 countries and has granted preferences to many others, all under statutes Congress enacted. *See, e.g.*, Pub. L. No. 116-113, 134 Stat. 11; 19 U.S.C. § 2461 *et seq.* (Generalized System of Preferences, in effect 1976–2020); *id.* § 2701 et seq. (Caribbean Basin Economic Recovery Act). It is implausible that Congress would condemn as "discrimination" a practice it has repeatedly authorized for the United States, from the Cuban preference in 1930 to the USMCA in 2020. A precondition that is satisfied as to nearly every country at all times is no precondition at all, *see Corley*, 556 U.S. at 314, and a trigger that is always met raises precisely the major-questions and nondelegation problems discussed below.

*f. Canada's preference is not "unreasonable."* Paragraph (a)(1) applies only to a charge, exaction, regulation, or limitation that is "unreasonable." 19 U.S.C. § 1338(a)(1). Proclamation 11047 declares Canada's rule unreasonable, Proclamation No. 11047 ¶ 6, but gives no reason. There is nothing unreasonable about a country entering into a trade agreement and agreeing to give its partner lower duties or more favorable quota terms on certain goods; the United States does so routinely. Congress's later definition confirms the point: under Section 301, a practice is "unreasonable" if it is "otherwise unfair and inequitable," 19 U.S.C. § 2411(d)(3)(A). A preference granted in exchange for reciprocal concessions is neither.

A measure that confers a preference on a particular partner under a reciprocal agreement, while treating the United States better than most countries, does not

discriminate "against" the United States; it favors the partner. Reading Section 338 to transform every bilateral preference into discrimination against all who do not share it would conflict with the statute's title, with the meaning of "discrimination" when the statute was enacted, and with the structure of American trade law since. At a minimum, the text is ambiguous, and in tariff statutes ambiguity must be "resolved in favor of the importer." *Hartranft*, 121 U.S. at 616.

**2. The duties do not "offset" any burden or disadvantage.**

Section 338 does not authorize the President to impose whatever duty he likes, up to 50 percent. It authorizes only "such new or additional rate or rates of duty as he shall determine will offset such burden or disadvantage." 19 U.S.C. § 1338(d). The 50 percent figure is a ceiling, not a default. To "offset" is "[t]o set off; to place over against; to balance." *Offset, Webster's Revised Unabridged Dictionary* (1913).[9] The President may choose which products to tax, but the duty must balance the burden the discrimination places on American commerce. Congress's later enactments confirm that it understood retaliation for foreign discrimination to require calibration: Section 301 requires mandatory action to be "equivalent in value to the burden or restriction being imposed by that country on United States commerce." 19 U.S.C. § 2411(a)(3).

None of the original three proclamations ties the duty to the burden. The alcohol and motor vehicle proclamations recite declines in American exports to Canada of roughly $581 million and $5.6 billion, respectively. Proclamation No. 11046 ¶ 5;

[9] https://www.websters1913.com/words/Offset.

Proclamation No. 11048 ¶ 4. The dairy proclamation does not quantify the burden at all. Yet all three impose the same rate, the statutory maximum. None states the value of the Canadian goods subject to the duty or explains how a 50 percent duty on them corresponds to the burden it identifies. Each simply declares that the duties "will offset the burden or disadvantage on U.S. commerce." Proclamation No. 11046 ¶ 9; Proclamation No. 11047 ¶ 8; Proclamation No. 11048 ¶ 8. A bare recital of the statutory language is not an offset.

Instead, each proclamation states, in nearly identical terms, that the duties "will, among other things, expand opportunities for U.S. producers to compete within the U.S. market" and "may spur Canada to remove" the challenged measure. Proclamation No. 11046 ¶ 8; Proclamation No. 11047 ¶ 7; Proclamation No. 11048 ¶ 7. The first is protection of domestic producers in the *American* market, which does nothing to offset a burden on American exports to Canada. The second is leverage. Neither is an offset.

The September 8 scope proclamations confirm that "offset" has become a label rather than a limit. According to the President's advisers, the original duties already "offset the burden or disadvantage on U.S. commerce," but changing the products subject to them "would still offset the burden or disadvantage on U.S. commerce while better serving the public interest." Proclamation No. 11064 ¶ 5; Proclamation No. 11065 ¶ 5. The President then added nearly every category of cheese, along with hides, furskins, and motorboats, to the alcohol duties, and cheese classified in HTSUS subheading 0406.90.99, furniture, lamps, golf carts, and paper

to the motor vehicle duties. If both the original list and a substantially different one "offset" the same burden, the word constrains nothing. And duties on the cheese Plaintiff imports do not balance any burden that provincial liquor policies place on American wine and spirits, or that a Canadian surtax places on American cars. They raise the cost of an unrelated product until Canada yields. That is leverage, not an offset.

Less than three weeks after the duties took effect, the President invoked Section 338(b) to ban certain Canadian products altogether, providing that if the ban were invalidated, the 50 percent duty would apply instead. Proclamation No. 11062 ¶ 6, cl. 9(b). An import ban does not "offset" a burden; it eliminates trade. And a President who regards a 50 percent duty and a total ban as interchangeable is not calibrating anything. The President has construed "offset" to be satisfied by a recital and to permit duties designed to protect domestic producers and pressure Canada. That is "a clear misconstruction of the governing statute." *Maple Leaf Fish*, 762 F.2d at 89. It reads the limit out of the statute.

### C. Because of their economic and political significance, this Court should not presume that Section 338 authorizes the President to impose the tariffs.

Courts should not lightly presume that Congress implicitly delegated decisions of major economic or political significance to the executive. *Brown & Williamson*, 529 U.S. at 160; *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014) ("When an agency claims to discover in a long-extant statute an unheralded power to regulate a significant portion of the American economy, we typically greet its announcement

with a measure of skepticism."); *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) (per curiam); *West Virginia*, 597 U.S. at 716; *Biden v. Nebraska*, 600 U.S. 477, 501–06 (2023).

This case fits squarely within that framework, for three reasons.

*First, the power claimed is unheralded and long-extant.* Section 338 has been on the books for 96 years, and in all that time no President has used it to impose a tariff. *See supra* Facts § I.B. Presidents confronting foreign discrimination over those 96 years relied instead on the reciprocal trade agreements authority, Section 252, Section 301, or other later statutes. That is the paradigm of "a long-extant statute" in which the executive claims to have discovered "an unheralded power." *Util. Air*, 573 U.S. at 324. The President's sudden discovery of tariff authority in a 96-year-old statute is a telling indication that the statute does not confer it. *Cf. Learning Res.*, 607 U.S. at 250 (that no President had found tariff power in IEEPA "is strong evidence that it does not exist").

Second, the power claimed is vast, measured by the authority asserted and not merely the tariffs imposed so far. *See Ala. Ass'n of Realtors*, 594 U.S. at 764–65. On the government's reading, the President may find "discrimination" whenever a foreign country gives any third country any preference not given to the United States, which describes virtually every trading partner of the United States. Upon that finding, he may impose duties of up to 50 percent on any products of that country, without tying the duty to any measured burden. If the country does not yield, he may ban its products entirely. 19 U.S.C. § 1338(b). He may extend the

proclamation to any subdivision of a country, and "suspend, revoke, supplement, or amend" it whenever he wishes. *Id.* § 1338(c). And the duties last indefinitely. That is a power to impose tariffs and embargoes on most of the world's trade with the United States.

*Third, the power claimed lies at the core of Congress's constitutional authority and conflicts with the scheme Congress enacted.* "[I]n the absence of a clear mandate in the Act, it is unreasonable to assume that Congress intended to give the [executive] the unprecedented power over American industry that would result from the Government's view." *Indus. Union Dep't, AFL-CIO v. Am. Petroleum Inst.*, 448 U.S. 607, 645 (1980) (plurality opinion). And the government's reading would let the President override the limits Congress placed on retaliation in Section 301. The doctrine applies with special force where the executive claims a power to circumvent a comprehensive scheme Congress designed for the same problem. *Brown & Williamson*, 529 U.S. at 143–44, 159–60.

Section 338 contains no clear authorization for the power the government claims. Nothing in the statute says that a preference given to a third country under a reciprocal agreement is "discrimination," or that the President may impose the statutory maximum without tying the duty to any measured burden, or that he may bypass Section 301. The government's reading "strains credulity." *Ala. Ass'n of Realtors*, 594 U.S. at 765. The Court should decline to adopt it.

If nothing else, the canon of constitutional avoidance counsels against adopting a radically expansive reading of Section 338. "[W]hen statutory language is

susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems." *Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018); *see also Crowell v. Benson*, 285 U.S. 22, 62 (1932). The government's reading raises the serious nondelegation concerns discussed below. Plaintiff's reading, under which Section 301 governs, "discrimination" means singling out the United States, and duties must actually "offset" an identified burden, avoids them.

### D. The government's reading of Section 338 would render it an unconstitutional delegation of legislative power.

If Section 338 conferred the sweeping and unreviewable authority the government claims, it would be an unconstitutional delegation of legislative power. The Constitution vests "[a]ll legislative Powers herein granted" in Congress, U.S. Const. art. I, § 1, and "[t]he executive Power" in the President, *id.* art. II, § 1, cl. 1. In a case involving Section 338's own ancestor, the Supreme Court declared "[t]hat Congress cannot delegate legislative power to the President is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the Constitution." *Field v. Clark*, 143 U.S. 649, 692 (1892); *see also J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 406 (1928).

Congress must therefore supply an "intelligible principle" to guide the exercise of delegated discretion. *J.W. Hampton*, 276 U.S. at 409. A delegation fails where there is "an absence of standards for the guidance of the Administrator's action, so that it would be impossible in a proper proceeding to ascertain whether the will of Congress has been obeyed." *Yakus v. United States*, 321 U.S. 414, 426 (1944).

Congress must set out "the general policy" the executive must pursue and "the boundaries of [its] delegated authority." *FCC v. Consumers' Rsch.*, 606 U.S. 656, 673 (2025) (citation omitted). Several Justices have urged a more searching inquiry, *see Gundy v. United States*, 588 U.S. 128, 158 (2019) (Gorsuch, J., dissenting), but the government's reading of Section 338 fails under any version of the test.

The Supreme Court upheld earlier tariff delegations precisely because they did not give the President the discretion the government now claims. In *Field*, Congress fixed the exact duties that would apply; the President merely ascertained whether a foreign country's duties were "reciprocally unequal and unreasonable," and "[n]othing involving the expediency or the just operation of such legislation was left to the determination of the President." 143 U.S. at 693. In *J.W. Hampton*, Congress authorized the President to adjust duties under the flexible tariff provision of the 1922 Act only to equalize the differences in costs of production between domestic and foreign producers, a measurable standard, after investigation by the Tariff Commission. 276 U.S. at 401–02, 409. Each delegation contained a standard that allowed a court to determine whether the President had complied with Congress's will.

The government's reading of Section 338 contains no such standard. Section 338 has two potential limits: the President may act only against "discrimination," and he may impose only duties that "offset" the resulting burden. On the government's reading, neither limits anything. "Discrimination" is present whenever a foreign country gives any preference to any third country, which describes virtually every

country. And the "offset" requirement is satisfied whenever the President says it is. What remains is a power to impose duties of up to 50 percent on any products of virtually any country, for any period, followed by a ban if the country does not yield, subject only to the President's own judgment of "the public interest," 19 U.S.C. § 1338(a), (d), and his power to "suspend, revoke, supplement, or amend" the proclamation at will, *id.* § 1338(c). A "public interest" standard of that breadth, applied to the power to tax, provides no more guidance than the standard the Court rejected in *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935), which conferred authority "to regulate the entire economy on the basis of no more precise a standard than stimulating the economy by assuring 'fair competition.'" *Whitman*, 531 U.S. at 474.

The existence of Section 301 makes the delegation problem worse, not better. Congress has shown, in Section 301, what an intelligible principle for retaliation against foreign discrimination looks like: defined triggers, investigations, consultations, public participation, deadlines, an equivalence requirement, a preference for duties, and periodic review. If Section 338 nonetheless permits the President to impose the same remedies for the same conduct free of every one of those standards, then the President, not Congress, decides which set of rules applies, and therefore decides whether any rules apply at all. A delegation that allows the executive to choose whether to be bound by Congress's standards is no standard at all.

This Court need not hold Section 338 unconstitutional, however. It need only reject the government's reading. When a serious constitutional doubt is raised, the Court must "first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Jennings*, 583 U.S. at 296 (quoting *Crowell*, 285 U.S. at 62). Read as controlled by Section 301, and as confined to genuine discrimination and measured offsets, Section 338 raises no nondelegation problem. Read as the government reads it, Section 338 is an unconstitutional delegation of legislative power as applied to the Section 338 Proclamations.

### E. At a minimum, Section 338 did not permit Defendants to collect duties on Plaintiff's cheese before October 8, 2026.

Even if Section 338 authorized the duties, Defendants began collecting them on Plaintiff's cheese before the statute allowed. Section 338(d) provides that "thirty days after the date of such proclamation there shall be levied, collected, and paid upon the articles enumerated in such proclamation" the new or additional duties. 19 U.S.C. § 1338(d). The President followed that rule in the original proclamations: he issued them on July 20, 2026, and made them effective on August 19, 2026, 30 days later. 91 Fed. Reg. 46,639, 46,653, 46,663. But Plaintiff's cheese was not "enumerated" in any of those proclamations. *See* Proclamation No. 11046, Annex; Proclamation No. 11047, Annex II; Proclamation No. 11048, Annex. It first became subject to Section 338 duties through Proclamations 11064 and 11065, which the President issued on September 8, 2026, and made effective on September 15, 2026, only seven days later. Proclamation Nos. 11064, 11065, 91 Fed. Reg. 58,331, 58,339

(Sept. 14, 2026). Under subsection (d), no Section 338 duty could be collected on those newly enumerated articles before October 8, 2026.

Subsection (c), which allows the President to "suspend, revoke, supplement, or amend any such proclamation," 19 U.S.C. § 1338(c), does not change the result. A proclamation that adds new articles to the list of dutiable goods "specif[ies] and declare[s]" new duties on those articles. That is exactly what subsection (d) governs, and subsection (d) attaches the waiting period to every such declaration. Nothing in subsection (c) dispenses with it. Reading subsection (c) to let the President impose duties on new articles immediately, simply by calling the new proclamation an amendment, would render the waiting period "inoperative or superfluous." *Corley*, 556 U.S. at 314. And in tariff statutes, "the doubt would be resolved in favor of the importer." *Hartranft*, 121 U.S. at 616; *see Isham*, 84 U.S. (17 Wall.) at 504. The same waiting period appears in the provision Congress wrote for duties on third-country industries, confirming that it is a deliberate feature of the statute. 19 U.S.C. § 1338(e) (duties collected "on and after thirty days after the date of any such proclamation").

Plaintiff is therefore entitled, at a minimum, to a refund, with interest as provided by law, of the Section 338 duties it paid on entries made through October 7, 2026. *See* 28 U.S.C. § 2643(a)(1) (authorizing this Court to enter a money judgment "for or against the United States in any civil action commenced under section 1581"); Gellert Decl. ¶ 10. Because those duties have already been paid and

the waiting period has run, Plaintiff seeks this relief on summary judgment, not by preliminary injunction.

## II. Plaintiff will suffer irreparable harm if the Section 338 tariffs are not enjoined.

"Irreparable harm includes 'a viable threat of serious harm which cannot be undone.'" *Sumecht NA, Inc. v. United States*, 331 F. Supp. 3d 1408, 1412 (Ct. Int'l Trade 2018) (quoting *Zenith Radio Corp. v. United States*, 710 F.2d 806, 809 (Fed. Cir. 1983)). Although claims of financial loss generally do not constitute irreparable harm, *Sampson v. Murray*, 415 U.S. 61, 90 (1974), "bankruptcy or a substantial loss of business may constitute irreparable harm because those events render a final judgment ineffective and deprive movant of 'meaningful judicial review.'" *Retractable Techs.*, 739 F. Supp. 3d at 1340 (citing *Harmoni Int'l Spice, Inc. v. United States*, 211 F. Supp. 3d 1298, 1307 (Ct. Int'l Trade 2017)). "Price erosion, loss of goodwill, damage to reputation, and loss of business opportunities may also constitute irreparable harm in some circumstances." *Id.* (citing *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012)); *see, e.g.*, *Confederación de Asociaciones Agrícolas del Estado de Sinaloa, A.C. v. United States*, 389 F. Supp. 3d 1386, 1398 (Ct. Int'l Trade 2019).

Without an injunction, Plaintiff will suffer irreparable harm that no refund can repair. The Section 338 tariffs threaten the structure of Gellert's business, not merely its balance sheet. Gellert's Canadian goat's milk cheese and brie come from Ontario producers with whom it has partnered for more than 25 years, and they cannot be replicated or replaced with U.S.-produced alternatives without significant

disruption to customers and the supply chain. Gellert Decl. ¶¶ 6–7. For goat's milk cheese in particular, U.S. demand far exceeds domestic production. *Id.* ¶¶ 8, 15. If the tariffs continue, Gellert will be forced to raise prices, risking lost sales, customers, and product placements, and will face supply-chain interruptions as its Canadian producers scale down or close. *Id.* ¶¶ 13, 17. Those changes, once made, cannot be unwound by a later judgment. Lost product placements and customer relationships, built over decades, do not return when duties are refunded, and a supplier that has scaled back or closed cannot be restored. These are precisely the losses of goodwill, business opportunities, and customer relationships that this Court has recognized as irreparable. *Retractable Techs.*, 739 F. Supp. 3d at 1340.

The tariffs are also imposing enormous costs: a 50 percent duty on trade that was previously duty-free, an estimated $40 million per year, and more than $520,000 on just 22 entries made between September 16 and October 11, 2026. Gellert Decl. ¶¶ 9–10. Gellert is absorbing those costs for now, which has forced it to delay hiring and investment, has strained its working capital, and has dramatically reduced its margins. Id. ¶ 12. That cannot continue.

The threat to Gellert's business is not limited to the duties themselves. The President has already used Section 338(b) to proclaim outright import bans less than three weeks after the duties took effect, in all three actions, including the alcohol and motor vehicle actions under which Gellert pays duties. Proclamation Nos. 11061, 11062, 11063. If Gellert's cheeses were added to those bans, as Section 338(b) and (c) on the government's reading permit at any moment, Gellert could not

import them at any price, and its 25-year supply relationships would be destroyed. No refund could undo that harm.

These harms are irreparable even though duties paid may ultimately be refunded. A refund returns money, and only money. It does not return a customer that has moved to another supplier, a product placement that has gone to a competitor, or a 25-year supplier relationship that has ended because the supplier scaled back or closed.

## III. The balance of interests weighs in favor of enjoining the Section 338 tariffs, and an injunction serves the public interest.

As noted, Plaintiff faces irreparable harm in the absence of an injunction. The government, on the other hand, would not be harmed by an injunction preventing it from imposing unlawful tariffs. "[T]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Nor would an injunction impair the President's ability to address any genuine foreign discrimination through the procedures Congress has provided in Section 301.

Nor does any loss of tariff revenue outweigh Plaintiff's injury. The Section 338 Proclamations do not cite raising revenue as a justification, and Section 338 does not authorize tariffs for that purpose.

Granting an injunction is in the public interest. "The public interest is served by ensuring that governmental bodies comply with the law and interpret and apply trade statutes uniformly and fairly." *Am. Signature, Inc. v. United States*, 598 F.3d 816, 830 (Fed. Cir. 2010). The Section 338 tariffs raise prices for American

consumers on products, like goat's milk cheese, for which domestic supply cannot meet demand. Gellert Decl. ¶¶ 8, 15. And they harm American producers, including the upstate New York dairies that supply milk to Gellert's Canadian brie producer. Id. ¶ 14. The tariffs have also prompted Canadian counter-tariffs on approximately C$27.6 billion of American goods. *See supra* Facts § I.D. As to any interest the public may have in the policy underlying the President's invocation of Section 338, "the issuance of an injunction does not undermine that interest, it merely maintains the status quo." *In re Section 301 Cases*, 524 F. Supp. 3d 1355, 1372 (Ct. Int'l Trade 2021).

The injunction should run against the tariffs themselves, not merely their application to Plaintiff. Plaintiff's claims are that the Section 338 Proclamations exceed the President's statutory authority; if the tariffs are unlawful, they are unlawful in every application. This Court has exclusive jurisdiction over challenges to the tariffs, 28 U.S.C. § 1581(i)(1); *see Learning Res.*, 607 U.S. at 240 n.1, and Congress has authorized it to "order any other form of relief that is appropriate in a civil action, including . . . injunctions." 28 U.S.C. § 2643(c)(1). *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), does not limit that authority. *CASA* construed the equitable authority that the Judiciary Act of 1789 confers on federal district courts, *id.* at 839, 841–42; this Court's remedial powers derive from the Customs Courts Act of 1980, which grants both "all the powers in law and equity of . . . a district court of the United States," 28 U.S.C. § 1585, and the separate power to award appropriate injunctions, *id.* § 2643(c)(1). And because importers nationwide pay the same duties

under the same proclamations, an injunction limited to Plaintiff could invite a multiplicity of identical suits and the non-uniform administration of the customs laws that this Court's exclusive national jurisdiction exists to prevent. At a minimum, the Court should enjoin the collection of Section 338 duties from Plaintiff and order the refund of the duties Plaintiff has paid.

This Court should exercise its discretion under USCIT Rule 65(c) to require no bond. Courts may dispense with security where plaintiffs seek to restrain unlawful government action and an injunction serves the public interest. *See* USCIT R. 65(c) (security "in an amount that the court considers proper"); *Nat'l Treasury Emps. Union v. Trump*, 780 F. Supp. 3d 237, 268 (D.D.C. 2025), *stay granted*, No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025) (per curiam). The government faces no cognizable harm from complying with a lawful injunction, and any duties not collected while the injunction is in place could be collected later if the government prevails.

**Conclusion**

For the reasons set forth herein, Plaintiff respectfully requests that this Court grant Plaintiff's Motion for Preliminary Injunction and/or issue summary judgment in favor of Plaintiff, permanently enjoin Defendants from imposing or enforcing the tariffs set forth in the Section 338 Proclamations, order the refund of all Section 338 duties paid by Plaintiff with interest as provided by law, and grant such other relief as this Court may deem just or proper. A proposed order is attached.

Dated: October 23, 2026

Respectfully submitted,

/s/ Jeffrey M. Schwab

Jeffrey M. Schwab
Reilly Stephens
Liberty Justice Center
1629 K Street N.W.
Suite 300
Washington, D.C. 20006
512-481-4400
jschwab@ljc.org
rstephens@ljc.org

*Counsel for Plaintiff Gellert Global Group Corp.*

**Certificate of Compliance**

I, Jeffrey M. Schwab, hereby certify that this brief complies with the 14,000-word limitation of the United States Court of International Trade set forth in Standard Chambers Procedure § 2(B)(1), because this brief contains 13,748 words. In making this certification, I have relied upon the word count function of the Microsoft Word processing system used to prepare this brief.

Dated: October 23, 2026

Respectfully submitted,

/s/ Jeffrey M. Schwab

Jeffrey M. Schwab
Reilly Stephens
Liberty Justice Center
1629 K Street N.W.
Suite 300
Washington, D.C. 20006
512-481-4400
jschwab@ljc.org
rstephens@ljc.org

*Counsel for Plaintiff Gellert Global Group Corp.*

## Certificate of Service

I, Jeffrey M. Schwab, one of the attorneys for Plaintiff, certify that the foregoing document was filed electronically with the Court's Case Management/Electronic Case Filing (CM/ECF) system on October 23, 2026. The Court and/or Clerk of Court may serve and give notice to counsel by CM/ECF electronic transmission.

Dated: October 23, 2026

Respectfully submitted,

/s/ Jeffrey M. Schwab

Jeffrey M. Schwab
Reilly Stephens
Liberty Justice Center
1629 K Street N.W.
Suite 300
Washington, D.C. 20006
512-481-4400
jschwab@ljc.org
rstephens@ljc.org

*Counsel for Plaintiff Gellert Global Group Corp.*