**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| GELLERT GLOBAL GROUP CORP.,<br><br>Plaintiff,<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States; EXECUTIVE OFFICE OF THE PRESIDENT; the UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, in his official capacity as Commissioner of United States Customs and Border Protection; JAMIESON GREER, in his official capacity as United States Trade Representative; and OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE,<br><br>Defendants. | **Before: Claire R. Kelly, Joseph A Laroski, Jr., and Kara M. Westercamp, Judges**<br><br>**Court No. 26-04636** |

***AMICI CURIAE* BRIEF OF FORMER U.S. TRADE OFFICIALS**
**IN SUPPORT OF PLAINTIFF**

## TABLE OF CONTENTS

Page #

**INTEREST OF AMICI CURIAE** ........ **1**

**SUMMARY OF ARGUMENT** ........ **2**

**ARGUMENT** ........ **5**

I. While Implied Repeal of a Statute Is Rarely Found To Exist, It Clearly Exists in the Case of Section 338, Since Section 301 of the Trade Act of 1974 Covers Exactly the Same Subject Matter and Adds Important Procedural Protections ........ 5

II. The Drafting History of Section 301 Indicates That Section 338 Does Not Co-Exist with Section 301 ........ 7

III. Consistent Practice from 1975 To 2026 through Nine Successive Presidential Administrations – President Ford through Presidents Biden and Trump 1.0 – Has Been to Treat Section 338 as a Dead Letter ........ 8

IV. Even Where There Is Gross Discrimination, Not Excused by a Customs Union or Free Trade Agreement, No U.S. Administration Has Deployed Section 338 ........ 10

V. Even If Section 338 Is Somehow Still Alive, It Clearly Runs Afoul of the “Major Questions” Doctrine ........ 11

VI. The Administration Failed To Calculate the Amount of U.S. Trade Damage So As To Set An Appropriate Amount Of Canadian Goods Subject To Higher Duties Under Section 338 ........ 13

A. Section 338 Requires a 30-Day Grace Period To All Goods In Transit To Clear Customs and Avoid Saddling U.S. Importers with Unexpected Duty Liabilities ........ 14

B. Canadian Dairy Regime Is Highly Protectionist, But It Does Not Discriminate Under Section 338(a) Since It Applies to All of Canada’s Trading Partners ........ 15

**CONCLUSION** ........ **17**

## TABLE OF AUTHORITIES

**Page #**

**Cases**

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) .............................................. 6

*Learning Resources, Inc. v. Trump*, 146 S.Ct. 628 (2026) ........................................... 4, 11, 12, 13

*Posadas v. Nat'l City Bank*, 296 U.S. 497 (1936) ............................................................................ 6

*United States v. Tynen*, 11 Wall. 88 (1871) ...................................................................................... 7

**Statutory Provisions**

19 U.S.C. § 1338(a) ........................................................................................................... 15

19 U.S.C. § 1338(d) ..................................................................................................... 14, 15

19 U.S.C. § 1411 ................................................................................................................... 3

**Other Authorities**

Congressional Record – Senate, 78 Cong. Record, 8969 (May 17, 1934) .................................. 16

Congressional Record, Vol LXII, Part qq (August 11, 1922) ..................................................... 16

H.R. Report No. 71, p. 1892 (1930)............................................................................................ 13

Hearings before the Senate Committee on Finance on H.R. 19710, March 4 and 5, 1974, accessed through Reprints of the collection of the University of Michigan Library...................... 7

Pursuant to USCIT Rule 76, and with leave of this Court, *amici curiae* Carla A. Hills, Alan Wm. Wolff, and Warren H. Maruyama submit this brief in support of Plaintiff in this case.

## INTEREST OF *AMICI CURIAE*

*Amici curiae* are three former senior U.S. trade officials whose combined experience spans more than a century in the development, negotiation, implementation, and enforcement of U.S. trade policy. Their experience offers unique insight into the statute's origins, purpose, and application.

**Ambassador Carla A. Hills** served as United States Trade Representative from 1989 to 1993. She negotiated and concluded the North American Free Trade Agreement, led the U.S. negotiations on the Uruguay Round Agreements which resulted in the creation of the World Trade Organization ("WTO"), and concluded trade and investment agreements with countries around the world. Ambassador Hills also oversaw key Section 301 investigations and actions, including: Japan—satellites; Japan—supercomputers; Japan—forest products; Brazil—import licensing; India—investment; India—insurance services; China intellectual-property protection 1991–92; China market access, 1991–92; Canada—provincial beer practices, 1990–93; Thailand—cigarette import ban, 1989–90; Thailand—copyright enforcement, 1990–91; Thailand—pharmaceuticals, 1991–92; India—intellectual property, 1991–92; Taiwan—copyright protection, 1992; and Norway—electronic toll equipment, 1989–90. Earlier, Ambassador Hills served as Secretary of Housing and Urban Development (the third woman to hold a Cabinet position) and Assistant Attorney General for the Civil Division at the Department of Justice. As Chairman of Hills & Co., she has advised multinational clients on U.S. trade law and policy.

**Ambassador Alan Wm. Wolff** played a central role in the development and implementation of U.S. trade law. As the Department of Treasury's lead international trade lawyer from 1969 to 1973, he originated the Nixon Administration's proposal to revise Section 252 of the

Trade Expansion Act of 1962 and drafted the initial version of what became Section 301. He subsequently served as Deputy General Counsel (1973-74) and General Counsel (1974-77) of the Office of the Special Representative for Trade Negotiations, where he was the principal Administration draftsman of the Trade Act of 1974 during its consideration by Congress. In that capacity, he represented the Nixon and Ford Administrations throughout the legislative process and attended all House Ways and Means Committee and Senate Finance Committee mark-up sessions concerning the bill that became the Trade Act of 1974. Ambassador Wolff later served as Deputy Special Trade Representative under President Jimmy Carter from 1977 to 1979. Most recently, he served as Deputy Director-General of the World Trade Organization from 2017 to 2021 and is currently a Senior Fellow at the Peterson Institute for International Economics.

**Warren H. Maruyama** has played a significant role in the development and implementation of U.S. trade policy across multiple administrations. He served as General Counsel of the Office of the United States Trade Representative ("USTR") from 2007 to 2009 under President George W. Bush, and previously served on the White House staff under President George H.W. Bush as Deputy Associate Director (1989-91) and Associate Director (1992-93) for International Economic Policy. Earlier, as Associate General Counsel at USTR (1983-89), he participated in drafting both the Trade and Tariff Act of 1984 and the Omnibus Trade and Competitiveness Act of 1988.

## SUMMARY OF ARGUMENT

In its latest foray into tariffs, the Trump Administration imposed extensive duties on Canadian goods under Section 338 of the Smoot-Hawley Tariff Act of 1930. This required dredging up a long-forgotten U.S. trade statute which was superseded decades ago by Section 252

of the Trade Expansion Act of 1962[1] and then by Section 301 of the Trade Act of 1974.[2] The doctrine of implied repeal exists when two statutes cover the exact same subject matter, and the newer one introduces stricter requirements, conditions, or a different process, the later statute is legally recognized as the "last word" of Congress. To the extent that the earlier statute allows the executive to bypass those new requirements, the later statute modifies or implicitly overrides the earlier one. While the implied repeal of U.S. statutes is rare, this is that rare case because Section 338 covers the same issues of unfair discrimination as Section 301 and omits important procedural protections aimed at minimizing potential harms to the U.S. economy, businesses, and households from higher tariffs. The Administration of Franklin Roosevelt occasionally threatened to use Section 338 to impose punitive tariffs in the 1930s and 1940s, but never imposed tariffs, and even this faded out with the entry into force of the General Agreement on Tariffs and Trade in 1947, leaving Section 338 forgotten and defunct for decades. Instead, Section 338 has been supplanted by Section 301 which has proven a highly effective tool when used properly against specific unfair practices and in accordance with key statutory procedural safeguards. If this Court now were to revive Section 338 tariffs, it would hand the Administration a massive weapon that could – and likely would – be deployed against other U.S. trading partners or used to reinstate the IEEPA and Section 122 tariffs.

The Trump Administration's use of Section 338 also runs headlong into the Supreme Court's "major questions" doctrine. As the Court stated in *Learning Resources*, it has "long expressed 'reluctance to read into ambiguous statutory text' extraordinary delegations of

---

[1] Formerly codified at 19 U.S.C. § 1882. Repealed by Section 602(d) of the Trade Act of 1974 (Pub. L. 93-618, January 3, 1975, 88 Stat. 2072).

[2] 19 U.S.C. § 1411.

Congress's powers.'"[3] As the Court noted: these considerations apply with particular force when the purported statutory delegation involves the "core congressional power of the purse," lacks "significant procedural limitations" found in other trade statutes, and raises issues of "major economic and political significance."[4] The Section 338 tariffs cover approximately $20 billion in U.S.-Canada trade spread across hundreds of HTSUS classifications. The tariff war against Canada, using this authority and section 232 of the Trade Act of 1962, figured prominently in the recent mid-term elections, making it unlikely that this Congress, or its predecessors who approved recent decades of international trade relations under strict delegations to the Executive, would have wanted to permit this much power to be deployed against an ally without explicit Congressional approval.

Section 338 lacks key procedural protections, which Congress inserted in modern trade statutes to reflect the increased complexity of U.S. trade and vastly expanded number of U.S. stakeholders, including households, businesses, and farmers, who could be negatively impacted by higher tariffs and ensuing trade wars. Finally, while Section 338 contains only limited procedural requirements, the Administration ignored even these by failing to tie the rates of duty to specific amounts required to "offset" the alleged unfair practices, failing to provide a 30-day grace period for goods in transit, and citing Canadian practices that do not involve "discrimination" as defined in the statute. The Court should find that Section 338 is no longer valid, strike down the Section 338 duties, and order the Administration to promptly refund any duties collected.

---

[3] *Learning Resources, Inc. v. Trump*, 146 S.Ct. 628, 631 (2026).

[4] *Id.* at 639-40, 61.

## ARGUMENT

### I. While Implied Repeal of a Statute Is Rarely Found To Exist, It Clearly Exists in the Case of Section 338, Since Section 301 of the Trade Act of 1974 Covers Exactly the Same Subject Matter and Adds Important Procedural Protections

As the Court is aware, the entire framework of U.S. trade law changed radically with the enactment of the Reciprocal Trade Agreements Act of 1934. Henceforth, America's foreign trade would be governed increasingly by international trade agreements. Section 338 was created earlier in and for the world of Smoot-Hawley, the Tariff Act of 1930, which unilaterally set tariffs at much higher levels, led to extensive foreign retaliation against U.S. exports, and deepened and lengthened the Great Depression. Over subsequent decades, the United States increasingly acquired international trade obligations. These obligations became increasingly global with the creation of the General Agreement on Tariffs and Trade (GATT) in 1948, as incorporated in 1995 in the World Trade Agreement (WTO) agreements. This included most-favored nation (MFN)/non-discrimination commitments from GATT Contracting Parties and WTO signatories, which prohibited most key U.S. trading partners from discriminating against U.S. goods, and thus obviated the need for Section 338. As a result, after GATT entered into force in 1947, Section 338 fell into the dustbin of antiquated, obsolete, and forgotten U.S. trade statutes, much as Smoot-Hawley is now best known as the subject of a boring high school economics lecture in "Ferris Bueller's Day Off."

In practice, Section 338 was first overtaken by the subsequent enactment of Section 252 of the Trade Expansion Act of 1962, and finally and more fully by Section 301 of the Trade Act of 1974, as amended. The need for Section 338 disappeared with the enactment of Section 301, which covers all the purposes of and grants all of the authority granted in Section 338.

The only conceivable purpose served by invoking Section 338 is to avoid the stronger procedural requirements of Section 301. These requirements include public hearings,

consultations with the trading partners concerned, credible investigations, necessary findings (unreasonableness of the foreign act, practice or policy, and burden on U.S. commerce), time limits (sunset provision), and meeting the requirements of the Administrative Procedure Act (APA). These are no minor requirements and have been the subject of close scrutiny by a three-judge panel of this court in *In re Section 301 Forced Labor Cases*, No. 26-cv-03555-3JP.

The fact that there has been no direct legislative action to repeal Section 338 does not suggest approval by Congress, as the passage of time, disuse and changed circumstances have effectively superseded (repealed) Section 338. This history is surveyed below.

The doctrine of implied repeal exists when two statutes cover the exact same subject matter, and the newer one introduces stricter requirements, conditions, or a different process, the later statute is legally recognized as the "last word" of Congress. To the extent that the earlier statute allows the Executive Branch to bypass those new requirements, the later statute modifies or implicitly overrides the earlier one.

The Executive Branch cannot treat existing laws like a menu, picking and choosing which version to enforce based on convenience or policy preferences. If Congress added requirements to achieve an objective, the President is bound by those new boundaries.

Where a later act covers the whole subject of an earlier one and is clearly serves as a substitute, it operates similarly as a repeal.[5] A specific policy embodied in a later federal statute controls the construction of an earlier one even absent express amendment.[6] A repeal will be implied only so far as the later enactment is in conflict with the earlier, or so far as it is plainly intended as a substitute for the earlier. When there are two acts of Congress on the same subject,

---

[5] *See Posadas v. Nat'l City Bank*, 296 U.S. 497, 503 (1936).

[6] *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000).

and the latter act embraces all the provisions of the first, adds new provisions, and imposes different or additional penalties, the latter act operates, without any repealing clause, as a repeal of the first.[7]

## II. The Drafting History of Section 301 Indicates That Section 338 Does Not Co-Exist with Section 301

There are repeated references in Administration statements introducing the Trade Reform Act of 1973 (which became the Trade Act of 1974), detailing how Section 301 changed existing U.S. law. The statements made by Amb. William D. Eberle, the President's Special Representative for Trade Negotiations (STR) refer in the case of the proposed Section 301 solely to Section 252 as existing U.S. law in the spring of 1974, and details how Section 301 would change Section 252.[8] It was crystal clear that Section 301 was changing "current U.S. law" which was at the time Section 252 of the TEA. Existing law in 1974 did not include Section 338, as is clear from administration testimony.

Had there been any usefulness in retaining Section 338, there would have been some reference to it in 1973-74 when Section 301 was being considered in committee, when it was debated on the floor, or when substantial amendments were added in 1988, as it completely covers whatever Section 338 did, but with more requirements, reflecting the increased complexity of U.S. trade, including the growth of American exports, costs of higher tariffs, much larger number of stakeholders potentially affected, risks of foreign retaliation, and potential impacts on inflation and the U.S. economy.

---

[7] *See United States v. Tynen*, 11 Wall. 88 (1871).

[8] *See* Hearings before the Senate Committee on Finance on H.R. 19710, March 4 and 5, 1974, accessed through Reprints of the collection of the University of Michigan Library, at pp 306-306, 341.

The only reference to Section 338 found in the record in 1974 during the drafting of Section 301 was from a petitioner's side (pro-import protection) lead counsel (Eugene Stewart) who took the position that Section 301 was redundant and therefore unnecessary, given the existence of Section 338. This point of view was never discussed according to one who was there (Wolff) and the existing record, either internally within the Executive Branch, in committees of jurisdiction in the drafting process, or that process itself.

Ambassador Wolff was present during the drafting of the Trade Act of 1974, and all "mark-up" sessions (drafting decision making) of the two committees of primary jurisdiction of the trade bill, House and Senate, in 1973-74 and states for the record that the existence or relevance of Section 338 was not considered at all by the Administration, the committees of jurisdiction, of in the floor debate.

The same is true during subsequent amendments to Section 301 during the Trade and Tariff Act of 1984 and Omnibus Trade and Competitiveness Act of 1988 (Maruyama), and it was not considered as part of the Bush 41 Administration's implementation of the Super 301 provisions of U.S. trade law (Hills and Maruyama). There were zero references to or acknowledgement of the relevance of Section 338.

## III. Consistent Practice from 1975 To 2026 through Nine Successive Presidential Administrations – President Ford through Presidents Biden and Trump 1.0 – Has Been to Treat Section 338 as a Dead Letter

There is no record of Section 338 being considered as existing, much less necessary, in any debate over the use of Section 301 until the Trump Administrations.

This state of nonexistence is reinforced by the omission of Section 338 from successive "Blue Books", the Compilation of U.S. Trade Statutes, published by the House Ways and Means Committee, which (along with the Senate Finance Committee) has jurisdiction in Congress over trade and tariff issues. These volumes contain relevant trade statutes from 1975 to 2013, including

versions released in 1989, 1991, 1993, 1995, 1997, 2001, 2005, 2010. None includes or refers to Section 338.

A search of the public record indicates that nineteen chief trade legal officers of the Executive Branch, serving as General Counsel of the Office of Special representative for Trade Negotiations (STR) and its successor the Office of the U.S. Trade Representative (USTR) never once mentioned considering the use of Section 338. Indeed, Section 338 seems only to have been rediscovered by former USTR General Counsel John Veroneau with a colleague in an article that they first published in 2016 and made more widely available in 2018.

When faced with egregious foreign discrimination against U.S. products, USTR instead has turned to Section 301 or before it was enacted to its predecessor, Section 252 of the Trade Expansion Act of 1962. This includes the so-called "Chicken War" which arose when the formation of the European Common Market devastated U.S. exports of poultry, grain and other agricultural products. Congress therefore enacted Section 252 of the Trade Expansion Act of 1962. The United States took severe trade action against the EEC, putting in place tariffs on European exports of brandy, dextrin, potato starch and light trucks (which still remains in place today), as retaliation for the discrimination against U.S. products inherent in formation of the Common Market, particularly against U.S. agricultural exports. No reference was made to Section 338.

When the EEC was enlarged with the addition of Portugal and Spain, President Reagan threatened the use of Section 301 retaliatory tariffs.[9] No mention was made of Section 338.

Instead, the U.S. has consistently used Section 301 in cases of discrimination against U.S. products in favor of third country imports. It did this in the case of *European Community Tariff*

---

[9] https://www.reaganlibrary.gov/archives/speech/memorandum-united-states-trade-representative-restriction-certain-imports-european

*Preferences on Citrus Fruits* (1976–1985) and *European Community (EC) Bananas* dispute (1994–1996). Again, resorting to Section 338 is not to be found in the record.

## IV. Even Where There Is Gross Discrimination, Not Excused by a Customs Union or Free Trade Agreement, No U.S. Administration Has Deployed Section 338

Section 338 must be read in the context of the circumstances of its enactment, the existence of gross discrimination from the UK's "imperial preferences" and a concern over potential foreign retaliation against the Smoot-Hawley tariffs. The only current gross discrimination against U.S. products justifying ultimately a ban on a country's products could occur if a foreign country were to deploy a higher general tariff against U.S. products than to imports from one or more other countries outside of a Free Trade Agreement (FTA) or Customs Union.

The best case of gross discrimination against U.S. products is provided by China. China's simple average tariff applied to other countries is 7.5%, whereas its current tariff applicable to U.S. imports averages 31.9%. If ever there was a case where Section 338 would be applicable it is against China. The Trump and other administrations have used every other trade statute, including most prominently Section 301, as well as, selectively, Section 232 (national security), as well as Section 201 safeguard actions against Chinese goods.

The Trump Administration use of Section 301 against China has proved that it is effective when deployed against specific unfair acts of discrimination and in accordance with Section 301's statutory procedural requirements. Then USTR Robert E. Lighthizer's use of Section 301 against China during Trump 1.0 included a lengthy report detailing China's unfair trade practices, extensive opportunities for public comment, and days of public hearings allowing affected American stakeholders to testify in support of tariffs as well as to the costs that would arise for their U.S. businesses and customers from higher tariffs on specific imported items. The result was a major U.S. trade action with broad support and one that led to a minimum of public and political

controversy. In contrast, the Trump 2.0 Administration's sweeping tariffs against Canada under Section 338 contained no such procedural safeguards, and have stirred up a major public and political backlash.

### V. Even If Section 338 Is Somehow Still Alive, It Clearly Runs Afoul of the "Major Questions" Doctrine

As the Supreme Court stated in *Learning Resources*, it has "long expressed 'reluctance to read into ambiguous statutory text' extraordinary delegations of Congress's powers.'"[10]. This is known as the "major questions" doctrine and covers actions by the Executive Branch of "major economic and political significance." As the Court noted: "These considerations apply with particular force where, as here, the purported delegation involves the core congressional power of the purse."[11] As the Supreme Court also observed: "When Congress has delegated its tariff powers, it has done so in explicit terms, and subject to strict limits."[12] The Court also cited IEEPA's lack of "significant procedural limitations in other trade statutes" and the President's alleged authority to "issue a dizzying array of modifications at will" of U.S. tariffs.[13] The Court also noted that it was "telling that in IEEPA's 'half-century of existence' no President has invoked the statute to impose any tariffs – let alone tariffs of this magnitude and scope."[14] These factors apply with equal force to Section 338.

While it was used occasionally to threaten tariffs in the 1930s and 1940s, Section 338 has never been used to impose actual duties and has been a dead letter for well over the half-century cited in *Learning Resources*. The Section 338 tariffs cover around $20 billion in trade spread

[10] *Learning Resources*, 146 S.Ct. at 631 (citing *West Virginia v. Environmental Protection Agency*, 597 U.S. 697, 723 (2022)).

[11] *Id.* at 639.

[12] *Id.*

[13] *Id.* at 640.

[14] *Id.*

across hundreds of HTSUS classifications. While this is less than the $4 trillion of trade covered by the IEEPA tariffs, its "magnitude and scope" remains massive, and figured prominently in Republican losses in the recent mid-term elections, underscoring their "economic and political significance" for "major questions" purposes, such that "'a reasonable interpreter would [not] expect' Congress to 'pawn[] such a 'big time policy call[] … off to another branch.'"[15]

There is nothing in the limited legislative history of Section 338 to suggest that it was intended as a tool for sweeping tariffs against Canada, a longstanding friend and ally which shares a border with the U.S. and an open trading relationship with U.S. under NAFTA that was recently updated in the United States-Mexico-Canada Agreement (USMCA) during the Trump 1.0 Administration.

While Section 338 is part of the Smoot-Hawley Tariff Act of 1930, it was originally drafted as Section 317 of the Fordney McCumber Tariff Act of 1922. 42 State 858, 944-46 (1922). During the Senate floor debate on the 1922 Act, Senator McCumber stated that the provision was designed to address discrimination against U.S. overseas commerce by authorizing additional duties. He explained that "[t]hose additional duties are limited to the extent of the discrimination." The Senator added: "The first step authorized is the very moderate one of additional duties to be measured by the extent of the damage done to our trade, which is the only limitation provided." He stressed the purpose of Section 317 was to ensure that foreign countries would "accord to our commerce the equality of treatment which it is our policy to extend to them."

While Section 317 was renumbered as Section 338 in the Smoot-Hawley Tariff Act, the conference report notes that it was a continuation of existing law and remained focused on

[15] *Id.* at 641 (quoting *Biden v. Nebraska*, 600 U.S. 477 (Barrett J. concurring)).

"equality of treatment."[16] During subsequent Senate debates over trade legislation, it was also described as substantially re-enacting Section 317 and as never having actually been used. In other words, the Administration is asking this Court to grant the President an "extravagant" amount of statutory authority to impose tariffs of "astonishing" magnitude and scope against a close friend, ally, and trading partner based on an obscure provision that has languished for decades in the dusty shelves of unopened trade law books, one moreover that was never used even in the heyday of Smoot-Hawley protectionism.[17]

Moreover, if the Court were to uphold Section 338 tariffs in this case, it would hand the Trump and future administrations a massive weapon that could – and would - be used against other trading partners, including to reinstate IEEPA tariffs, or to advance the President's various trade or foreign policy grievances. This would risk damaging the U.S. economy, driving up prices for tens of millions of U.S. households, and, fairly or not, further undermining the perceived effectiveness of the courts as checks on abuses of Executive Branch power. Article I of the U.S. Constitution is clear, the tariff power of the United States is vested in the Congress. It can be delegated only within clear limits.

## VI. The Administration Failed To Calculate the Amount of U.S. Trade Damage So As To Set An Appropriate Amount Of Canadian Goods Subject To Higher Duties Under Section 338

The three Presidential Section 338 proclamations do not contain any pretense or calculation indicating that the U.S. retaliatory duties under Section 338 are proportional to the harm by the claimed discrimination the products involved in U.S. exports to Canada. While Section 338

[16] H.R. Report No. 71, p. 1892 (1930).

[17] *Learning Resources*, 146 S.Ct. at 640-41.

contains only limited procedural safeguards, it does require the President to tie the retaliatory duties to the level of burden or restriction on U.S. exports:

> Whenever the President shall find as a fact that any foreign country places any burden or disadvantage upon the commerce of the United States by any of the unequal impositions or discriminations aforesaid, he shall, when he finds that the public interest will be served thereby, by proclamation specify and declare such new or additional rate or rates of duty as he shall determine will offset such burden or disadvantage, not to exceed 50 per centum *ad valorem* or its equivalent

19 U.S.C. § 1338(d) (emphasis added).

This provision ensures that the duties are proportionate to the trade damage, and avoids the overbroad application of tariffs, which could provoke a broader trade war. There is no evidence that the Administration made any effort here to calculate the impact of the alleged Canadian practices on U.S. commerce so as to develop an estimated amount of trade damage so as to calculate the proper amount of Canadian goods subject to higher duties. This is not an extraordinary undertaking. Until the Second Trump Administration, standard USTR practice under Section 301 was to bring together an inter-agency team of economists, including the USTR Chief Economist and White House Council of Economic Advisers (CEA), to come up with the estimated trade damage.

### A. Section 338 Requires a 30-Day Grace Period To All Goods In Transit To Clear Customs and Avoid Saddling U.S. Importers with Unexpected Duty Liabilities

Section 338(d) requires the President to give importers a 30-day grace period of allow goods in transit to clear U.S. Customs. This provision avoids saddling U.S. importers with a sudden and unexpected liability for punitive 50 percent duties. The Trump Administration ignored this provision. The President's Proclamations imposing Section 338 duties were issued on July 20, 2026, and stated that duties would go into effect on August 19, 2026, the requisite waiting period. However, the Administration quickly had second thoughts about some of the tariffs,

probably because of the political backlash, and issued Proclamations 11064 and 11065 on September 8, 2026, retracting the tariffs on certain products and substituting new products. The tariffs on these new products were put into effect on September 15, 2026, 15 days later and less than the required 30 days.

While Section 338(c) give the President authority to "suspend, revoke, supplement, or amend" any proclamation under Section 338, this does not obviate the 30-day grace period. Instead, Section 338(d) ties the effective date to "thirty days after the date of any such proclamation such new or additional rate or rates of duty so specified and declared in such proclamation shall be levied, collected, and paid upon such articles."[18] In other words, the statute is clear that the 30-day requirement covers "new or additional" rates of duty. This makes sense, since Congress was clearly aware that otherwise some of their constituents could be subject to punitive duties for goods in transit without any advance notice, potentially bankrupting small importers of record.

### B. Canadian Dairy Regime Is Highly Protectionist, But It Does Not Discriminate Under Section 338(a) Since It Applies to All of Canada's Trading Partners

Section 338 only applies if a foreign government:

> (1) Imposes, directly or indirectly, upon the disposition in or transportation in transit through or re-exportation from such country of any article wholly or in part the growth or product of the United States any unreasonable charge, exaction, regulation, or limitation which is not equally enforced upon the like articles of every foreign country; or
>
> (2) Discriminates in fact against the commerce of the United States, directly or indirectly, by law or administrative regulation or practice, by or in respect to any customs, tonnage, or port duty, fee, charge, exaction, classification, regulation, condition, restriction, or prohibition, in such manner as to place the commerce of the United States at a disadvantage compared with the commerce of any foreign country.

19 U.S.C. § 1338(a) (emphasis added).

[18] 19 U.S.C. § 1338(d) (emphasis added).

In short, the benchmark for Section 338 is whether a trading partner is according U.S. goods worse treatment than like goods of some other foreign country/trading partner. While Canada's dairy regime is highly protectionist and has been a longstanding source of U.S. trade friction, it applies to all of Canada's trading partners, not just the U.S. Indeed, the U.S. enjoys somewhat better treatment than most countries because of concessions secured by the Trump 1.0 Administration in the USMCA. The EU enjoys similar treatment because of the EU-Canada FTA. Section 338 is clear that it only applies if the U.S. is being discriminated against as compared to some other foreign country, which gets even better treatment. This is one reason Section 338 has been supplanted by Section 301, which is broader and covers "unreasonable" practices and takes a broader approach to discrimination, such that it is not limited to disadvantages "compared with the commerce of any foreign country" and covers national treatment as well as MFN violations.

While the Section 338 findings on autos and alcoholic beverages challenge higher Canadian tariffs on U.S. products, these were imposed in response to the Trump Administration's Section 232 and 301 duties on Canada. The legislative history of Section 317 and subsequent Congressional trade acts make it clear that the purpose of Section 338 is "equality of treatment."[19] The U.S. can hardly complain that Canada imposed higher duties in response to punitive U.S. duties. If anything, the Canadian action ensures equality of treatment and the proverbial level playing field. The Senate debate also makes clear that the "United States should ask no special favors and grant no special favors." The Administration's approach effectively asks Canada to accept a distorted and unbalanced trade relationship, as opposed to equality of treatment.

---

[19] Congressional Record, Vol LXII, Part qq, pp. 11245-11247 (August 11, 1922); Congressional Record – Senate, 78 Cong. Record, 8969, pp. 8991-8992 (May 17, 1934).

## CONCLUSION

Section 338 of the Tariff Act of 1930 is not dormant; it is dead.

Section 252 of the Trade Expansion Act of 1962 partially replaced Section 338 (if indeed Section 338 was extant in 1962) and Section 301 completely replaced Section 338 (again, if it was existing U.S. law in 1974). Section 301 authorizes as retaliation tariffs with no upward limit, the equivalent of a ban. Unlike Section 338, there is no ceiling imposed by Congress on tariffs as a remedy under Section 301. In fact, USTR's standard practice before the Trump Administration was to impose 100% duties for WTO violations under Section 301 to encourage compliance, which was generally effective. In imposing sweeping duties on China in Trump 1.0, USTR Lighthizer used Section 301 not Section 338, which was no more. Desuetude and disuse, along with a long history of not being even considered as a current trade statute, prevents its resurrection now. The only conceivable purpose can be to skirt the additional safeguards and refinements that Section 301 includes, and to avoid the stricture under Section 301 that punitive tariffs must be administered consistently with the requirements of the Administrative Procedure Act.

For the foregoing reasons, the Court should find that Section 338 is no longer valid, strike down the Section 338 duties, and order the Administration to promptly refund any duties collected.

Respectfully submitted,

/s/ Alan Wm. Wolff

Alan Wm. Wolff
20 Bridle Court
P.O. Box 59110
Potomac, MD 20854
(202) 577-6107
alan.wolff@alanwmwolff.com

/s/ Warren H. Maruyama

Warren H. Maruyama
4131 Harrison Street NW
Washington, DC 20015
(202) 253-3844
WHMaruyama@gmail.com

/s/ Carla A. Hills

Carla A. Hills
5610 Wisconsin Avenue
Unit 20C
Chevy Chase, MD 20815
(202) 441-1875
Cahills@hillsandco.com

Date: November 11, 2026

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing AMICI CURIAE BRIEF OF FORMER U.S. TRADE OFFICIALS IN SUPPORT OF PLAINTIFF contains **5,186 words**, excluding those portions that do not count toward the word limitation and thus complies with the Court's Standard Chambers Procedures.

/s/ Alan Wm. Wolff