**UNITED STATES COURT OF INTERNATIONAL TRADE**

GELLERT GLOBAL GROUP CORP.,

Plaintiff,

v.

DONALD J. TRUMP, in his official capacity as President of the United States; EXECUTIVE OFFICE OF THE PRESIDENT; the UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, in his official capacity as Commissioner of United States Customs and Border Protection; JAMIESON GREER, in his official capacity as United States Trade Representative; and OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE,

Defendants.

Before: Claire R. Kelly, Joseph A. Laroski, Jr., and Kara M. Westercamp, Judges

Court No. 26-04636

**BRIEF OF AMICUS CURIAE BARRY APPLETON IN SUPPORT OF PLAINTIFF**

Prof. Barry Appleton
Amicus Curiae, pro se

185 West Broadway, New York, NY 10013
(416) 966-8800, bappleton@appletonlaw.com

# TABLE OF CONTENTS


Page

TABLE OF AUTHORITIES ..... ii

STATEMENT OF INTEREST AND DISCLOSURE ..... 1

SUMMARY OF ARGUMENT ..... 2

ARGUMENT ..... 4

I. The Court Decides What "Discriminates in Fact" Means ..... 4

II. In 1922 the Senate Struck the Equal-Treatment Test ..... 6

A. Only paragraph (a)(1) of Section 338 mentions equal enforcement, and it also requires an unreasonable charge ..... 6

B. The Senate debated reciprocity and voted the equal-treatment clause out ..... 7

C. A clause Congress deleted is not read back into the statute ..... 10

D. "In fact" requires a real effect, and the contrary readings do not prevail ..... 11

E. A preference won in a reciprocal bargain is not discrimination without more ..... 17

III. Proclamation 11047 Treats a Negotiated Bargain as Discrimination ..... 21

A. The comparator is a reciprocal agreement ..... 21

B. Congress approved the American side of the bargain ..... 22

C. The Proclamation treats a difference between agreement terms as discrimination in fact ..... 23

D. The Proclamation's reading would reach the USMCA itself ..... 24

CONCLUSION ..... 24

APPENDIX A ..... App. 1

# TABLE OF AUTHORITIES

**Page**

**Cases**

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) ....10

*Learning Resources, Inc. v. Trump*, 607 U.S. ___, Nos. 24-1287, 25-250 (Feb. 20, 2026) ....5

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ....4, 5

*Maple Leaf Fish Co. v. United States*, 762 F.2d 86 (Fed. Cir. 1985) ....4, 5

*Motion Systems Corp. v. Bush*, 28 C.I.T. 806, 342 F. Supp. 2d 1247 (2004), *aff'd on other grounds*, 437 F.3d 1356 (Fed. Cir. 2006) (en banc) ....4, 5

*Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359 (1980) ....11

*Oregon v. United States*, Slip Op. 26-47, Court Nos. 26-01472 & 26-01606 (Ct. Int'l Trade May 7, 2026), appeal pending, Nos. 2026-1804, 2026-1805, 2026-1928 (Fed. Cir.) (stay pending appeal granted June 11, 2026) ....4, 11

*Russello v. United States*, 464 U.S. 16 (1983) ....11

**Statutes**

19 U.S.C. § 1332(g) ....21

19 U.S.C. § 1338 .... passim

19 U.S.C. § 2411(d)(3) ....18

19 U.S.C. § 2411(d)(5) ....19

19 U.S.C. § 4511(a) ....22

19 U.S.C. § 4512 ....5

Pub. L. No. 112-41, 125 Stat. 428 (2011) ....24

Pub. L. No. 116-113, 134 Stat. 11 (2020) ....22

Tariff Act of 1922, ch. 356, § 317, 42 Stat. 858 .... passim

Tariff Act of 1930, ch. 497, §§ 316, 338, 46 Stat. 590 ....1, 2, 10, 13, App. 1

**Regulations and Executive Materials**

Proclamation No. 11047, 91 Fed. Reg. 46,653 (July 20, 2026) .... passim

Proclamation No. 11062, 91 Fed. Reg. 58,319 (Sept. 8, 2026) ....6, 18, 21

Request for Comments Regarding Implementation of 19 U.S.C. 1338(g), 91 Fed. Reg. 57,387 (Sept. 9, 2026) ....1, 7

46 C.F.R. § 542.1(b) ....18

**Legislative Materials**

H.R. 5430, 116th Cong. ....22

S. Rep. No. 67-595 (1922) ....................................................................................12, 13

62 Cong. Rec. 11,245-49 (1922)....................................................................8, 11, 12, 13, App. 2

**Other Authorities**

Barry Appleton, *Discrimination in Fact: A Standard, a Procedure and a Public Record for Section 338 of the Tariff Act of 1930*, Comments in USITC Inv. No. MISC-053 (filed Oct. 30, 2026)..............................................................1, 20, 23, App. 2

Comprehensive Economic and Trade Agreement, Can.-EU, Oct. 30, 2016 ..........3, 21, 22, 23, 24

Final Report of the Panel, *Canada: Dairy TRQ Allocation Measures*, USMCA Secretariat File No. CDA-USA-2021-31-01 (Dec. 20, 2021) ...............................................23

Final Report of the Panel, *Canada: Dairy Tariff-Rate Quota Allocation Measures 2023*, USMCA Secretariat File No. CDA-USA-2023-31-01 (Nov. 10, 2023).......................23

Glob. Affairs Can., *Notice to Importers No. 895: CETA Cheese Tariff Rate Quota (TRQ)* (Aug. 1, 2017).........................................................................................22

Gov't of Can., *Canada-European Union Comprehensive Economic and Trade Agreement: Technical Summary of Final Negotiated Outcomes (Agreement-in-Principle)* (as of Oct. 18, 2013) ......................................................................................22

Int'l Dairy Foods Ass'n, Comment, USITC Inv. No. MISC-053 (Nov. 6, 2026) ........................18

Simon Lester, *A Brief Section 338 Reaction*, Int'l Econ. L. & Pol'y Blog (July 21, 2026) ...........................................................................................................19

Simon Lester, *The Meaning of "Discrimination" in Section 338's Predecessor (Section 317 of the Tariff Act of 1922)*, Int'l Econ. L. & Pol'y Blog (July 27, 2026) .......................................................................................................7, 19

Simon Lester, *What Kind of Discrimination Should Section 338 Target?*, Int'l Econ. L. & Pol'y Blog (Sept. 25, 2026)..........................................................................20

Wallace McClure, *A New American Commercial Policy as Evidenced by Section 317 of the Tariff Act of 1922* (Studies in History, Economics and Public Law vol. 114, no. 2, 1924) ............................................................................................ passim

Mona Paulsen, *Why Section 338 Does Not Work in a GATT/WTO World: Lessons from Trade Law History*, Int'l Econ. L. & Pol'y Blog (July 23, 2026) ..............................7, 11

U.S. Int'l Trade Comm'n, Nonfat Milk Solids: Competitive Conditions for the United States and Major Foreign Suppliers, Pub. No. 5732, Inv. No. 332-607 (Apr. 2026) .............21

U.S. Tariff Comm'n, *Fourteenth Annual Report* (1930) .........................................................10

U.S. Tariff Comm'n, *Seventh Annual Report* (1923) ...............................................12, 15, 16, 18

U.S. Tariff Comm'n, *Sixth Annual Report* (1922)............................................................12, 15

U.S. Trade Representative, *Report on the Appellate Body of the World Trade Organization* (Feb. 2020)...........................................................................................20

John K. Veroneau & Catherine H. Gibson, *Presidential Tariff Authority*, 111 Am. J. Int'l L. 957 (2017)..........................................................................................14, 15

## STATEMENT OF INTEREST AND DISCLOSURE

Amicus is a Distinguished Adjunct Professor of Law at New York Law School, Co-Director and Distinguished Senior Fellow of its Center for International Law, Adjunct Professor in the School of International Policy and Governance at Wilfrid Laurier University, Interim Director of the Balsillie Legal Advisory Centre at the Balsillie School of International Affairs, and Managing Partner of Appleton & Associates International Lawyers LP. He is a member of the Bar of this Court, appears pro se in a personal capacity, and is not a party. He has practiced and taught international trade law for more than thirty-five years and has written two books on the North American Free Trade Agreement.

Amicus has written publicly about Section 338 of the Tariff Act of 1930. He co-authored two opinion articles with Professor Marc Busch of Georgetown University, published in The Hill on July 24 and August 28, 2026. He also filed a comment in the United States International Trade Commission's Investigation No. MISC-053 on how the Commission should carry out its duty under 19 U.S.C. § 1338(g). Barry Appleton, *Discrimination in Fact: A Standard, a Procedure and a Public Record for Section 338 of the Tariff Act of 1930*, Comments in USITC Inv. No. MISC-053 (filed Oct. 30, 2026) [hereinafter Appleton USITC Comment], responding to Request for Comments Regarding Implementation of 19 U.S.C. 1338(g), 91 Fed. Reg. 57,387 (Sept. 9, 2026), https://doi.org/10.5281/zenodo.23861082. The Appleton USITC Comment is identified on the U.S. International Trade Commission MISC-053 Comment site as document 899256, https://edis.usitc.gov/external/search/document/899256, and it is available on SSRN as https://dx.doi.org/10.2139/ssrn.7683305. Amicus draws on that research and cites the comment where it bears on the argument. He files to put before the Court the 1922 Senate record on which the meaning of "discriminates in fact" turns.

No party's counsel authored this brief in whole or in part, and no one other than amicus funded its preparation or filing. Amicus has no financial interest in the outcome. A separate Notice of Use of Generative Artificial Intelligence and Certification, filed under the Order on Artificial Intelligence of Judge Kelly, accompanies this brief.

## SUMMARY OF ARGUMENT

This brief addresses one question: what Congress meant by "discriminates in fact" in 19 U.S.C. § 1338(a)(2), together with the requirement in § 1338(a)(1) that a charge be "unreasonable." Plaintiff's Motion argues that a reciprocal preference is not discrimination and points to the American preference for Cuba in the Tariff Act of 1930 itself. Amicus adds to the record what Plaintiff's Motion does not discuss: the Senate's 1922 debate and the amendment that followed. He asks the Court to hold that "discriminates in fact" does not reach a difference between the terms of two reciprocal agreements unless the finding rests on an actual disadvantage to American commerce beyond the difference the bargain itself produces.

A difference between the terms Canada gives the United States and the terms it gives another partner under a separate reciprocal agreement is not, without more, discrimination "in fact" against American commerce. The history shows why. In 1922, the Senate had before it a clause that would have condemned any treatment of American commerce that was not equal to the treatment given another country. Senators asked whether the clause would reach reciprocity agreements, including the preference the United States gave Cuba. The Senate struck the clause without a recorded objection, kept the word "discriminates," and adopted the section as amended by a vote of 38 to 19. The words "in fact" were added after the Senate acted, and the Tariff Commission read the enacted section to turn on "the effect upon American commerce." Congress carried the same structure into Section 338 in 1930. Equal treatment describes the policy behind

the section. The test Congress enacted asks whether American commerce suffers a disadvantage in fact.

The President's Proclamation 11047 of July 20, 2026 applies a different test. It found that Canada discriminates in fact through its cheese quota rules and imposed a 50 percent duty. It did so by comparing how Canada administers the cheese quota in the United States-Mexico-Canada Agreement (USMCA) with the quota in the Comprehensive Economic and Trade Agreement between Canada and the European Union (CETA), signed October 30, 2016. Each agreement is a negotiated bargain, and Congress approved the USMCA in 2020, when CETA was already in provisional application. The Proclamation treats a difference between the terms of two bargains as discrimination, which is the reading the Senate declined to adopt. That reading would also reach the USMCA itself, whose terms differ from CETA's in the same way.

Amicus accepts the Proclamation's recitals as stated and leaves the facts to the President. The argument does not depend on any finding that Canada treats all of its partners alike, and it holds even if the Proclamation is right that the two agreements differ. The question is whether the Proclamation applied the statutory term when it treated a difference between agreement terms as discrimination in fact. The words "in fact" make an effect on American commerce part of what the statute requires. The Court need not decide whether Canada's retailer-eligibility rule for its cheese quota is wise. It decides what a statutory phrase covers. Part I explains the Court's role in construing the phrase. Part II sets out the 1922 amendment and answers the authorities that point the other way. Part III applies that reading to Proclamation 11047.

Amicus takes no position on whether Section 301 displaces or controls Section 338, on nondelegation or the major questions doctrine, on the precondition in § 1338(g), or on whether the Proclamation's rates and effective dates satisfy § 1338(d). Other participants may address

those questions, and this brief neither repeats nor depends on them. It assumes for argument that Section 338 is operative.

## ARGUMENT

### I. The Court Decides What "Discriminates in Fact" Means

The Court determines the meaning of "discriminates in fact" for itself, and it will set aside presidential action under a trade statute that rests on "a clear misconstruction of the governing statute." *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394-95, 412-13 (2024) (courts must exercise independent judgment in deciding whether an agency has acted within its statutory authority and may not defer to an interpretation simply because a statute is ambiguous). That standard applies here to a single statutory phrase. Section 338 commits several judgments to the President, including whether the public interest will be served and what rate will offset a burden. Amicus does not question those judgments. Where Congress delegates discretion, the Court's task is to "police the outer statutory boundaries of those delegations." *Loper Bright*, 603 U.S. at 404. The Court is not asked to weigh the President's findings of fact or to review a judgment about foreign policy. This Court drew the same line in *Oregon v. United States*, where the majority said it would "interpret the statute in question" but would not "make factual determinations committed to the President's discretion." *Oregon v. United States*, Slip Op. 26-47, Court Nos. 26-01472 & 26-01606, at 29 n.23 (Ct. Int'l Trade May 7, 2026) (Barnett and Kelly, JJ.), *appeal pending*, Nos. 2026-1804, 2026-1805, 2026-1928 (Fed. Cir.) (stay pending appeal granted June 11, 2026); *see id.* at 16-17 (citing *Loper Bright*, 603 U.S. at 386).

Amicus acknowledges that this Court reviews presidential findings narrowly. In *Motion Systems Corp. v. Bush*, 28 C.I.T. 806, 342 F. Supp. 2d 1247, 1259-62 (2004), *aff'd on other*

*grounds*, 437 F.3d 1356 (Fed. Cir. 2006) (en banc), a case under section 421 of the Trade Act of 1974, this Court applied the *Maple Leaf Fish* standard, declined to review the truth or sufficiency of the President's evidence, and rejected an argument that the statute required him to quantify adverse impacts precisely. Amicus asks for neither. He accepts the Proclamation's recitals as stated and demands no quantification. The Federal Circuit affirmed en banc on a different ground. It held that the President's action under section 421 was sufficiently discretionary to preclude judicial review. *Motion Systems*, 437 F.3d 1356. Two judges, concurring in part and in the judgment, would have reviewed whether the President acted within the limits the statute sets. *Id.* (Gajarsa, J., joined by Newman, J., concurring in part and concurring in the judgment). No opinion in the case construed § 1338(a)(2), and the holding turns on the discretion that section 421 confers. The question here is what the condition in § 1338(a)(2) means, and on that question *Maple Leaf Fish* and *Loper Bright* direct the Court to its own judgment.

The Supreme Court's decision this year in *Learning Resources* describes how Congress has structured tariff delegations. The plurality observed that when Congress delegates its tariff powers "it has done so in explicit terms, and subject to strict limits." It named Section 338 among its examples, citing the 50 percent cap in § 1338(d). *Learning Res., Inc. v. Trump*, 607 U.S. ___, Nos. 24-1287, 25-250, slip op. at 8-9 (Feb. 20, 2026) (Roberts, C.J., joined by Gorsuch and Barrett, JJ., Part II-A-2). Amicus cites the passage only to describe how Section 338 is built.

Two limits frame the argument. First, amicus makes no claim under the USMCA and does not ask the Court to enforce the agreement or any panel report. The USMCA Implementation Act limits remedies based on the agreement. 19 U.S.C. § 4512(a), (c). The agreement, and Congress's approval of it, appear as historical facts bearing on what Congress treats as discrimination, as they do in Plaintiff's Motion. Second, amicus addresses only

Proclamation 11047, which alone compares Canada's treatment of the United States with its treatment of another trading partner. Proclamation No. 11047 ¶ 6, 91 Fed. Reg. 46,653 (July 20, 2026) [hereinafter Proclamation 11047] (finding that Canada "is discriminating in fact," that its measure "is unreasonable, is not equally enforced upon the like articles of every foreign country," and that it burdens United States commerce). Proclamation 11062, which imposes the dairy ban, rests on the finding in Proclamation 11047 but is not before the Court on this motion. *See* Proclamation No. 11062 ¶ 6, 91 Fed. Reg. 58,319, 58,320 (Sept. 8, 2026); Pl.'s Mot. for Summ. J., ECF No. 6 ("Pl.'s Mot.," cited by internal page number), at 13 (describing the dairy ban as resting on the finding that Canada "maintained the discriminations" identified in Proclamation 11047); Pl.'s Mot., Notice of Motion at 2 (seeking no relief against Proclamations 11061, 11062 and 11063).

## II. In 1922 the Senate Struck the Equal-Treatment Test

### A. Only paragraph (a)(1) of Section 338 mentions equal enforcement, and it also requires an unreasonable charge

Section 338(a) has two triggers, and subsection (d) ties the remedy to the same words.

The operative text reads:

> (a) The President when he finds that the public interest will be served shall by proclamation specify and declare new or additional duties as hereinafter provided upon articles wholly or in part the growth or product of, or imported in a vessel of, any foreign country whenever he shall find as a fact that such country—
>
> (1) Imposes, directly or indirectly, upon the disposition in or transportation in transit through or reexportation from such country of any article wholly or in part the growth or product of the United States any unreasonable charge, exaction, regulation, or limitation which is not equally enforced upon the like articles of every foreign country; or

> (2) Discriminates in fact against the commerce of the United States, directly or indirectly, by law or administrative regulation or practice, by or in respect to any customs, tonnage, or port duty, fee, charge, exaction, classification, regulation, condition, restriction, or prohibition, in such manner as to place the commerce of the United States at a disadvantage compared with the commerce of any foreign country.
>
> . . . .
>
> (d) Whenever the President shall find as a fact that any foreign country places any burden or disadvantage upon the commerce of the United States by any of the unequal impositions or discriminations aforesaid, he shall, when he finds that the public interest will be served thereby, by proclamation specify and declare such new or additional rate or rates of duty as he shall determine will offset such burden or disadvantage, not to exceed 50 per centum ad valorem or its equivalent, on any products of, or on articles imported in a vessel of, such foreign country . . . . 19 U.S.C. § 1338(a), (d).

The first paragraph pairs the equal-enforcement test with a requirement that the charge be unreasonable. The second turns on discrimination "in fact." Congress defined neither "unreasonable" nor "in fact." Under subsection (d), the additional duty must offset a "burden or disadvantage" and may not exceed 50 percent ad valorem.

**B. The Senate debated reciprocity and voted the equal-treatment clause out**

Section 338 began as Section 317 of the Tariff Act of 1922. Tariff Act of 1922, ch. 356, § 317, 42 Stat. 858, 944-46; *see* Request for Comments Regarding Implementation of 19 U.S.C. 1338(g), 91 Fed. Reg. 57,387, 57,387 n.i (Sept. 9, 2026) (Section 338(g) "originated at Section 317 of the Tariff Act of 1922 and was reenacted with minor changes" in 1930). *See also* Mona Paulsen, *Why Section 338 Does Not Work in a GATT/WTO World: Lessons from Trade Law History*, Int'l Econ. L. & Pol'y Blog (July 23, 2026), https://ielp.worldtradelaw.net/2026/07/why-section-338-does-not-work-in-a-gatt-wto-world-lessons-from-trade-law-history/ (tracing Section 338 to Section 317 and describing the 1922 debate over reciprocity); Simon Lester, *The Meaning of "Discrimination" in Section 338's Predecessor (Section 317 of the Tariff Act of 1922)*, Int'l Econ. L. & Pol'y Blog (July 27, 2026),

https://ielp.worldtradelaw.net/2026/07/the-meaning-of-discrimination-in-section-338s-predecessor-section-317-of-the-tariff-act-of-1922/ (discussing McClure's analysis). The committee text included several triggers for imposing tariffs. One paragraph reached an unreasonable charge that was not equally enforced. Two paragraphs reached any charge "not equally enforced" on goods moving to or from the United States, whether or not unreasonable. And the discrimination paragraph reached any country that "fails to accord to the commerce of the United States treatment equal and equivalent to that accorded to the commerce of any foreign country." 62 Cong. Rec. 11,245-49 (1922) (committee text read by Sen. Walsh at 11,245-47).

The senators quickly saw that the clause threatened reciprocity agreements. On August 11, 1922, Montana Senator Walsh observed that the United States gave Cuba "a preference over every other country." He then asked whether Yugoslavia, by admitting goods from Czechoslovakia at a lower rate than goods from the rest of the world, would make itself subject to the section. Senator Lodge answered "No," because the section "affects only nations which come under the favored-nation clause." When Walsh pressed that a reciprocal arrangement would still violate the section, Lodge said, "I am not sure of that," and then, after looking at the text, "It does not interfere with reciprocity treaties." Walsh answered that the section "applies to every country that discriminates against us." Senator McCumber, who managed the bill for the Finance Committee, said that where reciprocity treaties have been made between nations, "it would not be a discrimination against the United States for the reason that just and proper consideration is supposed to pass between the countries in making those reciprocal arrangements." Senator Lenroot answered, "Exactly." *Id.* at 11,245-46 (remarks of Sens. Walsh, Lodge, McCumber and Lenroot). Later in the debate Walsh observed that the equal-treatment clause would apply whatever consideration a third country had given in a reciprocity agreement,

and Senator Lodge replied that a reciprocal arrangement had never been held to violate the most-favored-nation clause. Lodge added that "[d]iscrimination exists only when a nation has been treated differently from all other nations which have no reciprocity treaties," and that "[y]ou do not discriminate where there is a reciprocity treaty, because you get an adequate return." Of reciprocity treaties, he said: "We have them ourselves." *Id.* at 11,247 (remarks of Sens. Walsh and Lodge).

Senator Lenroot then moved to strike the two bare equal-enforcement paragraphs and the "equal and equivalent" clause, which he said would "leave it applying to all discriminations against the United States." The amendment was agreed to without a recorded objection, and the Senate adopted Section 317 as amended by a vote of 38 to 19. The equal treatment clause was gone. *Id.* at 11,248-49 (Lenroot amendment agreed to at 11,248; vote on section as amended at 11,248-49).

**Table 1. What the Senate did to Section 317 on August 11, 1922**

| Finance Committee text | Senate action | Enacted section 317(a) |
|---|---|---|
| An unreasonable charge, exaction, regulation, or limitation "not equally enforced upon the like products of any foreign country" | Kept | Kept; today's §1338(a)(1) |
| A charge on goods not of United States origin shipped from the United States that "is not equally enforced upon importation from every foreign country" | Struck (Lenroot amendment) | Deleted |
| A duty or restriction on exports to the United States "not equally enforced upon the exportation of such products to every foreign country" | Struck (Lenroot amendment) | Deleted |
| Discrimination "in such manner as to place the commerce of the United States at a disadvantage compared with the commerce of any foreign country" | Kept; "customs, tonnage, or port" added | Kept; "in fact" added in conference; today's §1338(a)(2) |

| **Finance Committee text** | **Senate action** | **Enacted section 317(a)** |
|---|---|---|
| A country that "fails to accord to the commerce of the United States treatment equal and equivalent to that accorded to the commerce of any foreign country" | Struck (Lenroot amendment) | Deleted |

The Senate kept "discriminates." It deleted every clause that turned on unequal treatment alone, and it kept equal enforcement as a test only where the charge is also "unreasonable." Wallace McClure, writing in 1924, reached the same conclusion: the surviving paragraph applies "only if the unequal charge upon American commerce is 'unreasonable,'" a limitation that "does not appear in the paragraphs that were stricken out." Wallace McClure, *A New American Commercial Policy as Evidenced by Section 317 of the Tariff Act of 1922*, at 90 (Studies in History, Economics and Public Law vol. 114, no. 2, 1924) [hereinafter McClure]. Citations to McClure are to the pages of the monograph. The volume pagination used in some other citations to this work runs 210 pages higher.

Congress carried the same structure into Section 338 in 1930. Tariff Act of 1930, ch. 497, § 338, 46 Stat. 590, 704. The Tariff Commission reported in 1930 that Section 338 "takes the place of section 317," and that the only important change was to extend the section to articles imported in the vessels of a discriminating country. U.S. Tariff Comm'n, Fourteenth Annual Report 2 (1930). The operative words of both triggers, including "discriminates in fact," carried over unchanged. Re-enactment of the legislation in 1930 shows continuity of text and nothing more; amicus does not rely on it to prove what the 1930 Congress understood the words to mean.

**C. A clause Congress deleted is not read back into the statute**

"Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987) (quoting

*Nachman Corp. v. Pension Benefit Guar. Corp.*, 446 U.S. 359, 392-93 (1980) (Stewart, J., dissenting)); *see also Russello v. United States*, 464 U.S. 16, 23-24 (1983). The Senate acted openly. It considered the clause, discussed what it would reach, and removed it by an amendment agreed to without a recorded objection. The conference that later added the words "in fact" did not restore the clause. An open amendment is stronger evidence than the remarks of any one senator, which is why amicus rests on the amendment and uses the speeches only to explain it. This Court has looked to the same kind of evidence. In *Oregon*, the majority compared two versions of a bill to read the section it became. *See Oregon*, Slip Op. 26-47, at 34-37.

**D. "In fact" requires a real effect, and the contrary readings do not prevail**

According to McClure, the words "in fact" were inserted by the Conference Committee after the Senate acted, and he read them to carry their "familiar connotation of 'material,' 'real' or 'actual,'" so that, in McClure's words, practices "discriminatory on paper" that "do not interfere with the practical flow of trade" fell outside the section. McClure at 32, 90. The text the Senate agreed to on August 11 did not contain the words "in fact," which confirms that they came later. 62 Cong. Rec. at 11,249. The same passage is discussed in the Paulsen and Lester posts cited in Part II.B. The reading fits the second paragraph, which asks whether American commerce is placed "at a disadvantage." A disadvantage in fact is shown by effect. The Tariff Commission, which the statute directs to keep informed of such discriminations, read the enacted words the same way soon after enactment. The statute, it reported, "makes it clear that the point to be regarded is the effect upon American commerce and not the motive or intent of the foreign country in adopting its legislation or in adjusting its rates." The Commission also recognized that a discrimination may be reasonable, giving sanitary regulations as an example, and said that aside from such reasonable exceptions every country that discriminates in fact is liable. U.S.

Tariff Comm'n, Sixth Annual Report 6 (1922); accord U.S. Tariff Comm'n, Seventh Annual Report 42 (1923). The Senate Finance Committee's report points the same way. It described the additional duties as "limited to the amount of the discrimination" and "measured by the extent of the injury done to our trade," which presupposes a measurable disadvantage. S. Rep. No. 67-595, pt. 1, at 3-4 (1922) ("An Elastic Tariff").

The record is not one-sided, and in fairness the Court should have all of it. Senator Lodge called the committee wording "so sweeping" that it needed to change, because the United States could not interfere with reciprocity treaties. 62 Cong. Rec. at 11,247 (remarks of Sen. Lodge). After the Lenroot amendment was offered, he called the surviving discrimination clause "very sweeping," covering "everything relating to the commerce of the United States." *Id.* at 11,248. The record also holds remarks that point the other way. Introducing the section, Senator McCumber said the President could escalate against a country that "does not accord to our commerce that equality of treatment which it is our policy to extend to them," and Senator Smoot called the equal-enforcement paragraph "a notice to the world that America intends to be treated equally with all other countries." 62 Cong. Rec. at 11,245 (remarks of Sen. McCumber), 11,246 (remarks of Sen. Smoot). Both remarks came before the Lenroot amendment, and Smoot was describing a paragraph the Senate then struck. Senator McCumber also said that the equal-enforcement paragraphs, though they did not use the word, described "acts which are discriminatory," and Defendants may argue that the Senate struck them as redundant. *Id.* at 11,247. That explanation fits poorly with the "equal and equivalent" clause, of which Senator Walsh said, "There is no discrimination there at all." *Id.* (remarks of Sen. Walsh). The Finance Committee's report, submitted in April 1922 before the floor amendment, also called the House bill's reciprocity provisions "contrary to the policy of equality of opportunity and the principle of

the open door" and proposed in their place "a policy of penalizing discriminations against American commerce." S. Rep. No. 67-595, pt. 1, at 4 (1922). The report objected to the House bill's machinery for adjusting American duties country by country, including agreements that would not require Senate ratification. It did not address a preference that one foreign country grants another in a reciprocal agreement. The floor debate took up that question four months later and answered it the other way.

McClure, who wrote as an advocate of unconditional most-favored-nation treatment, concluded that a favor granted to a third country for a reciprocal favor is not "any less in fact a discrimination against the commerce of the United States." He suggested that the insertion "may possibly have been intended to deprive the word 'discriminates' of any legal connotation" that the American conditional reading of most-favored-nation treatment gave it. McClure at 84, 89, 119. McClure's views deserve weight but do not prevail. The suggestion about the Conference Committee is McClure's own, and he offered it tentatively. A change made in a conference committee is weaker evidence of meaning than the Senate's adoption of a deliberate amendment after floor debate. McClure himself also read "in fact" to require real effect on trade. Senator Lenroot, who offered the amendment, voted against the section as amended. 62 Cong. Rec. at 11,248-49. His own description of the amended section, that it would apply to "all discriminations against the United States," still presupposes a discrimination. The 1930 Act that re-enacted the section also preserved the American preference for Cuba. Tariff Act of 1930, § 316, 46 Stat. at 695; *see* Pl.'s Mot. at 35-36.

McClure's own survey of discriminatory practices belongs in the record too, because Defendants may rely on it. He wrote that the preferences Canada and Great Britain accord each other constitute "a discrimination against the United States," that nothing in the language of

section 317 distinguishes "free favors" from "favors accorded for a consideration," and that the exclusive concessions in Haiti's reciprocity treaty with France "must be assumed to constitute a discrimination against the United States." McClure at 34-36. In a footnote he added that, "[w]hile not unthinkable," it appeared "hardly possible under the language of the Act that an exchange of exclusive favors under a reciprocity treaty could be regarded as a not unreasonable discrimination," and that a contrary reading "would be largely nullifying." *Id.* at 35-36 n.2. Three features of that passage matter here. First, the same footnote recognizes that "the traditional policy of the United States has been to regard exclusive favors granted in exchange for reciprocal concessions as in a different category from such favors when granted freely," which is the conditional reading of most-favored-nation treatment that the Senators had in mind when they asked about the Cuban preference. Second, the footnote directs the reader to the Senate debate on section 317, which it says should "be carefully read," and that debate is the record on which this brief rests. Third, McClure's Canadian example is a preference between members of an Empire with separate customs laws, not a trade agreement approved by Congress. *Id.* at 33-34.

Later executive practice carries less weight than the Senate's amendment. Defendants may point to a 1932 State Department communication stating that a French tax treaty that would exempt Belgian goods, but not American goods, from French import taxes "clearly falls within the meaning of Section 338 of the Tariff Act." John K. Veroneau & Catherine H. Gibson, *Presidential Tariff Authority*, 111 Am. J. Int'l L. 957, 965-66 & n.68 (2017) [hereinafter Veroneau & Gibson]. The account of that exchange does not say whether the Belgian arrangement was reciprocal, and the quoted sentence does not refer to the 1922 debate. The same account reports that the matter appears to have been resolved by treaty after Section 338 was threatened, so the reading was never tested. Veroneau & Gibson at 965-66 & n.70. Veroneau and

Gibson also describe the President's burden and the Commission's role. They write that "the president bears the factual burden to establish discriminatory treatment as defined in the statute," and that Section 338 "appears less dependent on factfinding or investigations of government agencies or commissions" than Section 301 or Section 232. Veroneau & Gibson at 958-59. Amicus does not address the Commission's role under § 1338(g).

Defendants may also rely on the Commission's own description of the statute. The passage of the Sixth Annual Report cited above says that section 317 "covers discriminations of all varieties whether in customs duties or other charges, or in classifications, prohibitions, restrictions, or regulations of any kind," and the Seventh Annual Report repeats it. U.S. Tariff Comm'n, *Sixth Annual Report* at 6; *accord Seventh Annual Report* at 42. That sentence describes the forms of discrimination the section reaches. The paragraph before it in the Sixth Annual Report makes the effect on American commerce the point to be regarded, and the Seventh Annual Report adds that the Commission surveyed exporters "to obtain data in regard to the practical effect of the discriminations." *Seventh Annual Report* at 42. An internal Commission memorandum from 1923, which Veroneau and Gibson report, stated that "[t]he task of showing that a discrimination in fact exists distinctly rests upon the United States." Veroneau & Gibson at 962 & n.37. The same account says the staff thought a foreign country's motive could be relevant, and the memorandum recommended against action on conflicting evidence. *Id.* at 962 & nn.37-38. The memorandum was internal and concerned Italian treatment of cottonseed oil. Amicus offers it as a contemporaneous reading of the words "in fact" and rests on the Commission's published statement that the statute asks about effect.

Defendants may also point to the Seventh Annual Report's statement that section 317, unlike the 1909 maximum-and-minimum provision, is "flexible" and may be "adapted to the

circumstances of each case." Seventh Annual Report at 41. The sentence explains why the 1909 provision proved "comparatively ineffective." It says nothing about what must be shown before section 317 applies. On that question the same report says that "[t]he law itself thus defines discrimination and makes it clear that the point to be regarded is the effect upon American commerce and not the motive or intent of the foreign country in adopting its legislation or in adjusting its rates." *Id.* at 42. The report also describes the President's duty to "endeavor to secure the removal of all discriminations which foreign countries may inflict," and it recognizes that a "reasonable" discrimination, such as one resting on sanitary regulations, falls outside the section. *Id.*

The House Managers' statement accompanying the conference report belongs in the record as well. It said the Senate amendment "is designed to reach every form of discrimination, direct or indirect, whereby American commerce is placed at a disadvantage as compared with the commerce of any foreign country," and that under it "the United States offers, under its tariff, equality of treatment to all nations, and at the same time insists that foreign nations grant to our external commerce equality of treatment." McClure at 31, 33 (quoting the statement of the House Managers accompanying the conference report). The Managers describe a policy of equal treatment for American commerce, and the House provisions the conferees rejected would have let the United States trade exclusive concessions for foreign ones. The portions of the statement that McClure quotes are silent on a foreign country's reciprocal agreements with third countries. The breadth they describe lies in the forms discrimination may take, "direct or indirect," and the enacted words still ask whether the form in question discriminates "in fact." The Managers also described the target as discrimination "whereby American commerce is placed at a disadvantage," which is the language of effect. Their phrase "equality of treatment" states the

policy behind the section. The test Congress wrote into the section is discrimination in fact, and the clause that would have made unequal treatment the test was gone. McClure's own examples, which include imperial preferences and Haiti's reciprocity treaty with France, show the same link. He found Haiti's arrangement discriminatory because competing American goods were "placed at a disadvantage." McClure at 35-36. The inquiry he describes runs to the burden on American goods. The imperial preferences he discussed ran between members of an empire with separate customs laws, before the General Agreement on Tariffs and Trade and before the free trade agreements Congress has since approved, including the USMCA.

**E. A preference won in a reciprocal bargain is not discrimination without more**

The 1922 record shows a choice. The Senate chose a discrimination test over an equal-treatment test, and the enacted text does not contain the clause that would have condemned unequal treatment alone. A reading under which any difference between a partner's treatment of American goods and its treatment of another country's goods is discrimination would restore the clause the Senate struck. The Proclamation's own theory restates the struck clause: Canada, it says, "denies to the United States the favorable treatment that Canada provides to the EU and its member States." Proclamation 11047 ¶ 5.

A difference in treatment that a third country obtains in exchange for concessions of its own therefore does not, by that fact alone, "discriminate in fact against" American commerce. A finding of discrimination should rest on an effect on American commerce that goes beyond the difference a reciprocal bargain itself produces. This reading of three statutory words, "discriminates in fact," gives no safe harbor to any agreement.

Defendants may answer that paragraph (a)(1) is itself a comparison among countries, because it speaks of "like articles of every foreign country," and that the Proclamation found it

satisfied. A comparison is a necessary element of that paragraph, but not a sufficient one. The Senate paired it with a requirement that the charge be "unreasonable," and McClure links that word to practices that, though "clearly discriminatory, are commonly accepted as justifiable because of the existence of peculiar or unusual circumstances." McClure at 32-33. The Proclamation recites that Canada's rule is unreasonable and states no reason. Pl.'s Mot. at 37 (Proclamation "declares Canada's rule unreasonable" but "gives no reason"). Proclamation 11062 repeats the finding without elaboration. Proclamation 11062 ¶ 1, 91 Fed. Reg. at 58,319. What "unreasonable" means is a question of statutory meaning for the Court. The Senate kept it as a separate element with its own content. A comment filed in the International Trade Commission's Inv. No. MISC-053 argues that "unreasonable" in § 1338(a)(1) should be read broadly, by analogy to section 317 of the 1922 Act, to section 301 of the Trade Act of 1974, 19 U.S.C. § 2411(d)(3), and to a Federal Maritime Commission regulation, 46 C.F.R. § 542.1(b). Comment of the Int'l Dairy Foods Ass'n, USITC Inv. No. MISC-053 (Nov. 6, 2026) [hereinafter IDFA Comment]. The section 301 and Maritime Commission analogies are to provisions that define their own terms. The section 317 analogy rests on the Tariff Commission's Seventh Annual Report, which Part II.D addresses: the Commission described the forms of discrimination the section reaches and said that the same section asks about effect and recognizes reasonable exceptions. The same comment asks that the Commission's process keep "a clear distinction between discrimination against U.S. commerce and broader protectionist or market-access measures appropriately addressed through other trade mechanisms." *Id.*

Paragraph (a)(2) invites a similar objection. It measures disadvantage against "the commerce of any foreign country," which reads like a most-favored-nation test, and one commentator concludes that the statute permits no justification for a preference given to another

partner. *See* Simon Lester, *A Brief Section 338 Reaction*, Int'l Econ. L. & Pol'y Blog (July 21, 2026), https://ielp.worldtradelaw.net/2026/07/a-brief-section-338-reaction/; *but see* Lester, *The Meaning of "Discrimination"* (discussing McClure's treatment of practices commonly accepted as justifiable). Again, the 1922 record answers it. The Senate considered an equal-treatment test and rejected it.

The comparison clause does not turn section 338 into an equal-treatment rule. Paragraph (a)(2) asks whether a measure places American commerce "at a disadvantage compared with the commerce of any foreign country." The comparison tells the President whose treatment to look at. "Disadvantage" remains something to be found as a fact, and the words "in fact" require that it be found. An equal-treatment reading would make every difference in treatment a disadvantage without any inquiry into American commerce, and the Senate removed the clause that said so. Two consequences follow. First, an equality test would reach every preference that one country gives another by agreement, including the preferences the United States gives its own partners, which is the problem Part III.D describes. Second, it would turn this case into a contest over whether two quota regimes are equal, when the statute asks what happens to American commerce. A test of disadvantage in fact avoids both consequences. It looks to the effect on American commerce, which is where the Senate debate and the Tariff Commission located the concern of the section.

Defendants may add that Section 301 defines "discriminatory" to include, "when appropriate, any act, policy, and practice which denies national or most-favored-nation treatment to United States goods, services, or investment." 19 U.S.C. § 2411(d)(5). Section 301 is a later statute with its own purposes. It shows that Congress writes a most-favored-nation test when it intends one, and it did not write one into section 338(a)(2). This brief assumes for argument that

section 338 is operative, and its reading of "discriminates in fact" would be the same whichever way the Court resolved any question about the later statute. A history of non-use, whatever weight it may carry on other questions, says nothing about what "discriminates in fact" meant in 1922.

A mere difference in outcome does not, by itself, show discrimination. The Executive Branch has taken the same position in another forum. In 2020 the Trade Representative criticized a test that finds discrimination "based solely on evidence that the measure may impact imports from one country more than imports from another country," because it "renders almost any origin-neutral measure vulnerable to challenge." U.S. Trade Representative, *Report on the Appellate Body of the World Trade Organization* 10 (Feb. 2020). That report addressed the WTO agreements. Amicus cites it only for the Executive Branch's own view that a difference in impact does not establish discrimination. The discrimination inquiry looks to whether the measure is *bona fide*, judged by its terms, structure, and operation. One commentator would ask instead whether the measure was designed to protect domestic industry. A test of design would require proof of motive that a documentary record seldom supplies, and the objective inquiry reaches the same concern about disguised favoritism. *See* Appleton USITC Comment, Part IV.E; Simon Lester, *What Kind of Discrimination Should Section 338 Target?*, Int'l Econ. L. & Pol'y Blog (Sept. 25, 2026), https://ielp.worldtradelaw.net/2026/09/what-kind-of-discrimination-should-section-338-target. The Tariff Commission's published reading, noted above, looked to the effect of the measure and set motive aside. A reciprocal bargain is a feature of the arrangement itself. It bears on whether a difference in terms amounts to a disadvantage, and a court can see it from the agreements without inquiring into anyone's purpose.

## III. Proclamation 11047 Treats a Negotiated Bargain as Discrimination

### A. The comparator is a reciprocal agreement

The Proclamation finds that the eligibility rules for Canada's USMCA cheese quota "do not allow retailers to obtain and use" quota quantities, while the rules under Canada's agreement with the European Union give retailers access. It names the European Union and its member States as the comparator. Proclamation 11047 ¶¶ 3-6; Pl.'s Mot. at 9-10; *see* 19 U.S.C. § 1338(i) (defining "foreign country" by reference to separate tariff rates or separate regulation of commerce). CETA is a reciprocal agreement, provisionally applied since September 21, 2017. Comprehensive Economic and Trade Agreement, Can.-EU, Oct. 30, 2016, provisionally applied Sept. 21, 2017. The difference the Proclamation identifies is a difference between the terms of two agreements. Differences of that kind are what the Senators in 1922 had in view when they struck the equal-treatment clause.

The Proclamation does not say whether the Union is one "foreign country" or several under § 1338(i). It addresses retailer eligibility for the cheese quota and does not refer to milk pricing or to Class 4(a) pricing. Proclamation 11062 states that the President received "information, opinions, and recommendations from senior executive branch officials." Proclamation 11062 ¶¶ 5-6, 91 Fed. Reg. at 58,319-20. Neither Proclamation refers to a report of the International Trade Commission as a source for its findings. The Commission's report on nonfat milk solids, prepared under 19 U.S.C. § 1332(g) at the request of the Trade Representative, discusses Canada's milk class pricing and describes the two USMCA dairy panels. U.S. Int'l Trade Comm'n, *Nonfat Milk Solids: Competitive Conditions for the United States and Major Foreign Suppliers*, Pub. No. 5732, Inv. No. 332-607, at 189-91, 193-94 (Apr. 2026). It notes that CETA establishes tariff-rate quotas for cheese but not for nonfat milk solids products, *id.* at 192 n.609, and it does not address retailer eligibility for the cheese quota. Its

phrase "regulatory price discrimination" is the Government of Canada's description of pricing milk protein by end use. *Id.* at 189 & n.586.

**B. Congress approved the American side of the bargain**

The USMCA quota is the other half of the comparison. The United States negotiated it, and Congress approved the agreement in 2020, with CETA already in provisional application. The House voted 385 to 41 and the Senate 89 to 10. Pub. L. No. 116-113, § 101(a), 134 Stat. 11 (2020) (codified at 19 U.S.C. § 4511(a)); H.R. 5430, 116th Cong. (House vote Dec. 19, 2019; Senate vote Jan. 16, 2020). A reading of Section 338 under which Canada's administration of that quota is discrimination against the United States treats the terms Congress approved as the harm. The European quota was published before the United States agreed to its own. Canada's published summary of the negotiated outcome, current as of October 18, 2013, listed tariff-rate quotas for European cheese, including 16,800 tonnes of cheese and 1,700 tonnes for industrial use. Gov't of Can., *Canada-European Union Comprehensive Economic and Trade Agreement: Technical Summary of Final Negotiated Outcomes (Agreement-in-Principle)* (as of Oct. 18, 2013), at 3, 10 (Agricultural Goods, Canada). On August 1, 2017, Canada notified importers that distributors and retailers could apply for allocations of the CETA cheese quota. Glob. Affairs Can., *Notice to Importers No. 895: CETA Cheese Tariff Rate Quota (TRQ)* (Aug. 1, 2017). The Protocol that replaced NAFTA with the USMCA was done on November 30, 2018. 19 U.S.C. § 4511(a)(1). The feature of CETA on which the Proclamation relies, retailer access to the cheese quota, was therefore published more than a year before the Protocol was done.

The retailer-eligibility rule has also been examined under the USMCA's own dispute procedure, with mixed results. A first panel found against Canada in 2021 on its reservation of quota pools for processors. In 2023, a majority of a second panel found that Canada's treatment

of retailers and other applicants was not inconsistent with the agreement, agreeing with Canada's position that the USMCA's eligibility paragraph "is merely the floor of eligibility." One panelist would have found a breach. Final Report of the Panel, *Canada: Dairy TRQ Allocation Measures*, USMCA Secretariat File No. CDA-USA-2021-31-01 (Dec. 20, 2021) (finding Canada's reservation of quota pools for processors inconsistent with the agreement, after which Canada revised its measures); Final Report of the Panel, *Canada: Dairy Tariff-Rate Quota Allocation Measures 2023*, USMCA Secretariat File No. CDA-USA-2023-31-01, ¶¶ 90, 309 (majority) and ¶¶ 313-332 (separate opinion, which would have found a breach as to retailers and food service operators) (Nov. 10, 2023). On the dates on which unused quota is returned, the second panel considered the United States' comparison with the CETA quotas and said the comparison is "not evidence" that Canada administers its quotas untimely. *Id.* ¶ 274. *See* Pl.'s Mot. at 11; Appleton USITC Comment, Part V.C. Amicus offers both reports as part of the bargain record and does not ask the Court to treat either as binding or to enforce the agreement.

Defendants may answer that the difference lies in how Canada administers its quota, not in the agreements. The 2023 majority held that the USMCA's eligibility paragraph sets a floor within which Canada may add requirements, over the position of the United States. A measure that operates within the terms of a bargain Congress approved is a poor candidate for discrimination "in fact" without some showing of effect, which is the subject of Part III.C.

**C. The Proclamation treats a difference between agreement terms as discrimination in fact**

For purposes of this brief, amicus accepts the Proclamation's recitals as stated, including its recital of a burden on United States commerce and lost sales. The Court need not weigh, test, or supplement them. The only question is whether the Proclamation applied the statutory term. The words "in fact" make an effect on American commerce part of what § 1338(a)(2) requires,

and the Proclamation's finding rests on a comparison between the retailer-eligibility terms of two agreements. The Proclamation derives the burden from the difference. It states that "[t]his discrimination impedes market access into Canada and results in lost sales or revenues for U.S. dairy producers and exporters." Proclamation 11047 ¶ 5. The effect it recites is inferred from the difference in terms, so accepting the recital does not supply an effect found apart from the comparison.

The rule that follows is one of meaning. A finding of discrimination "in fact" must rest on an effect on American commerce. A difference between agreement terms identifies the comparison but does not itself show that effect. Amicus does not suggest that any particular measurement is required and asks the Court to make no finding of fact.

**D. The Proclamation's reading would reach the USMCA itself**

If "discriminates in fact" reached any difference between the terms a partner gives the United States and the terms it gives another partner under a reciprocal agreement, it would reach the USMCA. The terms Congress approved in 2020 differ from those Canada gave the European Union in CETA, which has been in provisional application since 2017. The United States also grants preferences to its own partners under agreements Congress has approved, and the reading applied to Canada would reach those preferences as well. *See, e.g.*, United States-Korea Free Trade Agreement Implementation Act, Pub. L. No. 112-41, 125 Stat. 428 (2011); Pl.'s Mot. at 36-37. The enacted text omits the clause that would have produced that result.

## CONCLUSION

Section 338 asks whether a foreign country discriminates against American commerce in fact. In 1922 the Senate considered a clause that would have made unequal treatment enough, saw that it would reach reciprocity agreements, and struck it. The enacted words ask about a

disadvantage to American commerce, and the Tariff Commission read them that way while the section was new.

Proclamation 11047 compares the retailer-eligibility terms of two reciprocal agreements and treats the difference as discrimination in fact. That reading restores the clause the Senate removed, and it would reach the USMCA that Congress approved in 2020. The Proclamation's separate recital that Canada's rule is "unreasonable" under § 1338(a)(1) states no reason, although the Senate kept "unreasonable" as an element with its own content.

Amicus does not ask the Court to find that no disadvantage exists, and the facts remain with the President. The Court should hold that "discriminates in fact" in Section 338(a)(2) does not reach a difference between the terms of two reciprocal agreements, absent a finding that rests on an actual disadvantage to American commerce beyond the difference the bargain itself produces. Applying that construction, the Court should hold that the Proclamation's finding of discrimination misconstrues the statute.

Respectfully submitted,

/s/ Barry Appleton
Barry Appleton

Member of the Bar of this Court
Amicus Curiae, pro se
185 West Broadway, New York, NY 10013
(416) 966-8800, bappleton@appletonlaw.com

Dated: November 12, 2026

## Certificate of Compliance

Standard Chambers Procedure 2(B)(1) sets word limits for movants' and respondents' briefs and for reply briefs and sets none for amicus briefs. In accordance with the certificate requirement of Procedure 2(B)(2), I certify that the foregoing brief, including headings and quotations but excluding the cover page, the table of contents, the table of authorities, the signature block, this certificate, and the appendix, contains 7,814 words according to the word-processing system used to prepare it, which is below the 14,000-word limit that applies to a movant's brief.

/s/ Barry Appleton
Barry Appleton

# APPENDIX A

## Section 317 of the Tariff Act of 1922: Finance Committee Text and Enacted Text

The left column is the Finance Committee text of section 317 as the Senate took it up on August 11, 1922. Provisions struck through were deleted on the Senate floor. The right column is section 317(a) as enacted on September 21, 1922. Words in bold appear in the enacted text and not in the committee text. Section 338 of the Tariff Act of 1930 re-enacted this text with minor changes, among them the addition of articles imported in vessels to the opening words and the numbering of the two triggers. The operative words of the two triggers are unchanged.

| Finance Committee text (August 11, 1922) | Text as enacted (September 21, 1922) |
|---|---|
| That the President shall by proclamation specify and declare new or additional duties as hereinafter provided upon the products of any foreign country whenever he shall find as a fact that such country— | That the President **when he finds that the public interest will be served thereby** shall by proclamation specify and declare new or additional duties as hereinafter provided upon **articles wholly or in part the growth or product of** any foreign country whenever he shall find as a fact that such country— |
| Imposes, directly or indirectly, upon the disposition in or transportation in transit through or reexportation from such country of any product of the United States any unreasonable charge, exaction, regulation, or limitation which is not equally enforced upon the like products of any foreign country; | Imposes, directly or indirectly, upon the disposition in or transportation in transit through or reexportation from such country of any **article wholly or in part the growth or** product of the United States any unreasonable charge, exaction, regulation, or limitation which is not equally enforced upon the like **articles** of **every** foreign country; |
| ~~Imposes, directly or indirectly, upon the importation from the United States of any article not the product of the United States any customs, tonnage, or port duty or any other charge, exaction, regulation, or limitation whatever which is not equally enforced upon importation from every foreign country of the like article not being the product of the country whence it is directly imported;~~ | (Deleted) |
| ~~Imposes upon any product upon its exportation to the United States any duty, charge, restriction, or prohibition whatever which is not equally enforced upon the exportation of such products to every foreign country;~~ | (Deleted) |

| Finance Committee text (August 11, 1922) | Text as enacted (September 21, 1922) |
|---|---|
| Discriminates against the commerce of the United States, directly or indirectly, by law or administrative regulation or practice, by or in respect to any duty, fee, charge, exaction, classification, regulation, condition, restriction, or prohibition, in such manner as to place the commerce of the United States at a disadvantage compared with the commerce of any foreign country; ~~or fails to accord to the commerce of the United States treatment equal and equivalent to that accorded to the commerce of any foreign country.~~ | Discriminates **in fact** against the commerce of the United States, directly or indirectly, by law or administrative regulation or practice, by or in respect to any **customs, tonnage, or port** duty, fee, charge, exaction, classification, regulation, condition, restriction, or prohibition, in such manner as to place the commerce of the United States at a disadvantage compared with the commerce of any foreign country. |

Sources: Committee text, 62 Cong. Rec. 11,245, 11,247-48 (1922), and Wallace McClure, A New American Commercial Policy as Evidenced by Section 317 of the Tariff Act of 1922, at 76-77 n.1 (Studies in History, Economics and Public Law vol. 114, no. 2, 1924). Enacted text, Tariff Act of 1922, ch. 356, § 317(a), 42 Stat. 858, 944, reprinted in McClure at 23. Layout adapted from Annex B to the Appleton USITC Comment.