In The

# United States Court of International Trade

Before Claire R. Kelly, Joseph A. Laroski, Jr., and Kara M. Westercamp, Judges

| | |
|---|---|
| GELLERT GLOBAL GROUP CORP.,<br>*Plaintiff,*<br>v.<br>*(For Continuation of Caption See Inside Cover)* | CASE NO. 26-04636 |

## BRIEF OF AMICI CURIAE ADVANCING AMERICAN FREEDOM; NATIONAL TAXPAYERS UNION FOUNDATION; COMPETITIVE ENTERPRISE INSTITUTE; JONATHAN BEAN, PROFESSOR OF HISTORY, SOUTHERN ILLINOIS UNIVERSITY CARBONDALE; SHAWNNA BOLICK, ARIZONA STATE SENATOR, DISTRICT 2; PETER T. CALCAGNO, PH.D., PROFESSOR OF ECONOMICS, COLLEGE OF CHARLESTON, DIRECTOR, CENTER FOR PUBLIC CHOICE & MARKET PROCESS; ABIGAIL R. HALL, PHD., CHAIR, DEPARTMENT OF ECONOMICS, UNIVERSITY OF TAMPA; INDEPENDENT INSTITUTE; INSTITUTE FOR POLICY INNOVATION; JOHN LOCKE FOUNDATION; MICHAEL C. MUNGER, PROFESSOR, POLITICAL SCIENCE AND ECONOMICS, DUKE UNIVERSITY; MELISSA ORTIZ, PRINCIPAL & FOUNDER, CAPABILITY CONSULTING; MEN AND WOMEN FOR A REPRESENTATIVE DEMOCRACY IN AMERICA, INC.; RIO GRANDE FOUNDATION; WILLIAM F. SHUGHART II, J. FISH SMITH PROFESSOR IN PUBLIC CHOICE, UTAH STATE UNIVERSITY; PAUL STAM, FORMER SPEAKER PRO TEM, NC HOUSE OF REPRESENTATIVES; STAN VEUGER, SENIOR FELLOW, AMERICAN ENTERPRISE INSTITUTE; TAX FOUNDATION; TAXPAYERS PROTECTION ALLIANCE; THE HON. WILLIAM WAGNER (RET), DISTINGUISHED PROFESSOR OF LAW EMERITUS; AND WOMEN FOR DEMOCRACY IN AMERICA, INC., IN SUPPORT OF PLAINTIFF

J. MARC WHEAT
*Counsel of Record*
TIMOTHY HARPER (Admitted in DC)
ADVANCING AMERICAN FREEDOM, INC.
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 780-4848
MWheat@advancingamericanfreedom.com

*Counsel for Amici Curiae*

CP COUNSEL PRESS (800) 4-APPEAL • (132603)

---

DONALD J. TRUMP, in his official capacity as President of the United States; EXECUTIVE OFFICE OF THE PRESIDENT; the UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, in his official capacity as Commissioner of United States Customs and Border Protection; JAMIESON GREER, in his official capacity as United States Trade Representative; and OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE,

*Defendants.*

---

# TABLE OF CONTENTS


Page

TABLE OF AUTHORITIES ........ ii

CORPORATE DISCLOSURE STATEMENT ........ 1

STATEMENT OF INTEREST OF AMICI CURIAE ........ 2

INTRODUCTION AND SUMMARY OF THE ARGUMENT ........ 4

ARGUMENT ........ 11

I. Section 338 Does Not Empower the President to Impose These Tariffs ........ 11

A. By its own terms, Section 338 does not empower the President to impose the tariffs at issue in this case ........ 11

B. Section 338 has been impliedly repealed by, or at least significantly limited by, Section 301 of the Trade Act of 1974 ........ 14

II. The President's Interpretation of Section 338 Falls Far Short of the Bar Set by a Constitutionally Robust Nondelegation Doctrine ........ 16

A. The Constitution vests the federal government's nondelegable legislative power in Congress alone ........ 16

B. The President's interpretation of Section 338 would render the statute an unconstitutional delegation of legislative power to the Executive Branch ........ 21

III. There is no Foreign Affairs Exception to the Separation of Powers ........ 26

IV. The Government's Interpretation of Section 338 Would Turn the Constitutional Amendment Process on its Head ........ 29

CONCLUSION ........ 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*A.L.A. Schechter Poultry Corporation v. United States*,
295 U.S. 495 (1935) ....................22, 25

*Cargo of the Brig Aurora v. United States*,
11 U.S. (7 Cranch) 382 (1813) ....................28

*Dep't of Transp. v. Ass'n of Am. Railroads*,
575 U.S. 43 (2015) ....................29

*Fletcher v. Peck*,
6 Cranch 87 (1810) ....................17

*Gibbons v. Ogden*,
22 U.S. 1 (1824) ....................16

*Gundy v. United States*,
588 U.S. 128 (2019) .................... *passim*

*Learning Resources v. Trump*,
607 U.S. 229 (2026) ....................7, 8, 26

*Marshall Field & Co. v. Clark*,
143 U.S. 649 (1892) ....................22, 28

*McCulloch v. Maryland*,
17 U.S. 316 (1819) ....................16, 20

*Nat'l Fed'n of Indep. Bus. v. Sebelius*,
567 U.S. 519 (2012) ....................16

*United States v. Tynen*,
78 U.S. 88 (1870) ....................15

*V.O.S. Selections, Inc. v. Trump*,
149 F.4th 1312 (Fed. Cir. 2025) ....................28

*Zemel v. Rusk*,
381 U.S. 1 (1965) ....................28

**Statutes and Other Authorities:**

U.S. Const. art. I, § 1 .......... 16

U.S. Const. art. I, § 7, cl. 1 .......... 19

U.S. Const. art. I, § 7, cl. 2 .......... 29

U.S. Const. art. I, § 8 .......... 27

U.S. Const. art. I, § 8, cl. 1 .......... 19, 28

U.S. Const. art. I, § 8, cl. 3 .......... 20, 28

U.S. Const. art. II, § 2 .......... 27

U.S. Const. art. II, § 3 .......... 27

U.S. Const. art. V .......... 29

U.S. Const. art. X .......... 4

19 U.S.C. § 1338 .......... *passim*

19 U.S.C. § 1338(a) .......... 6, 13

19 U.S.C. § 1338(b) .......... 6, 7

19 U.S.C. § 1338(d) .......... 6, 13

19 U.S.C. §§ 2411–2420 .......... *passim*

An Old Whig No.6, The Founders' Constitution, art. I, § 8, cl. 1, https://press-pubs.uchicago.edu/founders/documents/a1_8_1s5.html (Last visited Oct.17, 2025) .......... 28

David R. Burton, *Reduce Tariffs on Final Consumer Products* in *Affordability 101* (Sept. 2026) https://advancingamericanfreedom.com/affordability101 .......... 9

Canada—Dairy TRQ Allocation Measures, No. CDA-USA-2021-31-01, Final Panel Report (Dec. 20, 2021) .......... 12

*Fact Sheet: President Donald J. Trump Further Modifies Canadian Products Subject to Tariffs Under Section 338* (Oct. 23, 2026) .......... 13

Federal Farmer No. 3, *The Founders' Constitution*, Art. I, § 8, cl. 1, https://press-pubs.uchicago.edu/founders/documents/a1_8_1s4.html (Last visited Oct. 17, 2025) .......... 28

Federalist No. 30 (Alexander Hamilton) (George Carey & James McClellan eds., 2001) .......... 27

Federalist No. 33 (Alexander Hamilton) (George Carey & James McClellan eds., 2001) .......... 17

Federalist No. 35 (Alexander Hamilton) (George Carey & James McClellan eds., 2001) .......... 21

Federalist No. 45 (James Madison) (George Carey & James McClellan eds., The Liberty Fund 2001) .......... 16

Federalist No. 51 (James Madison) (George Carey & James McClellan eds., The Liberty Fund 2001) .......... 18

Federalist No. 62 (James Madison) (George Carey & James McClellan eds., The Liberty Fund 2001) .......... 18

Federalist No. 70 (Alexander Hamilton) (George W. Carey & James McClellan, eds., The Liberty Fund 2001) .......... 21

Federalist No. 73 (Alexander Hamilton) (George Carey & James McClellan eds., The Liberty Fund 2001) .......... 19

Federalist No. 78 (Alexander Hamilton) (George Carey & James McClellan eds., The Liberty Fund 2001) .......... 17

Federalist No. 78 (C. Rossiter ed. 1961) (A. Hamilton) .......... 17

Edwin J. Feulner, Jr., Conservatives Stalk the House: The Story of the Republican Study Committee, 212 (Green Hill Publishers, Inc. 1983) .......... 2

Joel Griffith, Andrew Hale, *Section 338 Tariffs Are Unlawful*, Advancing American Freedom (Nov. 10, 2026) available at https://advancingamericanfreedom.com/memos/section-338-tariffs-are-unlawful .......... *passim*

Philip Hamburger, *Is Administrative Law Unlawful?*, 84 (2015) .......... 17

*House retirements so far are at a historic low*, Roll Call (July 9, 2025 3:19 PM) https://rollcall.com/2025/07/09/house-open-seats-retirements-midterm-elections/ .......... 18

Independence Index: Measuring Life, Liberty and the Pursuit of Happiness, Advancing American Freedom available at https://theindependenceindex.org/ .......... 2

James Madison, *Preface to Debates in the Convention, The Founders' Constitution*, art. I, § 8, cl. 1, https://press-pubs.uchicago.edu/founders/documents/a1_8_1s2.html (Last visited Oct. 24, 2025) ....................................20

Philip Magness, J. Marc Wheat, *Trump's Tariff 'Plan B' Has Arrived*, Washington Examiner (Aug. 5, 2026 6:00am) https://www.washingtonexaminer.com/in_focus/4674354/trump-tariff-plan-b-has-arrived/ ....................................8

National Taxpayers Union Foundation, State Tariffs Tracker (data by Trade Partnership Worldwide), Q3 2026 available at https://tariffs.org/ ....................14

Jack Nicastro, *Over 1,500 Economists Agree: Trump's Tariffs Are Terrible*, Reason (Apr. 24, 2025) https://reason.com/2025/04/24/over-1500-economists-agree-trumps-tariffs-are-terrible/ ....................................24

Opening Brief for the Respondents in No. 24-1287 and the Petitioners in 25-250 at 9; *Learning Resources, Inc. v. Trump*, 607 U.S. 229....................8, 26

Proclamation No. 11012, 91 Fed. Reg. 9339 (Feb. 20, 2026) ..............................8

Proclamation No. 11046, 91 Fed. Reg. 46,639 (July 23, 2026) ..............................7

Proclamation No. 11047, 91 Fed. Reg. 46,653 (July 23, 2026) ..............................7

Proclamation No. 11048, 91 Fed. Reg. 46,663 (July 23, 2026) ..............................7

Proclamation No. 11056, 91 Fed. Reg. 54,789 (Aug. 24, 2026) ..............................7

Proclamation No. 11061, 91 Fed. Reg. 58,311 (Sept. 14, 2026) ..............................7

Proclamation No. 11062, 91 Fed. Reg. 58,319 (Sept. 14, 2026) ..............................7

Proclamation No. 11063, 91 Fed. Reg. 58,325 ..............................7

Proclamation No. 11064, 91 Fed. Reg. 58,331 ..............................7

Proclamation No. 11065, 91 Fed. Reg. 58,339 ..............................7

Proclamation No. 11076, 91 Fed. Reg. 68,861 (October 23, 2026) ..............................7

The Declaration of Independence (U.S. 1776) ..............................20

*The Senate Passes the Smoot Hawley Tariff*, United States Senate (last visited Nov. 11, 2026) available at https://www.senate.gov/artandhistory/history/minute/Senate_Passes_Smoot_Hawley_Tariff.htm ..............................5

## CORPORATE DISCLOSURE STATEMENT

Amici curiae Advancing American Freedom; National Taxpayers Union Foundation; Competitive Enterprise Institute; Jonathan Bean, Professor of History, Southern Illinois University Carbondale; Shawnna Bolick, Arizona State Senator, District 2; Peter T. Calcagno, Ph.D., Professor of Economics, College of Charleston, Director, Center for Public Choice & Market Process; Abigail R. Hall, PhD., Chair, Department of Economics, University of Tampa; Independent Institute; Institute for Policy Innovation; John Locke Foundation; Michael C. Munger, Professor, Political Science and Economics, Duke University; Melissa Ortiz, Principal & Founder, Capability Consulting; Men and Women for a Representative Democracy in America, Inc.; Rio Grande Foundation; William F. Shughart II, J. Fish Smith Professor in Public Choice, Utah State University; Paul Stam, Former Speaker Pro Tem, NC House of Representatives; Stan Veuger, Senior Fellow, American Enterprise Institute; Tax Foundation; Taxpayers Protection Alliance; The Hon. William Wagner (Ret), Distinguished Professor of Law Emeritus; and Women for Democracy in America, Inc., are nonprofit corporations. They do not issue stock and are neither owned by nor are they owners of any other corporate entity, in part or in whole. They have no parent companies, subsidiaries, affiliates, or members that have

issued shares or debt securities to the public. The corporations are operated by volunteer boards of directors.

## STATEMENT OF INTEREST OF AMICI CURIAE

Advancing American Freedom (AAF) is a nonprofit organization that promotes and defends policies that elevate traditional American values, including freedom from arbitrary power.[1] AAF "will continue to serve as a beacon for conservative ideas, a reminder to all branches of government of their responsibilities to the nation,"[2] and believes American prosperity depends on ordered liberty and self-government.[3] AAF files this brief on behalf of its 168,157 members nationwide.

The National Taxpayers Union Foundation (NTUF) shows Americans how taxes, government spending, and regulations affect everyday life. NTUF's Free Trade Initiative researches ways in which trade policy affects U.S. taxpayers and the economy, and has provided testimony before congressional committees and federal agencies on a variety of topics ranging from the impact of Section 232 and Section 301 tariffs to ways the federal government can promote U.S. economic and

---

[1] No counsel for a party authored this brief in whole or in part. No person other than Amicus Curiae and its counsel made any monetary contribution intended to fund the preparation or submission of this brief.

[2] Edwin J. Feulner, Jr., Conservatives Stalk the House: The Story of the Republican Study Committee, 212 (Green Hill Publishers, Inc. 1983).

[3] Independence Index: Measuring Life, Liberty and the Pursuit of Happiness, Advancing American Freedom available at https://theindependenceindex.org/.

national security by working to expand mutually beneficial trade. NTUF therefore holds an institutional interest in this Court's ruling in this case.

Competitive Enterprise Institute (CEI) is a nonprofit educational and research institute headquartered in Washington, D.C., dedicated to promoting the principles of free markets and limited government. Since its founding in 1984, the institute has focused on raising public understanding of the problems of overregulation through policy analysis, commentary, and litigation. CEI also pursues public-interest litigation to ensure that federal agencies act within the constraints of the United States Constitution, the Administrative Procedures Act, and its enabling statutes. CEI's mission is to develop and advocate for policies that advance the right to freedom, fairness, property, and prosperity for Americans. CEI's scholars research and write about the economic and legal consequences of federal regulation, including trade policy and the costs tariffs impose on American consumers and businesses. CEI's interest is in making sure Congress's choices about how tariff power may be exercised are respected.

Amici Jonathan Bean, Professor of History, Southern Illinois University Carbondale; Shawnna Bolick, Arizona State Senator, District 2; Peter T. Calcagno, Ph.D., Professor of Economics, College of Charleston, Director, Center for Public Choice & Market Process; Abigail R. Hall, PhD., Chair, Department of Economics, University of Tampa; Independent Institute; Institute for Policy Innovation; John

Locke Foundation; Michael C. Munger, Professor, Political Science and Economics, Duke University; Melissa Ortiz, Principal & Founder, Capability Consulting; Men and Women for a Representative Democracy in America, Inc.; Rio Grande Foundation; William F. Shughart II, J. Fish Smith Professor in Public Choice, Utah State University; Paul Stam, Former Speaker Pro Tem, NC House of Representatives; Stan Veuger, Senior Fellow, American Enterprise Institute; Tax Foundation; Taxpayers Protection Alliance; The Hon. William Wagner (Ret), Distinguished Professor of Law Emeritus; and Women for Democracy in America, Inc., believe that the government's compliance with the Constitution's limits on government power is essential to the preservation of American freedom.

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Government officials may not alter the structures created by the Constitution except by following the procedures the Constitution itself establishes for its own amendment. When those in government attempt to do so, they act beyond their legitimate power and usurp the powers of the other branches or of those "reserved to the States respectively, or to the people." U.S. Const. art. X. The courts serve as a backstop to overreach by the political branches, a last line of defense for the people's liberty. This Court must play that role here.

Those who do not learn from history are doomed to repeat it. In 1930, President Herbert Hoover signed into law the Smoot-Hawley Tariff Act, which

sparked a trade war and ultimately led to electoral backlash.[4] Many provisions of Smoot-Hawley were later repealed, but some remain on the books as vestiges of that disastrous policy.

One such vestigial provision is Section 338 of Smoot-Hawley. 19 U.S.C. § 1338. Section 338 purports to empower the President to respond to foreign discrimination against American trade and unreasonable and unequally applied foreign trade policies. Under Section 338, the President "shall by proclamation specify and declare new or additional duties . . . whenever he shall find as a fact that such country" either:

> (1) Imposes, directly or indirectly, upon the disposition in or transportation in transit through or reexportation from such country of any article wholly or in part the growth or product of the United States any unreasonable charge, exaction, regulation, or limitation which is not equally enforced upon the like articles of every foreign country; or
>
> (2) Discriminates in fact against the commerce of the United States, directly or indirectly, by law or administrative regulation or practice,

[4] "As the economists predicted, the high tariff proved to be a disaster. Even before its enactment, U.S. trading partners began retaliating by raising their tariff rates, which froze international trade. . . Nor did the tariff sit well with the voters. In 1932 they turned the majority in both houses over to the Democrats, by large margins. The voters also made clear their disdain for the Smoot-Hawley tariff by booting both Reed Smoot and Willis Hawley out of office that year." *The Senate Passes the Smoot Hawley Tariff*, United States Senate (last visited Nov. 11, 2026) available at https://www.senate.gov/artandhistory/history/minute/Senate_Passes_Smoot_Hawley_Tariff.htm.

> by or in respect to any customs, tonnage, or port duty, fee, charge, exaction, classification, regulation, condition, restriction, or prohibition, in such manner as to place the commerce of the United States at a disadvantage compared with the commerce of any foreign country.

19 U.S.C. § 1338(a).

Further, if the President finds that in response to a proclamation under subsection (a), a country has "maintained or increased its said discriminations against the commerce of the United States," the President may "issue a further proclamation directing that such products of said country or such articles imported in its vessels as he shall deem consistent with the public interests shall be excluded from importation into the United States." 19 U.S.C. § 1338(b).

The duties imposed under the statute are to be calculated to "offset" the "burden or disadvantage," caused by the discriminatory policy, but the duties may not "exceed 50 per centum ad valorem or its equivalent." 19 U.S.C. § 1338(d). Further, the duties may not be levied until 30 days after the issuance of the proclamation. *Id.*

On July 20, 2026, President Trump invoked Section 338 to issue three proclamations imposing 50% tariffs, the maximum rate allowed by the statute, on a

range of Canadian products.[5] The President issued a new proclamation on August 18, the day before they were to go into effect, delaying the imposition of the tariffs by three days.[6] After negotiations fell through, the tariffs went into effect on August 22.[7]

On September 8, the President issued five more proclamations, two of which modified duties imposed in earlier proclamations.[8] Those modified rates went into effect seven days later.[9] The other three proclamations banned the importation of certain products under subsection (b) of Section 338.[10]

Finally, on October 23, the President issued another proclamation further modifying previously imposed duties.[11] These modifications, like those in the September 8 modification, went into effect a mere seven days later.[12]

The President's use of Section 338 was an attempt to circumvent the Supreme Court's decision in *Learning Resources v. Trump¸* 607 U.S. 229 (2026).[13] Since the

---

[5] Proclamation No. 11046, 91 Fed. Reg. 46,639 (July 23, 2026); Proclamation No. 11047, 91 Fed. Reg. 46,653 (July 23, 2026); Proclamation No. 11048, 91 Fed. Reg. 46,663 (July 23, 2026).
[6] Proclamation No. 11056, 91 Fed. Reg. 54,789 (Aug. 24, 2026).
[7] *Id* at para. 7.
[8] Proclamation No. 11061, 91 Fed. Reg. 58,311 (Sept. 14, 2026); Proclamation No. 11062, 91 Fed. Reg. 58,319 (Sept. 14, 2026); Proclamation No. 11063, 91 Fed. Reg. 58,325; Proclamation No. 11064, 91 Fed. Reg. 58,331; Proclamation No. 11065, 91 Fed. Reg. 58,339.
[9] Proclamation No. 11064 para. 9, 91 Fed. Reg. 58,331; Proclamation No. 11065 para. 9, 91 Fed. Reg. 58,339.
[10] Proclamation No. 11061, 91 Fed. Reg. 58,311 (Sept. 14, 2026); Proclamation No. 11062, 91 Fed. Reg. 58,319 (Sept. 14, 2026); Proclamation No. 11063, 91 Fed. Reg. 58,325.
[11] Proclamation 11076, 91 Fed. Reg. 68,861 (October 23, 2026).
[12] *Id.* at para. 10.
[13] Joel Griffith, Andrew Hale, *Section 338 Tariffs Are Unlawful* at 6, Advancing American Freedom (Nov. 10, 2026) available at https://advancingamericanfreedom.com/memos/section-

beginning of the President's second term, his administration has sought to impose tariffs with little regard for the Constitution or statutory text.

First, the President imposed sweeping tariffs under the International Emergency Economic Powers Act. The administration insisted that it was addressing an "unusual and extraordinary threat" to American national security.[14] The administration told courts that no other tariff power would do[15] and yet, the day the Supreme Court struck down those tariffs, the administration pivoted to Section 122 of the Trade Act of 1974.[16] The administration insisted then that it was addressing a "large and serious" balance of payments deficit.[17] Defending those tariffs in court, "the administration leaned heavily on an obsolete economic statistic known as 'basic balance,'" a measure which proved thirty years ago to be "highly inaccurate, unreliable, and conceptually flawed."[18]

The tariffs here challenged are not as broad as those imposed under IEEPA or Section 122. Yet if the President's interpretation were adopted, Section 338 would

---

338-tariffs-are-unlawful.

[14] Opening Brief for the Respondents in No. 24-1287 and the Petitioners in 25-250 at 9; *Learning Resources, Inc. v. Trump*, 607 U.S. 229.

[15] Philip Magness, J. Marc Wheat, *Trump's Tariff 'Plan B' Has Arrived*, Washington Examiner (Aug. 5, 2026 6:00am) https://www.washingtonexaminer.com/in_focus/4674354/trump-tariff-plan-b-has-arrived/.

[16] *Id.*

[17] Proclamation 11012 at para. 1, 91 Fed. Reg. 9339 (Feb. 20, 2026).

[18] Griffith, Hale, *supra* note 13 ("The basic balance statistic combined the current account with long-term capital flows to identify persistent economic trends. It was completely abandoned by the Department of Commerce in 1976 because it proved to be highly inaccurate, unreliable, and conceptually flawed in a post-Bretton Woods system of floating exchange rates.").

vest power in the President similar to that which he claimed under the earlier-used statutes. It could be that the administration is trying not to place all of its tariff eggs in one statutory basket. Or it could be that the administration is hoping to gain a victory on narrower tariffs that it can then use to justify much broader trade actions. Regardless, Americans foot the bill for taxes to which they never consented and that the Constitution forbids.[19]

This massive scope for Section 338 tariffs does not arise out of a proper reading of that statute. The Canadian policies to which these tariffs respond are not unreasonable or discriminatory; the President's tariffs are not in the public interest; and they are not calculated to offset the harm caused by Canadian policies.

Further, even if Section 338, by its own terms, did empower the President to impose these tariffs, that provision has been impliedly repealed by, or significantly limited by, Section 301 of the Trade Act of 1974, a law the President has used in other contexts to impose tariffs.

Further still, the powers asserted by the President in this case are not within the constitutional authority of the Executive Branch. Rather, they belong to Congress, which cannot delegate them to the President. The President's exercise of

---

[19] *Id.* at 3. "Most recently, the administration used section 338 of the Tariff Act to impose 50% tariffs on certain imports from Canada. Even putting aside legality, studies indicate that Americans bear the vast majority of the incidence of these taxes." David R. Burton, *Reduce Tariffs on Final Consumer Products* in *Affordability 101* at 91 (Sept. 2026) https://advancingamericanfreedom.com/affordability101.

power here is thus either outside the scope of Section 338 or Section 338 is an unconstitutional delegation of power constitutionally reserved to the legislative branch.

"The nondelegation doctrine bars Congress from transferring its legislative power to another branch of Government," *Gundy v. United States*, 588 U.S. 128, 132 (2019) (plurality opinion), precisely because the Founders understood that important policy decisions should be the result of a deliberative process and should pass only with the support of a legislative coalition representing a broad swath of the nation's population.

Further, despite the Executive's claims, the fact that tariffs may be used as a tool of foreign affairs does not lessen the force of the nondelegation doctrine's limitations on the President's asserted tariff power. The powers the President is exercising, along with several other foreign affairs powers, belong exclusively to Congress under the Constitution and there is no foreign affairs exception to the separation of powers.

Finally, if the Court were to uphold the President's assertion of legislative power in this case, it would effectively turn the constitutional amendment process on its head. Section 338, as misinterpreted by the President, vests legislative power in the President, something only a constitutional amendment could do. Without judicial intervention, it would likely take a veto-proof majority to amend or repeal

Section 338—the same two-thirds majority necessary for Congress to propose a constitutional amendment to the states for ratification.

Congress did not and cannot pass its Article I tax power to the President. This Court should strike down the President's Section 338 tariffs.

## ARGUMENT

### I. Section 338 Does Not Empower the President to Impose These Tariffs.

*A. By its own terms, Section 338 does not empower the President to impose the tariffs at issue in this case.*

The President's proclamations implementing Section 338 tariffs point to Canadian tariffs and trade restrictions as the discriminatory actions that trigger the President's Section 338 authority. But the tariffs to which the administration claims to be responding were themselves imposed in response to the President's earlier tariffs. As Advancing American Freedom scholars Joel Griffith and Andrew Hale have noted, retaliation is not discrimination.

"[I]n ordinary usage, to discriminate means to treat someone differently without a legitimate basis, not merely to treat them differently. Two of the three Canadian policies referenced in the Section 338 proclamations were in response to the President's own initial tariffs."[20] These tariffs "followed the imposition of U.S.

[20] Griffith, Hale, *supra* note 13 at 2.

tariffs on Canada."[21] They do not demonstrate "hostility towards American goods as such."[22]

The Canadian government has said that it will end these tariffs when American tariffs are removed.[23] "A measure that responds to a prior restriction and is conditioned on its removal is explained by that restriction, not by any preference for other countries" and "[n]othing in the text of Section 338 authorizes the President to treat a response to his tariffs as a fresh offense that justifies a second round of duties."[24]

One of the policies to which the President's tariffs respond was already considered by a United States-Mexico-Canada (USMCA) dispute resolution panel, carrying out a process that is part of the USCMA agreement that President Trump successfully negotiated in his first term. The panel ruled that the Canadian policy was consistent with the USCMA's terms.[25]

"[T]hese tariffs cover USMCA-compliant goods and carry no expiration date, which departs from the agreement Congress approved and from the dispute process that agreement created."[26] Section 338 is not a means of bypassing the later-adopted

---

[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] Canada—Dairy TRQ Allocation Measures, No. CDA-USA-2021-31-01, Final Panel Report (Dec. 20, 2021).
[26] Griffith, Hale, *supra* note 13 at 2.

USMCA agreement, and the President's attempt to use it as such "is fundamentally illegal."[27] The proper venue for the President's objections to these policies is the USMCA dispute resolution process which already upheld the Canadian policy.[28]

Further, as Griffith and Hale have also noted, the administration is attempting to use its Section 338 tariffs as leverage, not, as the statute requires, as an offset to the objected-to trade policies. Subsection (d) of Section 338 "allows the imposition of a rate the President determines 'will offset such burden or disadvantage.'"[29] The Section 338 proclamations at issue here, however, set "the duty at the maximum 50 percent regardless of any measured burden. The stated aim is to 'spur Canada to remove' the alleged discriminatory practices, and the White House describes the effort as restoring 'reciprocity.'"[30] Clearly, "the administration is imposing tariffs at a rate designed to secure negotiation leverage, not to 'offset' any alleged discriminatory trade practices by Canada."[31]

Finally, these tariffs do not "serve[]" the "public interest" as the statute requires. 19 U.S.C. § 1338(a). Americans are footing the bill, likely paying 85 to 95 percent of the costs the tariffs impose.[32] Indeed National Taxpayers Union

---

[27] *Id.*
[28] *Id.*
[29] *Id.* at 3.
[30] *Id. See Fact Sheet: President Donald J. Trump Further Modifies Canadian Products Subject to Tariffs Under Section 338* (Oct. 23, 2026)
[31] *Id.*
[32] *Id.*

Foundation reports the gross cost of the administration's tariffs was $403 billion through September 2026, the equivalent of $2,970 per household.[33] Since American tariffs against Canadian goods went into effect in March 2025, "U.S. trade with Canada has fallen $50 billion . . . with no boost to U.S. manufacturing. Some states have suffered disproportionately, including North Dakota and Montana where Canada accounts for more than 75% of goods trade."[34] An ever-changing trade war with American allies is simply not in the nation's public economic interest.

*B. Section 338 has been impliedly repealed by, or at least significantly limited by, Section 301 of the Trade Act of 1974.*

Unlike much of Smoot-Hawley, Section 338 has never been explicitly repealed. Griffith and Hale point out that Congress addressed the same realm of foreign policy later in a more thorough provision, Section 301 of the Trade Act of 1974, 19 U.S.C. §§ 2411–2420. Section 301 "empowers the President to act when a foreign country's practice is 'unreasonable or discriminatory and burdens or restricts United States commerce,' nearly identical to Section 338's own trigger."[35] Unlike Section 338, "Section 301 provides a specific process to address such disputes: an investigation, 30 days' notice, a hearing for any interested person who asks, and a determination published in the Federal Register, usually within a year."[36]

---

[33] National Taxpayers Union Foundation, State Tariffs Tracker (data by Trade Partnership Worldwide), Q3 2026 available at https://tariffs.org/.
[34] Griffith, Hale, *supra* note 13 at 3.
[35] *Id.* at 4.
[36] *Id.*

Section 301's "procedures stand in stark contrast to Section 338, which permitted a unilateral presidential finding, with no investigation, comment period, or hearing required . . . The president may not use a dormant general power to circumvent Congress' clear subsequent directive as it has been implied repealed or, at minimum cannot be used to bypass that later statutory framework."[37]

By later adopting legislation that addressed the same conduct as Section 338, Congress has impliedly repealed it. "When a court determines that the two statutes are completely incompatible or that the later act covers the entire subject matter of the earlier one and is clearly intended as a substitute, it will rule that the later act repealed the prior act by implication."[38] A key case relating to implied repeal is *United States v. Tynen*, 78 U.S. 88 (1870). There, the Supreme Court held that because an earlier and a later law were necessarily in conflict, the later law had repealed the earlier law by implication.

Section 338 does not empower the President to impose the tariffs at issue in this case. More fundamentally, Section 301 of the Trade Act of 1974 addresses the same or virtually the same field of conduct addressed by Section 338. It provides greater direction to the President, presenting less of a constitutional delegation problem. This Court should find that the President does not have the power he has

[37] *Id.* at 5.
[38] *Id.* at 4.

asserted here under Section 338 and grant Plaintiff's motion for summary judgment and request for permanent injunction.

## II. The President's Interpretation of Section 338 Falls Far Short of the Bar Set by a Constitutionally Robust Nondelegation Doctrine.

### *A. The Constitution vests the federal government's nondelegable legislative power in Congress alone.*

The federal government is one of enumerated powers,[39] and enumeration implies limitation. *Gibbons v. Ogden*, 22 U.S. 1, 195 (1824). The Constitution vests "all legislative powers" of the federal government in "a Congress of the United States." U.S. Const. art. I, § 1.

Legislative power is "the power to adopt generally applicable rules of conduct governing future actions by private persons—the power to 'prescribe the rules by which the duties and rights of every citizen are to be regulated,' or the power to 'prescribe general rules for the government of society.'" *Gundy*, 588 U.S. at 153

[39] The Federalist No. 45 at 241 (James Madison) (George Carey & James McClellan eds., The Liberty Fund 2001) ("The powers delegated by the proposed constitution to the federal government, are few and defined."). *McCulloch v. Maryland*, 17 U.S. 316, 405 (1819) (The federal "Government is acknowledged by all to be one of enumerated powers. The principle that it can exercise only the powers granted to it would seem too apparent to have required to be enforced by all those arguments which its enlightened friends, while it was depending before the people, found it necessary to urge."). The Constitution, "rather than granting general authority to perform all the conceivable functions of government," "lists, or enumerates, the Federal Government's powers." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 534 (2012). An "enumeration of powers is also a limitation of powers, because '[t]he enumeration presupposes something not enumerated.'" *Id*. at 534 (quoting *Gibbons v. Ogden*, 22 U.S. 1, 9 (1824)) (alteration in original).

(Gorsuch, J., dissenting) (quoting The Federalist No. 78, p. 465 (C. Rossiter ed. 1961) (A. Hamilton); *Fletcher v. Peck*, 6 Cranch 87, 136 (1810)).

Alexander Hamilton explained that legislative power is the power that "not only commands the purse but prescribes the rules by which the duties and rights of every citizen are to be regulated,"[40] one of which "is the power of laying and collecting taxes."[41] According to Blackstone, "Legislators and their laws are said to compel and oblige."[42] As Professor Philip Hamburger explains:

> [T]he natural dividing line between legislative and nonlegislative power was between rules that bound subjects and those that did not . . . It therefore was assumed that the enactment of legally binding rules could come only from a representative legislature and that the resulting rules could bind only subjects, not other peoples . . . [T]he executive could not make rules or duties that bound subjects, for these were legislative.[43]

The Constitution grants the national government's legislative powers to Congress alone because the framers "believed the new federal government's most

[40] Federalist No. 78 at 383 (Alexander Hamilton) (George Carey & James McClellan eds., The Liberty Fund 2001).
[41] *See* Federalist No. 33 at 160 (Alexander Hamilton) (George Carey & James McClellan eds., 2001) (What is the power of laying and collecting taxes, but a legislative power, or a power of making laws, to lay and collect taxes?").
[42] Philip Hamburger, *Is Administrative Law Unlawful?*, 84 (2015) (internal quotation marks omitted).
[43] *Id.*

dangerous power was the power to enact laws restricting the people's liberty." *Gundy v. United States*, 588 U.S. 128, 154 (2019) (Gorsuch, J., dissenting). According to James Madison, there are two means of securing the liberty of the people against government abuse. "[T]he primary control on the government" is "a dependence on the people," but, he explained, experience had "taught mankind the necessity of auxiliary precautions."[44]

The most immediate source of the federal government's "dependence on," or accountability to, the people is the biennial election of members of the House of Representatives. Because the vast majority of members seek reelection,[45] the American people in general have an opportunity every other November to hold Congress accountable in a meaningful way.

Because popular accountability is not always sufficient to restrain government excess, the Constitution's structural limits on power act as "auxiliary precautions."[46] At the Founding, it was the "facility and excess of lawmaking" that "seem[ed] to be the diseases to which our governments [were] most liable."[47] As a cure to those "diseases," "the framers went to great lengths to make lawmaking difficult." *Gundy*,

---

[44] Federalist No. 51 (James Madison) (George Carey & James McClellan eds., The Liberty Fund 2001).
[45] "Going back 80 years, the average number of House open seats has been 35," or less than 10% of the Houses members. *House retirements so far are at a historic low*, Roll Call (July 9, 2025 3:19 PM) https://rollcall.com/2025/07/09/house-open-seats-retirements-midterm-elections/.
[46] Madison, Federalist No. 51 *supra* note 44 at 269.
[47] Federalist No. 62, 321-22 (James Madison) (George Carey & James McClellan eds., The Liberty Fund 2001).

588 U.S. at 154 (Gorsuch, J., dissenting). While, "[s]ome occasionally complain about the arduous processes for new legislation," "to the framers these were bulwarks of liberty." *Id*.

These "arduous processes" "were also designed to promote deliberation," *id*., because, "[t]he oftener a measure is brought under examination, the greater the diversity in the situations of those who are to examine it, the less must be the danger of those errors which flow from want of due deliberation, or of those missteps which proceed from the contagion of some common passion or interest."[48]

Thus, vesting legislative power in Congress helped secure the liberty of the people by allowing for popular accountability and facilitating deliberative and careful lawmaking. Should the Court conclude that the President may exercise legislative power, those protections would be undermined.

The first of Congress's Article I, Section 8 powers is, "To lay and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defense and general welfare of the United States." U.S. Const. art. I, § 8, cl. 1. Further, this power is limited by the requirement that "All bills for raising revenue shall originate in the House of Representatives." U.S. Const. art. I, § 7, cl. 1. The third power listed

[48] Federalist No. 73, 381-82 (Alexander Hamilton) (George Carey & James McClellan eds., The Liberty Fund 2001).

in Section 8 is "To regulate commerce with foreign nations, and among the several states, and with the Indian tribes." U.S. Const. art. I, § 8, cl. 3.

That the power to tax is listed first among Congress's powers is no accident. The inability of the national government under the Articles of Confederation to raise revenue was the impetus for the constitutional convention.[49] But the Framers of the Constitution also knew, as the Court would later say, "[t]hat the power to tax involves the power to destroy." *McCulloch v. Maryland*, 17 U.S. 316, 431 (1819). Among the founding generation's complaints against British rule was that King George III had "impos[ed] taxes on us without our consent."[50] The Declaration of Independence para. 19 (U.S. 1776). When the Framers designed America's system of government, they consciously kept the taxing power close to the people and far from unilateral control.

Further, while tariffs are certainly a tool of foreign affairs, they are also of great domestic concern. Americans, after all, pay tariffs. American importers pay the duties themselves and then, as Alexander Hamilton understood, it is usually the case

---

[49] *See, e.g.*, James Madison, *Preface to Debates in the Convention, The Founders' Constitution*, art. I, § 8, cl. 1, https://press-pubs.uchicago.edu/founders/documents/a1_8_1s2.html (Last visited Oct. 24, 2025) ("At the date of the Convention, the aspect & retrospect of the pol: condition of the U.S. could not but fill the pub. mind with a gloom which was relieved only by a hope that so select a Body would devise an adequate remedy for the existing and prospective evils so impressively demanding it. It was seen that the public debt rendered so sacred by the cause in which it had been incurred remained without provision for its payment. The reiterated and elaborate efforts of Cong. to procure from the States a more adequate power to raise the means of payment had failed.").

[50] Griffith, Hale, *supra* note 13 at 5.

that the "consumer is the payer."[51] Tariffs' effect on foreign relations, then, is the secondary effect of reduced demand for foreign goods resulting from higher prices. It is unsurprising, then, that the Framers of the Constitution vested this foreign affairs power in the deliberative body of Congress, rather than in the "energetic Executive."[52]

Tariffs are legislative in nature because they are binding on Americans seeking to purchase goods from overseas, restricting their liberty to do so. And, whether tariffs are taxes or a form of regulation of commerce with foreign nations, the Constitution vests the power to enact them explicitly and exclusively in Congress.

*B. The President's interpretation of Section 338 would render the statute an unconstitutional delegation of legislative power to the Executive Branch.*

As Plaintiff argues, the President's interpretation of Section 338 would render the statute an unconstitutional delegation of legislative power under the Supreme Court's nondelegation doctrine because the statute as interpreted lacks an intelligible principle to guide the President's actions.[53]

The nondelegation doctrine, properly applied, sets a high bar for congressional direction of presidential action which Section 338, as interpreted by

---

[51] Federalist No. 35 at 168 (Alexander Hamilton) (George Carey & James McClellan eds., 2001).
[52] Federalist No. 70, at 363 (Alexander Hamilton) (George W. Carey and James McClellan, eds., The Liberty Fund 2001).
[53] Plaintiff's Motion for Preliminary Injunction and/or Summary Judgment for Permanent Injunction at 44.

the Executive, cannot clear. Under the canon of constitutional avoidance, the Court should read Section 338 narrowly.

When the Court first used the term "intelligible principle" in 1928, "No one . . . thought the phrase meant to effect some revolution in this Court's understanding of the Constitution." *Gundy*, 588 U.S. at 162 (Gorsuch, J., dissenting). The difficulty in some cases of determining "the exact line between policy and details, law-making and fact-finding, and legislative and non-legislative functions" does not undermine the fact that "these [are] the relevant inquiries." *Id*.

"That Congress cannot delegate its legislative power to the President is a principle universally recognized as vital to the integrity and maintenance of the system of government ordained by the Constitution." *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892). The Court echoed this sentiment again in 1935, writing, "The Congress is not permitted to abdicate or to transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corporation v. United States*, 295 U.S. 495, 529-30 (1935).

Justice Gorsuch has explained how the Court can apply the nondelegation doctrine in a way that is more faithful to the Constitution's separation of powers[54]:

> To determine whether a statute provides an intelligible principle, [courts] must ask: Does the statute assign to the executive only the

[54] Griffith, Hale, *supra* note 13 at 7.

> responsibility to make factual findings? Does it set forth the facts that the executive must consider and the criteria against which to measure them? And most importantly, did Congress, and not the Executive Branch, make the policy judgments? Only then can we fairly say that a statute contains the kind of intelligible principle the Constitution demands.

*Gundy*, 588 U.S. at 166 (Gorsuch, J., dissenting). Section 338 as interpreted by the President cannot meet this standard.

First, Section 338, according to the President's interpretation, does more than empower him to make findings of fact. To the extent that the administration argues that it is entitled to judicial deference regarding what constitutes an unreasonable or discriminatory policy, it is arguing for a reading of Section 338 that would render it an unconstitutional delegation of legislative power. If a statute enacted under one of Congress's enumerated powers is so vague that courts cannot determine whether the President has followed the law without drifting into law-making, then such a statute is too vague to pass constitutional muster.

Relatedly, if statutory terms "unreasonable," "discriminate," and "offset" vest the President with the unilateral power of definition, then those terms do not meaningfully guide the President's consideration of facts. What makes a foreign nation's trade policy unreasonable or discriminatory? How should the President

assess those facts? Which facts must the President consider when determining which countries' goods will be tariffed? Which facts must the President consider when determining the tariff rate he will impose?[55] What facts must the President consider when determining the duration of the tariffs?

Further, in what circumstances would a tariff policy be in the public interest, as the statute requires? Many, if not most, economists, of course, would likely say that the President's 50% tariffs against numerous Canadian goods are harmful to the public interest.[56] If the President needs nothing more than a report saying the opposite, then this is not a standard by which courts could assess whether the law is being followed and therefore leaves too much to the discretion of the President.

Third, and "most importantly," Section 338, according to the President's interpretation, allows the Executive to make policy judgments of massive import. According to the President's interpretation of Section 338, he may unilaterally

---

[55] Indeed, it appears that the President's objective is not to offset the alleged Canadian trade discrimination but to pressure Canada to drop its retaliatory tariffs against American Products. Griffith, Hale, *supra* note 13 at 3 ("Each Section 338 proclamation sets the duty at the maximum 50 percent regardless of any measured burden. The stated aim is to 'spur Canada to remove' the alleged discriminatory practices, and the White House describes the effort as restoring 'reciprocity.' . . . In reality, it seems clear that the administration is imposing tariffs at a rate designed to secure negotiation leverage, not to 'offset' any alleged discriminatory trade practices by Canada. Certainly, the administration has not made any showing, much less a good faith one, that Canada has, in fact, engaged in such practices.").

[56] *See* Jack Nicastro, *Over 1,500 Economists Agree: Trump's Tariffs Are Terrible*, Reason (Apr. 24, 2025) https://reason.com/2025/04/24/over-1500-economists-agree-trumps-tariffs-are-terrible/.

determine tariff targets, duration, and rate subject only to a 50% cap. He may modify the rates for any reason or for no reason.

On the administration's "theory, the President alone decides whether discrimination exists, which goods to target, what rate to charge, and how long the duties last, and he may rewrite the list at will, as the October 23 proclamation did."[57] Those are not executive actions. "Those are policy judgments belonging to Congress alone. If the administration's reading is correct, Section 338 delegates what the Constitution forbids."[58] That would be "delegation running riot." *Gundy*, 588 U.S. at 161 (Gorsuch, J., dissenting) (internal quotation marks omitted) (quoting *Schechter Poultry*, 295 U.S. at 553 (Cardozo, J., concurring).

This Court need not revive the nondelegation doctrine to resolve this case. Section 338 should be read narrowly as a matter of constitutional avoidance. Nonetheless, the Constitution's structure remains as a backstop against government overreach should the Court find that the President's interpretation of Section 338 is consistent with its text as limited by Section 301. Whether on statutory or constitutional grounds, this Court should rule for Plaintiff.

[57] Griffith, Hale, *supra* note 13 at 7.
[58] *Id.*

**III. There is no Foreign Affairs Exception to the Separation of Powers.**

The President argued in an earlier tariff case that the nondelegation doctrine should play virtually no role in the Court's consideration of that case because the tariff power is in the realm of foreign affairs.[59] Rather than consider the nature and constitutional vesting of the specific powers at issue, the Executive insisted, the Court should treat the whole category of "foreign affairs" as a no-go zone for judicial separation of powers analysis. The Constitution's language and structure requires the opposite.

The power at issue in this case is not the power to direct America's foreign affairs, generally. At issue in this case are the powers of taxation and commerce regulation which are specifically vested in Congress in Article I, Section 8 of the Constitution.[60] Despite these powers' clear relation to foreign affairs, the Framers of the Constitution thought it wise to entrust them to the deliberative, lawmaking branch of government. These powers are, after all, legislative in nature.

Nor is the Constitution's vesting of these "foreign affairs" powers in Congress exceptional. Congress has the power "To declare war, grant letters of marque and reprisal," "To raise and support armies," "To provide and maintain a navy," "To

---

[59] Opening Brief for the Respondents in No. 24-1287 and the Petitioners in 25-250 at 44-45; *Learning Resources, Inc. v. Trump*, 607 U.S. 229.
[60] Griffith, Hale, *supra* note 13 at 7.

provide for calling forth the militia to execute the laws of the union, suppress insurrections and repel invasions." U.S. Const. art. I, § 8.

The President, on the other hand, is "commander in chief of the Army and Navy," may negotiate treaties, must nominate and appoint ambassadors and "shall receive ambassadors and other public ministers." U.S. Const. art. II, §§ 2-3. However, three of these four powers depend on some degree of congressional action. Although the President is the "commander in chief of the Army and Navy," Congress, alone, has the power to declare war. Although the President may negotiate treaties, they must be approved by a supermajority of present Senators. U.S. Const. art. II, § 2. And, although the President must nominate and appoint ambassadors, he may do so only with the "Advice and Consent of the Senate." *Id*. The President's power over foreign affairs is hardly comprehensive. The Constitution vests significant foreign affairs power in Congress, not the Executive Branch.

Further, the founding generation saw taxes on imports and exports as an exercise of the same type of power as taxes internal to the nation. During debates over the ratification of the Constitution, many advocated for taxation on foreign trade, or "external taxation," as preferable to "internal taxation," as a source of revenue for the national government.[61] Regarding the Constitution itself, the debate

[61] Griffith, Hale, *supra* note 13 at 6. *See,* Federalist No. 30 at 147 (Alexander Hamilton) (George Carey & James McClellan eds., 2001) ("The more intelligent adversaries of the new constitution admit the force of this reasoning; but they qualify their admission by a distinction between what

was over whether Congress should have been granted authority to issue internal as well as external taxes, or whether it should have been limited to external taxation.[62] In other words, the debate was over the desirable extent of the congressional taxing power, demonstrating that "at the founding 'taxations levied on imports were not a special category of power that Congress shared with, or could share with, the President.'"[63] *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312, 1343 n.3 (Fed. Cir. 2025) (additional views of Cunningham, J.) (quoting Br. of Amici Curiae Advancing American Freedom et al. at 18).

Whatever the scope of the President's constitutional authority in the realm of foreign affairs, "the Constitution excludes from it the foreign affairs powers it assigns to Congress,"[64] including the power to impose tariffs, whether as a tax or as a regulation of commerce with foreign nations. U.S. Const. art. I, § 8, cl. 1, 3.

---

they call *internal* and *external* taxation. The former they would reserve to the State governments; the latter, which they explain into commercial imposts, or rather duties on imported articles, they declare themselves willing to concede to the Federal Head.").

[62] *See* Federal Farmer No. 3, *The Founders' Constitution*, Art. I, § 8, cl. 1, https://press-pubs.uchicago.edu/founders/documents/a1_8_1s4.html (Last visited Oct. 17, 2025); An Old Whig No.6, The Founders' Constitution, art. I, § 8, cl. 1, https://press-pubs.uchicago.edu/founders/documents/a1_8_1s5.html (Last visited Oct.17, 2025).

[63] Griffith, Hale, *supra* note 13 at 6.

[64] Griffith, Hale, *supra* note 13 at 7 ("This is in stark contrast to cases involving statutes where Congress made the policy and the President exercised discretion after finding a fact required by the statute. In *Marshall Field & Co. v. Clark*, 143 U.S. 649 (1892), Congress itself prescribed in advance the duties to be collected once the President found a trading partner's exactions on American products to be reciprocally unequal and unreasonable. In *Cargo of the Brig Aurora v. United States*, 11 U.S. (7 Cranch) 382 (1813), the President determined only whether France or Great Britain had revoked its trade barriers. And in *Zemel v. Rusk*, 381 U.S. 1, 17 (1965), the Court cautioned that it is not the case that 'simply because a statute deals with foreign relations, it can grant the Executive totally unrestricted freedom of choice.'").

Congressional delegation of its enumerated legislative powers to the President would "dash the whole [separation of powers] scheme," *Dep't of Transp. v. Ass'n of Am. Railroads*, 575 U.S. 43, 61 (2015), the very scheme the people, for the sake of their own liberty, imposed on those in power. Congress is not so empowered to tamper with the instrument of the liberty of the people. That tariffs may impact America's relations with other nations does not change that fact.

## IV. The Government's Interpretation of Section 338 Would Turn the Constitutional Amendment Process on its Head.

If the Court chooses not to strike down the President's interpretation of Section 338, the only remaining means of reversing the President's tariffs would be for Congress to repeal or amend Section 338 to clarify that the President does not have the power he is asserting. However, because the President would very likely veto any such law, for Congress to restore its constitutional authority, two-thirds of both chambers would have to vote in favor of the law. U.S. Const. art. I, § 7, cl. 2. Such veto-proof majorities are difficult to muster by design.

It is also the intentionally difficult-to-achieve margin required for Congress to propose a constitutional amendment to the states for ratification. U.S. Const. art. V.

Thus, one implication of the government's reading of Section 338 is that the Congress that passed Section 338 could effectively amend the Constitution by a bare majority, and the only way to reverse that decision is for Congress to meet the

formidable requirements for a constitutional amendment.[65] That turns the Constitution's amendment process on its head.

The Constitution divides the government's powers against one another to ensure that the liberty of the people is secure. Government officials cannot change that system apart from the established amendment process. Because the President's tariffs take powers away from Congress that the Constitution reserves exclusively to that branch, this Court should rule for Plaintiff.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment for Plaintiff and permanently enjoin the collection of the Section 338 tariffs at issue in this case.

/s/ J. Marc Wheat
J. MARC WHEAT
*Counsel of Record*
ADVANCING AMERICAN FREEDOM, INC.
801 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 780-4848
MWheat@advancingamericanfreedom.com
*Counsel for Amici Curiae*

[65] Griffith, Hale, *supra* note 13 at 7-8.

## Certificate of Compliance

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| GELLERT GLOBAL GROUP CORP., *Plaintiff,* v. DONALD J. TRUMP, in his official capacity as President of the United States; EXECUTIVE OFFICE OF THE PRESIDENT; the UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, in his official capacity as Commissioner of United States Customs and Border Protection; JAMIESON GREER, in his official capacity as United States Trade Representative; and OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE, *Defendants.* | Case No. 26-04636<br>Judges Claire R. Kelly, Joseph A. Laroski, Jr., and Kara M. Westercamp |

Pursuant To U.S. Court Of International Trade's Standard Chambers Procedures, Undersigned Counsel Certifies This Brief Complies With The Court's Type-Volume Limitation Rules Because It Contains 7,273 Words. This Brief Also Complies With All Typeface And Margin Requirements.

Respectfully submitted,

*/s/ J. Marc Wheat*
J. MARC WHEAT