UNITED STATES COURT OF INTERNATIONAL TRADE

---

GELLERT GLOBAL GROUP CORP.,

Plaintiff,

v.

DONALD J. TRUMP, in his official capacity as President of the United States; EXECUTIVE OFFICE OF THE PRESIDENT; the UNITED STATES OF AMERICA; UNITED STATES CUSTOMS AND BORDER PROTECTION; RODNEY S. SCOTT, in his official capacity as Commissioner of United States Customs and Border Protection; JAMIESON GREER, in his official capacity as United States Trade Representative; and OFFICE OF THE UNITED STATES TRADE REPRESENTATIVE,

Defendants.

**Before: Claire R. Kelly, Joseph A. Laroski, Jr., and Kara M. Westercamp, Judges**

**Court No. 26-04636-3JP**

---

**BRIEF OF PETER HARRELL, JENNIFER HILLMAN, AND GREGORY SHAFFER AS AMICI CURIAE IN SUPPORT OF PLAINTIFF**

---

Nithya Nagarajan
Husch Blackwell LLP
1801 Pennsylvania Avenue, NW, Suite 1000
Washington, DC 20006-3606
(202) 378-2409
Nithya.Nagarajan@huschblackwell.com
*Counsel for Amici Curiae*

# TABLE OF CONTENTS


INTEREST OF AMICI CURIAE .......... 6

INTRODUCTION AND SUMMARY OF ARGUMENT .......... 6

I. Congress Enacted Section 317, and Reenacted It as Section 338, to Counter Discrimination Against United States Commerce Through Duties That Offset a Measured Burden .......... 8

A. Congress Rejected a General Power to Penalize Foreign Tariffs and Adopted a Narrower Remedy for Discrimination .......... 8

B. Congress Designed a Calibrated Duty to Respond to Discrimination .......... 9

C. In 1922, "Discrimination" Did Not Include Preferences Exchanged for Reciprocal Concessions .......... 11

II. A Century of Practice Confirms That Section 338 Authorizes Only Duties That Offset Discrimination, Not General Retaliation .......... 13

III. Congress Assigned the Factfinding on Which Section 338 Duties Rest to the Tariff Commission, and No Such Investigation Occurred Here .......... 15

IV. The Challenged Proclamations Exceed the Authority Section 338 Confers .......... 18

A. The Proclamations Do Not Identify Measures That Are "Unreasonable" or "Discriminat[ory]" Within the Meaning of the Statute .......... 18

B. "Offset" Requires Duties Calibrated to a Measured Burden, but the Proclamations Measure None .......... 21

V. Constitutional Avoidance and Learning Resources Require a Bounded Reading of Section 338 .......... 24

CONCLUSION .......... 27

## TABLE OF AUTHORITIES


**Cases** **Page(s)**

*Edwards' Lessee v. Darby*, 25 U.S. (12 Wheat.) 206 (1827) ........................................................16

*Free Enterprise Fund v. Public Company Accounting Oversight Board*, 561 U.S. 477 (2010) ........................................................13

*Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1 (1824) ........................................................26

*Industrial Union Department v. American Petroleum Institute*, 448 U.S. 607 (1980) ..................26

*Learning Resources, Inc. v. Trump*, 607 U.S. 229 (2026) ................................7, 13, 20, 23, 25, 26

*Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024) ........................................................16

*Maple Leaf Fish Co. v. United States*, 762 F.2d 86 (Fed. Cir. 1985) ............................................23

*Motion Systems Corp. v. Bush*, 437 F.3d 1356 (Fed. Cir. 2006) (en banc) ..................................23

*National Federation of Independent Business v. OSHA*, 595 U.S. 109 (2022) .............................13

*Oregon v. United States*, 835 F. Supp. 3d 1307 (Ct. Int'l Trade 2026)..........................................23

*United States v. George S. Bush & Co.*, 310 U.S. 371 (1940)................................................17, 23

*USP Holdings, Inc. v. United States*, 36 F.4th 1359 (Fed. Cir. 2022) ..........................................23

*Zenith Radio Corp. v. United States*, 437 U.S. 443 (1978)...........................................................10

**Constitutional Provisions** **Page(s)**

U.S. Const. art. I, § 8, cl. 1 ........................................................26

**Statutes** **Page(s)**

19 U.S.C. § 1338 ........................................................ *passim*

19 U.S.C. §§ 1330–1341 ........................................................16

19 U.S.C. § 3511(a) ........................................................20

19 U.S.C. § 4511(a) ........................................................19

Tariff Act of 1909, ch. 6, 36 Stat. 11 ........................................................11

Tariff Act of 1922, ch. 356, 42 Stat. 858 ...........................................................8, 10, 11, 12, 15

Tariff Act of 1930, ch. 497, 46 Stat. 590 ...........................................................8, 11, 16

United States-Mexico-Canada Agreement Implementation Act, Pub. L. No. 116-113, 134 Stat. 11 (2020) ........................................................19

Uruguay Round Agreements Act, Pub. L. No. 103-465, 108 Stat. 4809 (1994) ..........................20

**Legislative Materials** **Page(s)**

62 Cong. Rec. 11,244 (1922) ........................................................15

62 Cong. Rec. 11,245 (1922) ........................................................9

62 Cong. Rec. 11,246–48 (1922) ....................12
62 Cong. Rec. 12,490 (1922) ....................9
H.R. Rep. No. 71-7 (1929) ....................8, 16
S.Doc. No. 67-187 (1922) ....................10
S.Doc. No. 67-253 (1922) (Conf. Rep.) ....................9, 10
S.Rep. No. 67-595, pt. 1 (1922) ....................9

**Executive and Administrative Materials** **Page(s)**

Exec. Order No. 3746 (Oct. 7, 1922) ....................15
Proclamation No. 11046, 91 Fed. Reg. 46,639 (July 23, 2026) ....................20
Proclamation No. 11047, 91 Fed. Reg. 46,653 (July 23, 2026) ....................19, 22
Proclamation No. 11048, 91 Fed. Reg. 46,663 (July 23, 2026) ....................20, 22
Proclamation No. 11061, 91 Fed. Reg. 58,311 (Sept. 14, 2026) ....................25
Proclamation No. 11062, 91 Fed. Reg. 58,319 (Sept. 14, 2026) ....................25
Proclamation No. 11063, 91 Fed. Reg. 58,325 (Sept. 14, 2026) ....................25
Proclamation No. 11064, 91 Fed. Reg. 58,331 (Sept. 14, 2026) ....................22, 23, 25
Proclamation No. 11065, 91 Fed. Reg. 58,339 (Sept. 14, 2026) ....................22, 23, 25
Proclamation No. 11076, 91 Fed. Reg. 68,861 (Oct. 30, 2026) ....................22, 25
U.S. Int'l Trade Comm'n, Request for Comments Regarding Implementation of 19 U.S.C. 1338(g), 91 Fed. Reg. 57,387 (Sept. 9, 2026) ....................18

**International and Foreign Materials** **Page(s)**

*Canada—Dairy Tariff-Rate Quota Allocation Measures 2023*, USMCA Panel No. CDA-USA-2023-31-01, Final Report (Nov. 10, 2023) ....................20
*Canada—Dairy TRQ Allocation Measures*, USMCA Panel No. CDA-USA-2021-31-01, Final Report (Dec. 20, 2021) ....................20
Convention of Commercial Reciprocity, U.S.-Cuba, Dec. 11, 1902, 33 Stat. 2136 ....................12
General Agreement on Tariffs and Trade 1994, Apr. 15, 1994, 1867 U.N.T.S. 187 ....................20, 24
United States Surtax Remission Order (Motor Vehicles 2025), SI/2025-60, C. Gaz. pt. II, vol. 159, no. 10 (May 7, 2025) (Can.) ....................20

**Other Authorities** **Page(s)**

Fact Sheet: President Donald J. Trump Imposes Additional Tariffs on Canada, White House (July 20, 2026) ....................22
Fact Sheet: President Donald J. Trump Responds to Canada's Retaliation, White House (Sept. 8, 2026) ....................23

*Free Trade Agreements*, Off. of the U.S. Trade Representative (last visited Nov. 10, 2026) ....24

Instruction from the Secretary of State (Hughes) to American Diplomatic Officers (Aug. 18, 1923), *in* 1 *Papers Relating to the Foreign Relations of the United States, 1923* (Joseph V. Fuller ed., 1938)....12

Simon Lester, *The Meaning of "Discrimination" in Section 338's Predecessor (Section 317 of the Tariff Act of 1922)*, Int'l Econ. L. & Pol'y Blog (July 27, 2026) ....12

Aaditya Mattoo, Nadia Rocha & Michele Ruta, *The Evolution of Deep Trade Agreements* (World Bank, Pol'y Rsch. Working Paper No. 9283, 2020)....24

Wallace McClure, *A New American Commercial Policy: As Evidenced by Section 317 of the Tariff Act of 1922* (Columbia Univ. 1924)....10, 17

Press Release, Off. of the U.S. Trade Representative, Ambassador Greer Issues Statement on President Trump Imposing Section 338 Tariffs on Canada (July 20, 2026) ....22

Telegram from the Secretary of State (Kellogg) to the Chargé in France (Whitehouse) (Oct. 8, 1927), *in* 2 *Papers Relating to the Foreign Relations of the United States 1927* (Joseph V. Fuller ed., 1942)....14

Telegram from Sec'y of State (Acheson) to the Consul at Shanghai (McConaughy) (Aug. 12, 1949), *in* 9 *Foreign Relations of the United States, 1949: The Far East: China* (Francis C. Prescott et al. eds., 1974) ....14

U.S. Int'l Trade Comm'n, *MTN Studies 6, Part 1: Agreements Being Negotiated at the Multilateral Trade Negotiations in Geneva—U.S. International Trade Commission Investigation No. 332-101* (S. Comm. on Fin., Comm. Print No. 96-27, 1979)....13

U.S. Tariff Comm'n, *Reciprocity and Commercial Treaties* (1919) ....8, 12

U.S. Tariff Comm'n, *Sixth Annual Report* (1922) ....8, 9, 11, 15

U.S. Tariff Comm'n, *Seventh Annual Report* (1923)....15

U.S. Tariff Comm'n, *Tenth Annual Report* (1926) ....15

U.S. Tariff Comm'n, *Twelfth Annual Report* (1928) ....16

U.S. Tariff Comm'n, *Thirteenth Annual Report* (1929)....13

U.S. Tariff Comm'n, *Fifteenth Annual Report* (1931)....15

U.S. Tariff Comm'n, *Twentieth Annual Report* (1936)....14, 16, 17

U.S. Tariff Comm'n, *Twenty-Fifth Annual Report* (1941)....13

John K. Veroneau & Catherine H. Gibson, *Presidential Tariff Authority*, 111 Am. J. Int'l L.957 (2017) ....17

World Trade Org., *Regional Trade Agreements Database* (last visited Nov. 2, 2026)....24

## INTEREST OF AMICI CURIAE

Amici curiae Gregory Shaffer and Jennifer Hillman are professors of law at Georgetown University Law Center, and Peter Harrell is a visiting scholar at Georgetown Law's Institute of International Economic Law. All three are experts in United States and international trade law. They have a substantial interest in the sound interpretation of the tariff statutes Congress has enacted and in preserving the constitutional allocation of the tariff power between Congress and the Executive. Amici do not address whether Canada's trade policies are wise or whether the United States has legitimate grievances against them. They address a discrete question of statutory authority: whether Section 338 of the Tariff Act of 1930 permits the President to impose fifty-percent duties, and then import bans, on Canadian goods in response to market-access terms the United States itself negotiated and to Canada's responses to United States tariffs.

This brief accompanies amici's Motion for Leave to File under USCIT Rules 7 and 76, which states amici's interest and why their participation is desirable.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Section 338 of the Tariff Act of 1930, adopted at a particular time in U.S. history, offers a bounded remedy for a defined harm. The defined harm is when a foreign country provides either unreasonable and unequal treatment or discriminatory treatment of United States commerce relative to that of other countries. The remedy is a duty that will "offset" the burden such unreasonable and unequal or discriminatory treatment imposes.[1] Section 338 was enacted as part of what is known as the Smoot-Hawley Tariff Act, updating Section 338's predecessor, Section 317 of the Tariff Act of 1922, known as the Fordney-McCumber Tariff. Despite being on the statute books for nearly 100 years, prior to 2026, Section 338 had never been used to apply tariffs

[1] 19 U.S.C. § 1338(a), (d).

because of key historical developments: first the success of the United States in having its trading partners agree to most-favored-nation (MFN) treatment pursuant to the 1934 Reciprocal Trade Agreements Act and then under the General Agreement on Tariffs and Trade (GATT) of 1947, and second because of Congress's passage of Section 301 of the 1974 Trade Act which encompasses and effectively displaced Section 338 in U.S. practice.

This brief proceeds in five parts. Part I shows that Congress enacted Section 338, and its predecessor Section 317, to counter discrimination against United States commerce through duties that "offset" a measured "burden." It further shows that such "discrimination" was not to include preferences exchanged for reciprocal concessions. Part II establishes that a century of executive practice confirms that understanding. Part III shows that Congress assigned the factfinding on which such duties rest to the Tariff Commission, now the International Trade Commission (USITC), which conducted no investigation here. Part IV demonstrates that the challenged proclamations satisfy neither the statute's triggers nor its offset requirement. Part V explains that the government's reading would convert Section 338 into a near-complete delegation of the tariff power: a power to impose duties of up to fifty percent on virtually any goods from virtually any country, and to change them at will. Learning Resources, Inc. v. Trump, 607 U.S. 229 (2026), forecloses that reading.

Because the challenged duties and import bans exceed the authority Congress conferred, they should be set aside.

## I. Congress Enacted Section 317, and Reenacted It as Section 338, to Counter Discrimination Against United States Commerce Through Duties That Offset a Measured Burden

### A. Congress Rejected a General Power to Penalize Foreign Tariffs and Adopted a Narrower Remedy for Discrimination

Section 338 reenacted, in substantially the same form, Section 317 of the Tariff Act of 1922.[2] Section 317, in turn, implemented the recommendation of the Tariff Commission's 1918 report on reciprocity and commercial treaties, whose principles, the Commission explained, were "developed and applied in section 317."[3] The Commission's recommendation was a policy of non-discrimination, not special advantage: "The United States should ask no special favors and should grant no special favors. It should exercise its powers and should impose its penalties, not for the purpose of securing discrimination in its favor, but to prevent discrimination to its disadvantage."[4]

The drafting history shows that Congress chose this anti-discrimination model over a broader one. The House bill contained a provision, Section 302, that would have placed "in the hands of the President power to penalize the commerce of any foreign country which imposes on its imports, including those coming from the United States, duties which he deems to be 'higher

[2]Tariff Act of 1930, ch. 497, § 338, 46 Stat. 590, 704 (1930) (codified at 19 U.S.C. § 1338) (reenacting Tariff Act of 1922, ch. 356, § 317, 42 Stat. 858, 944–46 (1922)); *id.* § 651(a)(1), 46 Stat. at 762 (repealing Tariff Act of 1922). *Compare* Tariff Act of 1930, ch. 497, § 338, 46 Stat. 590, 704–06 (codified at 19 U.S.C. § 1338) (reenacting Section 317, with the addition of articles "imported in a vessel of" a discriminating country), *with* Tariff Act of 1922, ch. 356, § 317, 42 Stat. 858, 944–46; *see also* H.R. Rep. No. 71-7, at 166 (1929) ("The only substantial change made by the section over existing law is the extension of its application to articles imported in vessels of a foreign country . . . ."); Tariff Act of 1930 § 651(a)(1), 46 Stat. at 762 (repealing Tariff Act of 1922).

[3]U.S. Tariff Comm'n, *Sixth Annual Report* 4–5 (1922).

[4]*Id.* at 5 (quoting U.S. Tariff Comm'n, *Reciprocity and Commercial Treaties* (1918)); U.S. Tariff Comm'n, *Reciprocity and Commercial Treaties* 15 (1919); *see also* U.S. Tariff Comm'n, *Sixth Annual Report*, *supra* note 3, at 5 (quoting same).

and reciprocally unequal and unreasonable.'"[5] That provision would have reached a foreign country's reciprocally unequal tariffs that the President found to be unreasonable, even if the foreign country applied them to every other country alike. The conferees rejected it and adopted Section 317 instead, explaining that under Section 317, "the United States offers, under its tariff equality of treatment to all nations, and at the same time insists that foreign nations grant to our external commerce equality of treatment."[6] Congress thus considered, and declined to give, the President a general power to penalize foreign trade measures he judged unreasonable. It gave him a narrower power: to respond to unequal and discriminatory treatment of United States commerce, subject to other conditions.

**B. Congress Designed a Calibrated Duty to Respond to Discrimination**

Congress specified that the remedy must match the wrong. The Senate Finance Committee, which drafted Section 317, described the duties as "limited to the amount of the discrimination, but if the discrimination is maintained the importation of the merchandise may be prohibited."[7] It described the first step as "the very moderate one of additional duties to be measured by the extent of the injury done to our trade."[8] On the Senate floor, Chairman McCumber explained that the duties were to be "limited to the extent of the discrimination" and "measured by the extent of the damage done to our trade."[9]

[5] 62 Cong. Rec. 12,490 (1922) (statement of the managers on the part of the House); *see also* U.S. Tariff Comm'n, *Sixth Annual Report*, *supra* note 3, at 5.
[6] 62 Cong. Rec. 12,490 (1922) (statement of the managers on the part of the House); *see also* S. Doc. No. 67-253, at 49–50 (1922) (Conf. Rep.); U.S. Tariff Comm'n, *Sixth Annual Report*, *supra* note 3, at 5.
[7] S. Rep. No. 67-595, pt. 1, at 3 (1922).
[8] *Id.* at 4.
[9] 62 Cong. Rec. 11,245 (1922) (statement of Sen. McCumber).

The enacted text adopts that limitation. As reported to the Senate, Section 317 directed the President to "find as a fact the burdens placed on the commerce of the United States by the discriminations aforesaid," and to declare duties "determined by him as aforesaid to be equivalent to such burdens, not to exceed 50 per centum ad valorem."[10] The conference committee substituted the formulation now in Section 338(d): duties "as he shall determine will offset such burdens."[11] Contemporaries understood the change as one of drafting, not substance. Wallace McClure, the State Department's specialist on commercial treaties and a legal scholar, described the conference text two years later as a "careful revision as to language" that "was not greatly changed as to meaning,"[12] and explained that the President "must undertake to measure the amount of additional duty necessary to offset the burden of the discrimination."[13]

"Offset" was the enacted word for "equivalent," which is the common meaning of "offset" in the context of a trade remedy. For example, Section 303 of the 1922 Act establishes the standard for calculating countervailing duties as "an additional duty equal to the net amount of such bounty or grant" (foreign subsidies or "bounties").[14] Later, in 1978, when the Supreme Court ruled on a case involving Section 303 of the Tariff Act of 1930, the Court held that "the countervailing duty was intended to offset the unfair competitive advantage that foreign producers would otherwise enjoy from export subsidies paid by their governments."[15] Contemporaneous sources from the 1922 Act's enactment describe Section 317 duties as the same type of duty as those of Section

[10]Tariff Act of 1922 (H.R. 7456) as Reported to the Senate, S. Doc. No. 67-187, at 115–16 (1922) (§ 317(e)).
[11]Conference Report on H.R. 7456, S. Doc. No. 67-253, at 49 (1922) (Amendment No. 1667); *see* 19 U.S.C. § 1338(d) ("will offset such burden or disadvantage").
[12]Wallace McClure, *A New American Commercial Policy: As Evidenced by Section 317 of the Tariff Act of 1922*, at 90 (Columbia Univ. 1924).
[13]*Id.* at 45.
[14]42 Stat. at 936.
[15]*Zenith Radio Corp. v. United States*, 437 U.S. 443, 455–56 (1978).

303. In 1922, the Tariff Commission said that the principle of Section 317(e) "is similar to that of countervailing duties to offset bounties given by foreign governments."[16] Furthermore, the official margin note sitting alongside Section 317(e) reads "Countervailing duties, President authorized to proclaim, to offset discrimination by foreign countries on American commerce."[17]

Congress adopted this calibrated remedy to replace a blunt one. The Tariff Act of 1909 had authorized a fixed twenty-five-percent penalty against discriminating countries, which the Tariff Commission criticized as "inflexible" and "comparatively ineffective" because it could not "be adapted to the circumstances of each case."[18] Section 317 replaced the uniform penalty with a duty to "offset" a "burden," capped at fifty percent. A fifty-percent duty applied as a matter of course, without regard to the burden, would restore the inflexible penalty Congress rejected, at twice the rate. In 1930, Congress carried forward that structure and the requirement that the duty offset the burden.[19]

### C. In 1922, "Discrimination" Did Not Include Preferences Exchanged for Reciprocal Concessions

Section 338(a)(2) asks whether a country discriminates "in such manner as to place the commerce of the United States at a disadvantage compared with the commerce of any foreign country." The operative word is "discriminates," and its meaning in 1922 did not reach preferences a country granted in exchange for reciprocal concessions.

When Congress enacted Section 317, the United States followed the conditional interpretation of most-favored-nation treatment. Under that interpretation, a concession granted to

[16]U.S. Tariff Comm'n, *Sixth Annual Report*, *supra* note 3, at 6.
[17]42 Stat. at 945.
[18]U.S. Tariff Comm'n, *Sixth Annual Report*, *supra* note 3, at 5; *see* Tariff Act of 1909, ch. 6, § 2, 36 Stat. 11, 82–83.
[19]*Compare* 42 Stat. at 944–45, *with* 46 Stat. at 705.

one country in exchange for a reciprocal concession was not owed to others, and withholding it from them was not discrimination.[20] The same Congress maintained a bargained preference of its own: Cuban goods continued to receive a reduction from the general rates under the 1902 reciprocity convention.[21] A Congress that preserved a reciprocal preference for Cuba would not have understood "discrimination" to include another nation's reciprocal preferences. The senators who managed the bill likewise treated preferences exchanged for reciprocal concessions as outside the concept.[22] The statute targets discrimination in this sense, meaning the denial to United States goods of treatment a country gives others without a reciprocal bargain. It does not reach every difference in the terms of trade between the United States and a given trading partner.

[20] *See* U.S. Tariff Comm'n, *Reciprocity and Commercial Treaties*, *supra* note 4, at 39–41 (describing the conditional interpretation followed by the United States). The United States did not adopt the unconditional interpretation until 1923, after Section 317's enactment. *See also* Instruction from the Secretary of State (Hughes) to American Diplomatic Officers (Aug. 18, 1923), *in* 1 *Papers Relating to the Foreign Relations of the United States, 1923*, at 131 (Joseph V. Fuller ed., 1938).

[21] Convention of Commercial Reciprocity, U.S.-Cuba, Dec. 11, 1902, 33 Stat. 2136; Tariff Act of 1922 § 320, 42 Stat. at 947.

[22] 62 Cong. Rec. 11,246 (1922) (statement of Sen. McCumber) ("[W]here reciprocity treaties have been made between nations it would not be a discrimination against the United States for the reason that just and proper consideration is supposed to pass between the countries in making those reciprocal arrangements."); *id.* at 11,247 (statement of Sen. Lodge) ("It is not a discrimination if a reciprocity treaty exists. Discrimination can only apply to the favored-nation clause."); *id.* (statement of Sen. Lodge) ("You do not discriminate where there is a reciprocity treaty, because you get an adequate return."); *see id.* at 11,248 (adopting Senator Lenroot's amendment striking the clauses that reached unequal treatment without regard to discrimination, which "will leave it applying to all discriminations against the United States"). *See also* Simon Lester, *The Meaning of "Discrimination" in Section 338's Predecessor (Section 317 of the Tariff Act of 1922)*, Int'l Econ. L. & Pol'y Blog (July 27, 2026), https://ielp.worldtradelaw.net/2026/07/the-meaning-of-discrimination-in-section-338s-predecessor-section-317-of-the-tariff-act-of-1922/.

## II. A Century of Practice Confirms That Section 338 Authorizes Only Duties That Offset Discrimination, Not General Retaliation

No President ever imposed a duty under Section 317 or Section 338 before the 2026 proclamations.[23] This practice is important for assessing the government's claims. Even before Section 317 was reenacted in the 1930 Tariff Act, the Tariff Commission was touting actions that achieved Section 317's goal of removing discrimination but without the need to resort to tariffs.[24] With the adoption of the General Agreement on Tariffs and Trade (GATT) in 1947, with its provisions requiring MFN treatment by all contracting parties, the likelihood of discrimination directed at the United States became slim, as such discrimination would violate countries' GATT obligations. In 1979, the USITC described Section 338 as "[a]n obscure and never-used provision of the law."[25] As the plaintiff's brief notes, the statute had, in practice, effectively been replaced by Section 301 of the 1974 Trade Act, which is much more detailed and incorporates all of the claims against discrimination and unreasonable charges that are included in Section 338. As the Supreme Court recently found regarding the President's use of IEEPA, the "lack of historical precedent for the IEEPA tariffs, coupled with the breadth of authority that the President now claims, is a telling indication that the tariffs extend beyond the President's legitimate reach."[26]

The historical instances in which the Executive considered acting under the statute confirm the understanding that Section 317 and Section 338 were to be used only when discrimination

[23] U.S. Tariff Comm'n, *Twenty-Fifth Annual Report* 44 (1941).
[24] U.S. Tariff Comm'n, *Thirteenth Annual Report* 47 (1929) (noting that the President had "secured the removal of important discriminations without imposing the retaliatory duties authorized by this section").
[25] U.S. Int'l Trade Comm'n, *MTN Studies 6, Part 1: Agreements Being Negotiated at the Multilateral Trade Negotiations in Geneva—U.S. International Trade Commission Investigation No. 332-101*, at 48 (S. Comm. on Fin., Comm. Print No. 96-27, 1979).
[26] *Learning Res.*, 607 U.S. at 245–46 (opinion of Roberts, C.J.) (internal quotation marks omitted) (quoting *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 119 (2022) (per curiam) (quoting *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 505 (2010))).

against the United States had imposed a measurable burden on U.S. commerce, with the amount of any potential duties to be limited to offsetting the discrimination. For example, when France imposed higher general duties on American exports in 1927, Secretary of State Kellogg warned France that Section 317 duties might follow, but explained that "these duties would only correspond to the bargaining duties which France has already imposed, and the two countries would be placed on more nearly equal bargaining basis."[27] The duties were to correspond to the discrimination, not exceed it. When the President found in the 1930s that Germany and Australia discriminated against United States commerce, he withheld trade-agreement concessions rather than imposing Section 338 duties.[28] And in 1949, Secretary of State Acheson instructed that any Section 338 action against China "would have to be based [on] evidence [of] discrimination, unfair treatment and not on mere fact [of] failure to comply [with] obligations [of a] trade agreement."[29]

The contrast with this case is stark. A statute that went unused through the Great Depression, World War II, and nine decades of trade disputes is now invoked against the United States' closest trading partner, with which it has a comprehensive trade agreement, the United States-Mexico-Canada Agreement (USMCA). It is invoked against market-access terms the United States agreed to, against Canada's responses to United States tariffs, and at the statutory maximum rate without any measurement of the burden.

---

[27]Telegram from the Secretary of State (Kellogg) to the Chargé in France (Whitehouse) (Oct. 8, 1927) (paraphrase), *in* 2 *Papers Relating to the Foreign Relations of the United States 1927*, at 690 (Joseph V. Fuller ed., 1942).

[28]U.S. Tariff Comm'n, *Twentieth Annual Report* 47 (1936).

[29]Telegram from Sec'y of State (Acheson) to the Consul at Shanghai (McConaughy) (Aug. 12, 1949), *in* 9 *Foreign Relations of the United States, 1949: The Far East: China* 960, 961 (Francis C. Prescott et al. eds., 1974).

## III. Congress Assigned the Factfinding on Which Section 338 Duties Rest to the Tariff Commission, and No Such Investigation Occurred Here

Congress specified how the facts on which Section 338 duties rest would be ascertained. During Senate consideration of Section 317, the bill was amended to assign the factfinding role to "the United States Tariff Commission," rather than to "such department or independent establishment of the Government as the President may direct."[30] Section 317(g) made it "the duty of the commission to ascertain and at all times to be informed whether any of the discriminations . . . are practiced by any country" and "to bring the matter to the attention of the President, together with recommendations."[31] The Commission described the duty as "mandatory upon the commission."[32]

The Executive implemented the statute accordingly. Shortly after signing the 1922 Act, President Harding directed by executive order that all petitions under Section 317 "be filed with or referred to the United States Tariff Commission for consideration and for such investigation as shall be in accordance with law and the public interest, under rules and regulations to be prescribed by such commission."[33] The Commission adopted procedures, surveyed "more than a thousand leading manufacturers and exporters in all lines of trade" on "the existence and effects of discrimination against American products," and reported its findings to the President.[34] As the Commission summarized the arrangement, the President could act "[i]f the commission finds that

[30]62 Cong. Rec. 11,244 (1922).
[31]Tariff Act of 1922 § 317(g), 42 Stat. at 946; *see* 19 U.S.C. § 1338(g).
[32]U.S. Tariff Comm'n, *Fifteenth Annual Report* 77 (1931).
[33]Exec. Order No. 3746 (Oct. 7, 1922), *reprinted in* U.S. Tariff Comm'n, *Sixth Annual Report*, *supra* note 3, at 3.
[34]U.S. Tariff Comm'n, *Seventh Annual Report* 42 (1923); *see* U.S. Tariff Comm'n, *Tenth Annual Report* 34 (1926) (reporting submission to the President of reports on "all important existing discriminations against the commerce of the United States").

discriminations are being practiced."[35] That practice continued under Section 338. As the Commission wrote in 1936: "The Commission studies acts of foreign countries which affect the commerce of the United States to determine whether they result in discrimination against our commerce. In addition to this current general study, the Commission investigates any act or practice, involving alleged discrimination, which may be called to its attention."[36]

As the U.S. Supreme Court wrote in Loper Bright, "the contemporaneous construction of those who were called upon to act under the law, and were appointed to carry its provisions into effect, is entitled to very great respect."[37] When Congress enacted Section 338, it was enacting the statute against the established practice under Section 317 of Commission investigations and findings. While the text of Section 338(a) did not specifically require Commission action prior to the President "find[ing] as a fact" discrimination, the text and history of Section 338 make clear that Congress intended the Commission to play a role in investigating potential discrimination before duties are imposed. Section 338(g) carried over the Section 317 requirement that the Tariff Commission "ascertain and at all times to be informed" regarding foreign discrimination, which, as just discussed, had for the previous eight years meant that the Tariff Commission was responsible for investigations. Congress also specifically moved the provision from the Act's general "Special Provisions" into Part II of Title III, "United States Tariff Commission," alongside the provisions governing the Commission's organization, powers, and investigations.[38]

---

[35] U.S. Tariff Comm'n, *Twelfth Annual Report* 36 (1928).

[36] U.S. Tariff Comm'n, *Twentieth Annual Report*, *supra* note 28, at 47.

[37] *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) (quoting *Edwards' Lessee v. Darby*, 25 U.S. (12 Wheat.) 206, 210 (1827)).

[38] Tariff Act of 1930, tit. III, pt. II, §§ 330–341, 46 Stat. at 696–707 (codified at 19 U.S.C. §§ 1330–1341); *see* H.R. Rep. No. 71-7, at 163 (1929) ("The committee felt that it was desirable to have all the provisions of law relating to the United States Tariff Commission incorporated in the Tariff Act of 1929 where they properly belong.").

Moreover, Section 338 refers four times to a requirement that the President find "as a fact." In the context of Section 338, "as a fact" means something that is actual or material, such that a practice that might be discriminatory on its face would not be actionable under Section 338 unless it caused actual harm to U.S. commerce. As McClure noted in his 1924 examination of Section 317, "in fact" carries its "familiar connotation of 'material', 'real' or 'actual'" and leaves aside practices that "though discriminatory on paper, do not interfere with the practical flow of trade."[39] Therefore, a finding of discrimination "as a fact" and a determination of the rate of duty that will offset the burden of such discrimination require more than simply reciting a foreign government's laws or regulations that might appear to be discriminatory. It requires an investigation and measurement of the trade effects, which is the work Congress assigned to the Commission.

The history of the implementation of Section 338 subsequent to its enactment confirms the role of the Tariff Commission. While no President ever used Section 338 to impose tariffs prior to 2026, Annual Reports of the Tariff Commission from the 1930s state that the Commission undertook Section 338 investigations.[40] The 1936 report of the Tariff Commission, for example, noted that the Commission actively studied cases of potential discrimination but that the President had not taken action under Section 338 (although he had taken action under other provisions of the Tariff Act).[41]

The statutory design matters for judicial review. In United States v. George S. Bush & Co., the Supreme Court held that the President's judgment under the flexible-tariff provision is not reviewable as to "the facts, adduced in pursuance of the procedure prescribed by Congress."[42] The

---

[39]McClure, *supra* note 12, at 32.
[40]*See* John K. Veroneau & Catherine H. Gibson, *Presidential Tariff Authority*, 111 AM. J. INT'L L. 957, 964–65 (2017).
[41]U.S. Tariff Comm'n, *Twentieth Annual Report*, *supra* note 28, at 47.
[42]*United States v. George S. Bush & Co.*, 310 U.S. 371, 380 (1940).

protection extends to facts developed through the procedure Congress prescribed. Here no such facts were developed. The USITC, to which Congress assigned the duty to investigate and ascertain discriminatory practices, did not investigate Canada before the proclamations issued. Indeed, subsequent to the President issuing the proclamations at issue in this litigation, the USITC acknowledged publicly that it "does not currently have an established practice" for conducting Section 338 investigations,[43] which reflects the fact that the statute was effectively replaced in practice by Section 301. The USITC has only recently requested public comment on how to discharge its Section 338(g) obligations.[44] A finding that rests on no investigation by the body Congress charged with ascertaining discrimination, and that quantifies no effect on United States commerce, is a recital, not a finding "as a fact."

## IV. The Challenged Proclamations Exceed the Authority Section 338 Confers

### A. The Proclamations Do Not Identify Measures That Are "Unreasonable" or "Discriminat[ory]" Within the Meaning of the Statute

Section 338(a) has two triggers. Paragraph (a)(1) covers an "unreasonable charge, exaction, regulation, or limitation" on the "disposition in or transportation in transit through or reexportation from" a country of United States goods, "which is not equally enforced upon the like articles of every foreign country." Paragraph (a)(2) reaches a country that "[d]iscriminates in fact" against United States commerce "by or in respect to any customs, tonnage, or port duty, fee, charge, exaction, classification, regulation, condition, restriction, or prohibition," so as to place it "at a disadvantage compared with the commerce of any foreign country."

[43] U.S. Int'l Trade Comm'n, Request for Comments Regarding Implementation of 19 U.S.C. 1338(g), 91 Fed. Reg. 57,387, 57,388 (Sept. 9, 2026).
[44] *Id.* at 57,387.

Each trigger has limits that the government's reading ignores. Paragraph (a)(1) requires both unequal enforcement and an "unreasonable" measure. The word "unreasonable" must add something, or it would be superfluous. Its history shows what it adds and what it does not. The enacting Congress rejected House Section 302, which would have let the President penalize foreign duties he deemed "higher and reciprocally unequal and unreasonable."[45] "Unreasonable" therefore cannot operate as a freestanding license to penalize whatever the President dislikes. And the words around it ("charge, exaction, regulation, or limitation") describe burdens a foreign government imposes on goods in the ordinary course. Nothing in them suggests a proportionate response to measures the United States itself imposed unlawfully. Paragraph (a)(2), in turn, requires "discriminat[ion] in fact" in the sense Congress understood in 1922, which did not include reciprocal bargained preferences.[46]

To turn to the facts in this case, the dairy proclamation faults Canada because the dairy tariff-rate quotas Canada negotiated with the European Union under the Comprehensive Economic and Trade Agreement (CETA) are said to be administered more favorably than those the United States negotiated in the USMCA.[47] The CETA quotas, however, are a preference exchanged for reciprocal concessions, which is precisely what the 1922 understanding of "discrimination" excluded. The United States bargained for its own preferential access to the Canadian market, on terms better than those Canada extends to almost all of its trading partners, and Congress approved that bargain.[48] Both agreements are permitted by the GATT rules on free trade areas, which the

---

[45]*See supra* notes 5–6 and accompanying text.
[46]*See supra* Part I.C.
[47]Proclamation No. 11047, 91 Fed. Reg. 46,653 (July 23, 2026).
[48]United States-Mexico-Canada Agreement Implementation Act, Pub. L. No. 116-113, § 101(a), 134 Stat. 11, 14–15 (2020) (codified at 19 U.S.C. § 4511(a)).

United States negotiated and Congress approved.[49] The United States, moreover, challenged Canada's allocation of the USMCA dairy quotas, and in November 2023, a USMCA panel found Canada's revised measures, including the exclusion of retailers and food-service operators from quota eligibility, "not inconsistent" with Canada's obligations.[50] The proclamation thus treats as "discrimination" terms the United States negotiated, Congress approved, and a binational panel upheld.

Nor do the motor-vehicle and alcoholic-beverage proclamations cover Canadian actions that are unreasonable or discriminatory within the meaning of the statute. The motor-vehicle and alcoholic-beverage proclamations rest on measures Canada adopted in response to United States tariffs. The motor-vehicle proclamation targets a Canadian surtax on United States vehicles that Canada imposed as a reciprocal response to new U.S. tariffs on Canadian automobiles.[51] The alcoholic-beverage proclamation targets provincial liquor boards' decisions, beginning in March 2025, to stop purchasing United States products in response to the IEEPA tariffs on Canada that the Supreme Court has since held unlawful, but which continue in effect under other statutes subject to ongoing court challenges.[52]

---

[49]General Agreement on Tariffs and Trade 1994, art. XXIV, Apr. 15, 1994, 1867 U.N.T.S. 187; Uruguay Round Agreements Act, Pub. L. No. 103-465, § 101(a), 108 Stat. 4809, 4814 (1994) (codified at 19 U.S.C. § 3511(a)).

[50]Final Report, *Canada—Dairy Tariff-Rate Quota Allocation Measures 2023*, USMCA Panel No. CDA-USA-2023-31-01, ¶¶ 309–311 (Nov. 10, 2023). The United States had prevailed in an earlier panel challenging Canada's prior measures. Final Report, *Canada—Dairy TRQ Allocation Measures*, USMCA Panel No. CDA-USA-2021-31-01 (Dec. 20, 2021).

[51]Proclamation No. 11048, 91 Fed. Reg. 46,663 (July 23, 2026); *see* United States Surtax Remission Order (Motor Vehicles 2025), SI/2025-60, C. Gaz. pt. II, vol. 159, no. 10 (May 7, 2025) (Can.), https://gazette.gc.ca/rp-pr/p2/2025/2025-05-07/html/si-tr60-eng.html.

[52]Proclamation No. 11046, 91 Fed. Reg. 46,639 (July 23, 2026); *see Learning Res.*, 607 U.S. at 255.

Section 317's conferees described the statutory bargain as reciprocal: the United States "offers under its tariff equality of treatment to all nations and at the same time insists that foreign nations grant to our external commerce equality of treatment."[53] The statute presupposes that the United States is extending equal treatment. When the United States has itself imposed duties on a partner's goods that it does not impose on others, the partner's commensurate response restores, rather than disturbs, the equality the statute protects. Section 338(a)(1) further makes the point explicit by reaching only "unreasonable" impositions. A response that is proportional to new United States tariffs—and in the case of alcoholic beverages, a response to tariffs the United States Supreme Court itself held the President had no authority to impose under domestic law (much less under the USMCA)—is not an "unreasonable" imposition within the meaning of a statute designed to restore equality. Were it otherwise, the President could impose unlawful tariffs, characterize the foreign response as discrimination, and invoke Section 338 to perpetuate the cycle of one country's retaliation begetting further retaliation by the United States.

### B. "Offset" Requires Duties Calibrated to a Measured Burden, but the Proclamations Measure None

Section 338(d) authorizes "such new or additional rate or rates of duty as [the President] shall determine will offset such burden or disadvantage, not to exceed 50 per centum." The enacting Congress understood "offset" to mean "equivalent to," and it described the duties as "limited to the amount of the discrimination."[54] The fifty-percent figure is a ceiling on what an offset may reach. A ceiling the President may reach in every case, regardless of the burden, limits nothing.

[53] *See supra* note 6 and accompanying text.
[54] *See supra* notes 7–13 and accompanying text.

The proclamations do no measuring. The clearest proof is that they impose the identical maximum rate on three burdens of very different sizes. The dairy proclamation asserts lost sales but quantifies no burden.[55] The motor-vehicle proclamation estimates that United States vehicle exports to Canada declined by roughly twenty-two percent, or $5.6 billion.[56] The burden the Administration identified for alcoholic beverages was about $582 million, roughly one-tenth of that figure.[57] Each generated a response of fifty-percent tariffs. A rate that stays the same while the burden varies tenfold, or is not measured at all, is not calibrated to the burden. The aggregate figures illustrate the same point. Applied to the "nearly $20 billion" in covered imports, a fifty-percent duty would amount to roughly $10 billion a year, well above the roughly $6.2 billion the Administration identified for the motor-vehicle and alcohol actions combined.[58] And when the President later removed some goods from the lists and substituted others, he declared that the duties "would still offset" the same burden.[59] He offered no basis for concluding that a fifty-percent duty on a different set of goods offsets the same burden.

Deference to the President's judgment does not save the proclamations. The decision in the case George S. Bush protects the President's weighing of facts "adduced in pursuance of the

[55]Proclamation No. 11047, 91 Fed. Reg. at 46,653.
[56]Proclamation No. 11048, 91 Fed. Reg. at 46,663.
[57]Fact Sheet: President Donald J. Trump Imposes Additional Tariffs on Canada, White House (July 20, 2026), https://www.whitehouse.gov/fact-sheets/2026/07/fact-sheet-president-donald-j-trump-imposes-additional-tariffs-on-canada/.
[58]Press Release, Off. of the U.S. Trade Representative, Ambassador Greer Issues Statement on President Trump Imposing Section 338 Tariffs on Canada (July 20, 2026), https://ustr.gov/about/policy-offices/press-office/press-releases/2026/july/ambassador-greer-issues-statement-president-trump-imposing-section-338-tariffs-canada; Fact Sheet, *supra* note 57.
[59]Proclamation No. 11064 ¶ 5, 91 Fed. Reg. 58,331, 58,331 (Sept. 14, 2026); Proclamation No. 11065 ¶ 5, 91 Fed. Reg. 58,339, 58,339 (Sept. 14, 2026); Proclamation No. 11076 ¶ 6, 91 Fed. Reg. 68,861, 68,862 (Oct. 30, 2026).

procedure prescribed by Congress."[60] It does not protect a proclamation that treats the statute's measure of the duty as a recital. Courts review whether the President "clear[ly] misconstru[ed]" his statutory authority or "violated an explicit statutory mandate."[61] The question here is not how the President weighed the evidence. It is whether he applied the statutory standard—duties that offset the burden—at all. Otherwise, the offset requirement, preserved through every revision of the statute, would impose no check on the President's assumption of tariff power.

Finally, Section 338(d) provides that duties take effect "thirty days after the date of such proclamation."[62] By the plain language of Section 338(d), the thirty-day waiting requirement applies to "such new or additional rate or rates of duty," not simply the initial proclamation that a President might issue under Section 338. Yet, goods added by the September proclamations were subject to duties in less than thirty days.[63] The waiting period is one of the "constraints" with which Congress grants tariff power.[64] It cannot be disregarded.

---

[60] 310 U.S. at 380.
[61] *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 89 (Fed. Cir. 1985); *Motion Sys. Corp. v. Bush*, 437 F.3d 1356, 1361 (Fed. Cir. 2006) (en banc) (per curiam); *see USP Holdings, Inc. v. United States*, 36 F.4th 1359, 1365–66 (Fed. Cir. 2022); *Oregon v. United States*, 835 F. Supp. 3d 1307, 1322 (Ct. Int'l Trade 2026).
[62] 19 U.S.C. § 1338(d).
[63] *See* Proclamation No. 11064, 91 Fed. Reg. at 58,331; Proclamation No. 11065, 91 Fed. Reg. at 58,339; Fact Sheet: President Donald J. Trump Responds to Canada's Retaliation, White House (Sept. 8, 2026), https://www.whitehouse.gov/fact-sheets/2026/09/fact-sheet-president-donald-j-trump-responds-to-canadas-retaliation/ (saying that "[t]he import bans will take effect on September 29, 2026, and the product additions and removals will take effect on September 15, 2026.").
[64] *Learning Res.*, 607 U.S. at 251.

## V. Constitutional Avoidance and Learning Resources Require a Bounded Reading of Section 338

The government asks this Court to read Section 338 in a way that would do far more than authorize the duties at issue. Its reading would convert Section 338 into precisely the type of unbounded tariff authority the Supreme Court refused to find in IEEPA.

Consider the government's theory of "discrimination." On its view, any country that gives another trading partner terms differing in any respect from those it gives the United States discriminates against the United States, even if the country and the United States have their own trade agreement, and even if the trade with the country is governed by a multilateral agreement such as the Agreement Establishing the World Trade Organization.

There are more than 450 regional and free trade agreements in force,[65] and every country is party to at least one preferential trade agreement,[66] which agreements are permitted under the GATT, subject to its Article XXIV conditions.[67] The United States is party to some of these agreements, including free trade agreements with 20 countries.[68] Thus, all of America's major trading partners have such agreements with other countries. Yet, under the government's reading, essentially every trading partner discriminates against the United States within the meaning of Section 338, and the President may impose fifty-percent duties on "any products" of each of them, change the duties and the goods they cover at will, and, if the country responds, ban its goods

[65] *Regional Trade Agreements Database*, World Trade Org., https://rtais.wto.org/UI/PublicMaintainRTAHome.aspx (last visited Nov. 2, 2026) (reporting 390 regional trade agreements "notified and in force" and 84 more "in force which have not yet been notified").
[66] Aaditya Mattoo, Nadia Rocha & Michele Ruta, *The Evolution of Deep Trade Agreements* 2 (World Bank, Pol'y Rsch. Working Paper No. 9283, 2020), http://hdl.handle.net/10986/33944.
[67] General Agreement on Tariffs and Trade 1994, art. XXIV, Apr. 15, 1994, 1867 U.N.T.S. 187.
[68] Mattoo et al., *supra* note 66; *Free Trade Agreements*, Off. of the U.S. Trade Representative, https://ustr.gov/trade-agreements/free-trade-agreements (last visited Nov. 10, 2026) (saying that "[t]he United States has comprehensive free trade agreements in force with 20 countries.").

outright. This is precisely the type of unbounded tariff power that the Supreme Court warned against in Learning Resources.

This is not hypothetical. Within two months of the original proclamations, the President issued five more, imposing import bans and substituting new goods for old on the tariff lists, and in October he modified the lists again.[69] Goods were added and duties collected on them in less than the thirty days the statute requires.[70] The Supreme Court described this same pattern under IEEPA, noting that the President "issued several increases, reductions, and other modifications,"[71] shifting goods into and out of the tariff framework, and that the government's reading left the President "free to issue a dizzying array of modifications at will."[72]

The Court held in Learning Resources that Congress does not delegate such power through ambiguous language: "When Congress grants the power to impose tariffs, it does so clearly and with careful constraints."[73] Section 338's constraints are the comparative triggers, the "unreasonable" requirement, the requirement for USITC involvement in investigations and finding "as a fact," the offset requirement, and a thirty-day waiting period. Reading those limits out of the statute would leave a power indistinguishable in practice from the one Learning Resources

---

[69]*See* Proclamation No. 11061, 91 Fed. Reg. 58,311 (Sept. 14, 2026) (excluding certain alcoholic beverages); Proclamation No. 11062, 91 Fed. Reg. 58,319 (Sept. 14, 2026) (excluding certain dairy products); Proclamation No. 11063, 91 Fed. Reg. 58,325 (Sept. 14, 2026) (excluding certain products in response to motor-vehicle discrimination); Proclamation No. 11064, 91 Fed. Reg. at 58,331 (modifying scope, alcoholic beverages); Proclamation No. 11065, 91 Fed. Reg. at 58,339 (modifying scope, motor vehicles); Proclamation No. 11076, 91 Fed. Reg. at 68,861 (further modifying Proclamation No. 11048).
[70]19 U.S.C. § 1338(d) (duties to be collected "thirty days after the date of such proclamation").
[71]*Learning Res.*, 607 U.S. at 238.
[72]*Id.* at 244 (opinion of Roberts, C.J.).
[73]*Id.* at 251.

rejected: "the power to impose tariffs on practically any products he wants, from any countries he chooses, in any amounts he selects."[74]

The government's reading would also press Section 338 against constitutional limits. The power to impose tariffs is "very clear[ly] . . . a branch of the taxing power," committed by Article I to Congress.[75] Congress may delegate some tariff-setting authority but only subject to constraints under an intelligible principle. The unreasonable or discrimination trigger, together with the finding "as a fact" and offset requirements, provides that principle in Section 338. Without them, any practice the President labeled "discrimination" would permit him to set tariff rates on any product at any rate up to fifty percent, and modify them at will, backed by an uncapped exclusion power. Whether the question is framed under the major-questions principle the Learning Resources plurality applied or under the statutory canon of constitutional avoidance, the result is the same. Where one construction raises a serious constitutional question and another avoids it, the Court should adopt the latter.[76] As Justice Gorsuch observed in Learning Resources, once a court reads a doubtful statute to grant the Executive such power, Congress may find it "almost impossible . . . to retrieve."[77]

[74] *Id.* at 256 (Gorsuch, J., concurring).
[75] *Learning Res.*, 607 U.S. at 240 (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 201 (1824)); *see* U.S. Const. art. I, § 8, cl. 1.
[76] *See Indus. Union Dep't v. Am. Petroleum Inst.*, 448 U.S. 607, 646 (1980) (plurality opinion).
[77] *Learning Res.*, 607 U.S. at 270 (Gorsuch, J., concurring).

## CONCLUSION

Amici do not address whether Section 338 has been replaced by Section 301 or otherwise effectively repealed; that question is addressed in the plaintiff's and other briefs. Amici rather maintain that, if the Court finds that Section 338 remains in force, it should hold that the challenged proclamations exceed the authority Section 338 confers. That holding rests on the statute, so the Court need not reach the serious constitutional questions the government's reading would raise. The duties and import bans should be set aside.

Respectfully submitted,

HUSCH BLACKWELL LLP

By: *<u>/s/ Nithya Nagarajan</u>*
Nithya Nagarajan

*Attorneys for Proposed Amici Curiae*

Peter Harrell, Jennifer Hillman, and Gregory Shaffer

<u>P.O. ADDRESS</u>:
1801 Pennsylvania Avenue, NW, Suite 1000
Washington 20006-3606
202.378.2300
202.378.2319 (fax)
nithya.nagarajan@huschblackwell.com

**CERTIFICATE OF COMPLIANCE**

Pursuant to U.S. Court of International Trade's Standard Chambers Procedures, undersigned counsel, certifies this brief complies with the Court's type-volume limitation rules. This brief contains 6,799 words, excluding the cover page, table of contents, table of authorities, and signature block. This brief also complies with all typeface and margin requirements.

*/s/ Nithya Nagarajan*
Nithya Nagarajan