IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

Before: The Honorable Claire R. Kelly, Joseph A. Laroski, and Kara M. Westercamp, Judges

| | |
|---|---|
| GELLERT GLOBAL GROUP CORP.,<br>Plaintiff,<br>v.<br>DONALD J. TRUMP, *et al.*,<br>Defendants. | Case No. 26-cv-04636 |

JOINT BRIEF OF *AMICI CURIAE* CATO INSTITUTE, AND PROFESSOR ILYA SOMIN

Ilya Somin
Professor of Law
ANTONIN SCALIA LAW SCHOOL
GEORGE MASON UNIVERSITY
3301 Fairfax Dr.
Arlington, VA 22201
Phone: (703) 993-8069
lsomin@gmu.edu

*Of Counsel*

Daniel Cannistra
CROWELL & MORING LLP
600 Fifth St., NW
Washington, DC 20001
Phone: (202) 624-2902
dcannistra@crowell.com

Weronika Bukowski
CROWELL & MORING LLP
Two Manhattan West
375 Ninth Ave
New York, NY 10001
Phone: (212) 530-1930
wbukowski@crowell.com

*Attorneys to Amici Curiae*

# TABLE OF CONTENTS

INTEREST OF AMICUS CURIAE .......... 4

ARGUMENT .......... 7

I. SECTION 338 DOES NOT GRANT THE SWEEPING TARIFF AUTHORITY CLAIMED BY DEFENDANTS .......... 7

A. Congress required both qualifying unequal treatment and an offsetting response .......... 7

B. Unreasonableness must be assessed within the congressionally approved trade relationship .......... 8

C. Discrimination in fact requires a statutory comparison, not merely a label. .......... 12

D. "Offset" requires a counterbalancing relationship, not merely a permissible rate level. .......... 14

E. The thirty-day requirement provides a distinct, narrower ground for relief. .......... 17

F. Review concerns the statutory authority exercised, not the label attached to the findings. .......... 18

G. Section 338 is no longer operative because it was superseded by later legislation. .......... 19

II. THE MAJOR QUESTIONS DOCTRINE FORECLOSES A TRANSFORMATIVE EXPANSION OF SECTION 338. .......... 19

A. The magnitude of the asserted authority matters beyond the particular entries before the Court .......... 21

B. Tariffs are not exempt from the major questions doctrine by virtue of being "foreign affairs" powers .......... 22

III. THE GOVERNMENT'S BROAD CONSTRUCTION OF SECTION 338 WOULD RENDER THE STATUTE AN UNCONSTITUTIONAL DELEGATION OF LEGISLATIVE POWER TO THE EXECUTIVE .......... 25

A. The Section 338 tariffs violate the nondelegation doctrine. .......... 25

B. Tariff delegations are not exempt from nondelegation constraints on the grounds that they are "foreign affairs" issues. .......... 30

C. Under the canon of constitutional avoidance, this court should interpret the statute to avoid the constitutional problem here. .......... 31

IV. THE AGREED MECHANISMS DISTINGUISH ENFORCING THE BARGAIN FROM SEEKING BETTER TERMS .......... 32

CONCLUSION .......... 33

# TABLE OF AUTHORITIES

Cases

*Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16 (1995) ........ 13
*Corus Group PLC v. International Trade Commission*, 352 F.3d 1351 (Fed. Cir. 2003) ........ 15
*FCC v. Consumers' Research*, 606 U.S. 656 (2025) ........ 6, 7, 18, 19
*HMTX Industries LLC v. United States*, 156 F.4th 1236 (Fed. Cir. 2025) ... 14, 15, 17, 19, 21
*ICC v. Baltimore & Ohio Railroad Co.*, 145 U.S. 263 (1892) ........ 8, 9
*J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394 (1928) ........ 18, 19
*Jennings v. Rodriguez*, 583 U.S. 281 (2018) ........ 20
*Learning Resources, Inc. v. Trump*, 607 U.S. 229 (2026) ........ 17, 18
*Maple Leaf Fish Co. v. United States*, 762 F.2d 86 (Fed. Cir. 1985) ........ 16
*Silfab Solar, Inc. v. United States*, 892 F.3d 1340 (Fed. Cir. 2018) ........ 15, 16
*Texas & Pacific Railway Co. v. ICC*, 162 U.S. 197 (1896) ........ 9
*United States v. George S. Bush & Co.*, 310 U.S. 371 (1940) ........ 15, 16
*V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025) ........ 16
*West Virginia v. EPA*, 597 U.S. 697 (2022) ........ 16

Constitutional and Statutory Provisions

U.S. Const. art. I, § 8, cls. 1, 3 ........ 18
19 U.S.C. § 1338 ........ passim
19 U.S.C. §§ 2411–2414, including § 2411(d)(3)(A) ........ 11, 21
19 U.S.C. § 4511(a) ........ 9
19 U.S.C. § 4512(a), (c) ........ 9, 11, 20
Proclamations and Other Authorities
Proclamation No. 11047, 91 Fed. Reg. 46,653 (July 23, 2026) ........ 8, 10, 11, 12, 14
Proclamation No. 11064, 91 Fed. Reg. 58,331 (Sept. 14, 2026) ........ 14
Proclamation No. 11065, 91 Fed. Reg. 58,339 (Sept. 14, 2026) ........ 14
Offset, *Webster's Revised Unabridged Dictionary* (1913) ........ 13
USMCA arts. 31.2, 31.4, 31.6, 31.18–31.19, 34.3, 34.7 ........ 20
CETA Annex 2-A ¶¶ 16–18 ........ 10
*Canada—Dairy Tariff-Rate Quota Allocation Measures 2023*, Final Report (Nov. 10, 2023) ........ 10, 11
USTR, Agriculture: Market Access and Dairy Outcomes of the USMC Agreement . 9, 10
Global Affairs Canada, CETA Chapter Summaries, ch. 2 ........ 10
Proclamation No. 11046, 91 Fed. Reg. 46,639 (July 23, 2026) ........ 12
Proclamation No. 11048, 91 Fed. Reg. 46,663 (July 23, 2026) ........ 12

## INTEREST OF AMICUS CURIAE

The Cato Institute is a nonpartisan public policy research foundation founded in 1977 and dedicated to individual liberty, free markets, and limited government. Cato's Robert A. Levy Center for Constitutional Studies, established in 1989, promotes the principles of limited constitutional government that are the foundation of liberty. Toward those ends, Cato publishes books and studies, conducts conferences, produces the annual *Cato Supreme Court Review*, and files amicus briefs in state and federal courts. This case concerns Cato because of its significance to the constitutional separation of powers and its potential effect on free trade and the U.S. economy.

Ilya Somin is Visiting Professor of Law at the University of Virginia School of Law, Professor of Law at the Antonin Scalia Law School at George Mason University, B. Kenneth Simon Chair in Constitutional Studies at the Cato Institute, and the author of numerous works on constitutional law and related issues, including *Free to Move: Foot Voting, Migration, and Political Freedom* (rev. ed. 2022), *Democracy and Political Ignorance: Why Smaller Government Is Smarter* (2d ed. 2016), and *The Grasping Hand: Kelo v. City of New London and the Limits of Eminent Domain* (rev. ed. 2016). His briefs and writings have been cited in decisions by the United States Supreme Court, lower federal courts, state supreme courts, and the Supreme Court of Israel. His writings helped inspire *V.O.S. Selections, Inc. v. Trump*, the case that led to the invalidation of the IEEPA tariffs, and he served as co-counsel for the plaintiffs throughout that litigation in the Court of International Trade, the Federal Circuit, and the Supreme Court.

This brief explains why Section 338 of the Tariff Act of 1930 ("Section 338"), 19 U.S.C. § 1338, cannot be used to impose the tariffs enacted by Defendants, and why doing so violates the major questions and nondelegation doctrines.

The focus of this case is the authority Congress delegated, not the President's preferred trade policy. Section 338 conditions extraordinary import taxes on qualifying foreign conduct, a resulting commercial burden or disadvantage, and duties directed to offsetting that burden after the prescribed waiting period. These duties are operative restrictions on power. Merely reciting the duties as pursuant to Section 338 cannot convert a bounded remedy into a general license to tax imports or renegotiate a congressionally approved trade bargain. In addition, Section 338 has been superseded by later-enacted statutes. Beyond that, the Government's interpretation of the statute runs afoul of the major questions doctrine and would amount to an unconstitutional delegation of legislative power to the executive.

Plaintiff alleges that three July 20, 2026, proclamations imposed the same maximum additional duty of 50 percent for distinct Canadian policies without relating the 50 percent rate and the covered trade to the supposed burdens. The duties, initially scheduled for August 19, took effect August 22 after a three-day suspension. September 8 proclamations added cheeses to the alcohol and motor-vehicle measures, with collection beginning September 15. Compl. ¶¶ 50–60, 66; Pl.'s Mem. 13–16, 38–40 (ECF No. 6, PDF pp. 28–31, 53–55). This brief addresses Plaintiff's challenged measures resulting from the proclamations.

The Court should limit the Section 338 duties for three reasons. First, Section 338's statutory phrase, "any unreasonable charge," requires that the term "unreasonable" be assessed within the actual reciprocal trade relationship, and in reference to the treatment of unrelated goods. Congress approved defined United States-Mexico-Canada Agreement ("USMCA") access, and the United States obtained dairy opportunities unavailable under the Comprehensive Economic and Trade Agreement ("CETA"). Section 338's statutory comparison must address that relationship and not isolate the least favorable feature of one product's treatment. Under either subsection 338(d) and (e) predicate, "offset" independently requires a response directed to the identified disadvantage, not simply a rate beneath the ceiling.

Second, the major questions doctrine forecloses interpreting Section 338 to permit the President to impose extraordinary import taxes whenever another country imposes any trade restrictions or declines to purchase American goods. Section 338 expressly authorizes some tariffs, unlike IEEPA. But clear authorization of a limited power is not authorization to discard the limiting conditions defining that power.

Third, stripping the statute's qualitative conditions of operative force raises grave nondelegation concerns. An extremely high rate ceiling of 50 percent cannot substitute for the legislative policy directing when and why tariffs may be imposed. *See FCC v. Consumers' Research*, 606 U.S. 656 (2025) (confirming the constitutional importance of meaningful qualitative boundaries). Congress's actual constraints

must govern; statutory words stripped of operative effect cannot effectively enforce constitutional limits on delegation.

## ARGUMENT

### I. SECTION 338 DOES NOT GRANT THE SWEEPING TARIFF AUTHORITY CLAIMED BY DEFENDANTS.

#### A. Congress required both qualifying unequal treatment and an offsetting response.

Section 338(a) explains that the President may declare "new or additional duties . . . whenever he shall find that as a fact such country," imposes certain types of burdens on U.S. imports, and then supplies alternative predicates by joining subsection 338(a)(1) and 338(a)(2) with the word "or." 19 U.S.C. § 1338(a)(1)–(2). Section 338(a)(1) only permits imposition of tariffs if a foreign trading partner imposes an "unreasonable charge, exaction, regulation, or limitation" on specified dealings in U.S. products, "not equally enforced upon the like articles of every foreign country." Meanwhile, 338(a)(2) requires foreign country discrimination "in fact," directly or indirectly, "by law or administrative regulation or practice," that places U.S. commerce "at a disadvantage compared with the commerce of any foreign country." 19 U.S.C. § 1338(a)(1)–(2). While "in fact" does not exclude discrimination implemented by law, neither subsection allows for an ordinary trade disagreement to be considered in conflict with the statute.

Section 338(d) limits the response to a burden or disadvantage resulting from the "unequal impositions or discriminations aforesaid." 19 U.S.C. § 1338(d). It authorizes rates the President determines "will offset such burden or disadvantage,"

not exceeding 50 percent. *Id.* § 1338(d). The word "such" links the remedy to the statutory wrong; "offset" specifies the relationship the remedy must bear to it.

The trigger and the remedy are therefore separate inquiries. Identifying a qualifying foreign restriction does not establish that any tariff beneath the ceiling offsets its consequences. The President must exercise judgment both about the disadvantage caused by the qualifying practice and about duties directed to offsetting that disadvantage. Treating the finding of discrimination as completing both inquiries would make the remedial condition redundant.

Public interest is an additional statutory condition, not a substitute for qualifying discrimination or an offsetting response. *See* 19 U.S.C. § 1338(a), (d). The statutory phrase "as he shall determine" identifies who implements Congress's policy; it does not authorize selection of a different policy. 19 U.S.C. § 1338(a). Section 338(g)'s Commission monitoring and recommendation duties reinforce the statute's focus on identifiable foreign practices and their commercial consequences. The statutory scheme concerns a defined remedial task, not open-ended trade leverage.

### B. Unreasonableness must be assessed within the congressionally approved trade relationship.

The Court should determine that not only are the statutory phrases "unreasonableness" and "unequal treatment" distinct, but it should also define "unreasonableness" by the statute's own language. *See* 19 U.S.C. § 2411(d)(3)(A) (When "[a]n act, policy, or practice is unreasonable . . . [it] . . . is otherwise unfair and inequitable"). Section 338(a)(1) requires both unreasonableness and unequal enforcement. Equating the two, as the Government did, eliminates a condition

Congress expressly prescribed. The dairy proclamation invokes both Section 338(a)(1) and (2), making the legal content of each predicate important. Proclamation No. 11047 ¶ 6, 91 Fed. Reg. 46,653, 46,654 (July 23, 2026). Section 338(a)(1) requires a determination why the challenged restriction is unreasonable in its actual setting; Section 338(a)(2)'s separate comparative requirement is addressed below.

The Supreme Court's commercial precedents distinguish unequal treatment from statutory unreasonableness. In *ICC v. Baltimore & Ohio Railroad Co.*, the Court construed the Interstate Commerce Act's prohibition on an "undue or unreasonable preference or advantage" and upheld reduced group fares. 145 U.S. 263, 278–84 (1892). It explained: "It is not all discriminations or preferences that fall within the inhibition of the statute—only such as are unjust or unreasonable." *Id.* at 276–77. The commercial circumstances and consideration supporting the different treatment mattered; disparity was not its own answer. A finding of unreasonableness therefore must do more than identify differential treatment.

*Texas & Pacific Railway Co. v. ICC* likewise required attention to relevant commercial context when applying the statutory prohibition on undue or unreasonable preferences. 162 U.S. 197, 233–39 (1896). The dispute involved lower through rates for imported goods than for domestic traffic. *Id.* The Court held that "all the circumstances and conditions that reasonably apply to the situation," including relevant foreign competition, could be considered. *Id.* at 233–34. It identified legal error in excluding relevant circumstances because of a misconception of the statute and rejected disparity alone as sufficient to establish undue

discrimination. *Id.* at 235–39. These commercial precedents illuminate the distinction Congress's use of "unreasonable" preserves: relevant context informs the qualitative judgment rather than disappearing once unequal treatment is identified.

The relevant context here is the reciprocal relationship embodied in USMCA, not a hypothetical world of unrestricted dairy trade. Congress expressly approved the agreement and its Statement of Administrative Action. 19 U.S.C. § 4511(a). The United States accepted defined access and product-specific limitations while Canada retained supply management. The Office of the United States Trade Representative ("USTR") described the agricultural bargain as new Canadian access for U.S. dairy, poultry, and eggs "in exchange" for new U.S. access for Canadian dairy and specified other products.[1] The limitation must be evaluated within that reciprocal exchange. Congress's approval makes the negotiated relationship indispensable to determining whether the challenged treatment is unreasonable.

Concrete dairy concessions show why the Government's selected comparison is flawed. USMCA provided U.S.-exclusive quotas reaching, in year six, 50,000 metric tons for fluid milk, 10,500 for cream, and 7,500 for skim milk powder, with subsequent growth and specified processing reservations. USTR, *supra* note 1. Canada's official CETA summary, by contrast, states that apart from cheese access

[1] Office of the U.S. Trade Representative, Agriculture: Market Access and Dairy Outcomes of the USMC Agreement, https://ustr.gov/trade-agreements/free-trade-agreements/united-states-mexico-canada-agreement/fact-sheets/market-access-and-dairy-outcomes (market-access exchange and U.S.-exclusive quotas).

and elimination of the milk-protein-substances tariff, CETA provided "no additional access" for other supply-managed products, including other dairy, poultry, and eggs.[2]

The focus should be on that two-way allocation of opportunity. The United States obtained dairy concessions unavailable under CETA, while the proclamation isolates an EU advantage in cheese-retailer eligibility. Proclamation No. 11047 ¶¶ 3–6. Selecting that feature while excluding the reciprocal framework mistakes a negotiated allocation of access for an independently imposed wrong. "Unreasonable" requires evaluation of the limitation's operation and justification within the relationship; it cannot merely repeat the observation that treatment differs. The absence of a concession the United States did not secure is not, standing alone, proof of unreasonableness.

The 2023 panel majority confirms the relevant negotiated baseline. It rejected the U.S. contention that the agreed text required retailer eligibility and recognized Canadian administrative flexibility within express limits. *Canada—Dairy Tariff-Rate Quota Allocation Measures 2023*, No. CDA-USA-2023-31-01, Final Report ¶¶ 82–96 (Nov. 10, 2023). The majority explained that the text did not require allocations to the applicants selected by the United States. *Id.* ¶ 85. The dispute therefore concerns an additional entitlement the United States failed to establish under its bargain, rather than access Canada promised and withdrew. The Government must confront that distinction when invoking Section 338.

[2] Global Affairs Canada, CETA Chapter Summaries, ch. 2, Agriculture, https://www.international.gc.ca/trade-commerce/trade-agreements-accords-commerciaux/agr-acc/ceta-aecg/chapter_summary-resume_chapitre.aspx?lang=eng. For cheese, CETA Annex 2-A ¶¶ 16–18 provides distinct general and industrial quotas and a WTO reallocation; those should not be conflated with non-cheese dairy access.

Plaintiff's claim arises under Section 338, whose statutory conditions define the inquiry. Congress's approval of USMCA supplies the commercial and legal context in which "unreasonable" operates. Section 4512 preserves domestic statutory authority and addresses private treaty remedies; it leaves the content and limits of Section 338 to be enforced on their own terms. 19 U.S.C. § 4512(a), (c). The question is therefore what that authority permits, not whether USMCA creates a separate private cause of action.

Section 338's own language thus governs. Section 301's definition of "unreasonable" as "otherwise unfair and inequitable" applies "[f]or purposes of this subchapter." 19 U.S.C. § 2411(d)(3)(A). The Court should construe the term Congress used in Section 301 in its commercial setting, preserving the independent work that condition must perform. It cannot mean merely whatever foreign trade policy the President opposes.

### C. Discrimination in fact requires a statutory comparison, not merely a label.

Proclamation No. 11047 justifies additional 338 duties by moving from a difference in retailer eligibility to findings of impeded access, and lost sales or revenues, to comparative disadvantage. Proclamation No. 11047 ¶¶ 4–6. The Court must determine whether the Government applied the requisite statutory comparison, as opposed to relying on general "discrimination" as it did. The statute requires discrimination against U.S. commerce producing the specified disadvantage. *See* 19 U.S.C. § 2411(d). The Government's construction must account for the negotiated access actually provided and the commercial operation of the challenged distinction.

In Section 338(a), Congress's reference to "any foreign country" identifies the reach of the comparison; it does not eliminate the requirement that there be discrimination "against" U.S. commerce. 19 U.S.C. § 1338(a)(2). The comparison Congress requires concerns the legal character and comparative operation of the challenged measure within the reciprocal arrangements. The reverse dairy concessions illustrate why selecting a single favorable feature from another agreement does not complete that inquiry. The Government must establish the statutory disadvantage under a construction that gives effect to the full condition, not simply point to a differently negotiated concession.

The focus is the statutory standard, not a contest between competing statistical forecasts. The proclamation identifies no quota-utilization, displaced-sales, or distribution-cost figures attributing a disadvantage to retailer exclusion. Proclamation No. 11047 ¶¶ 3–8. That omission underscores the importance of identifying the rule that converts the eligibility difference into statutory discrimination. Calling the conclusion a factual finding does not address whether the executive applied the comparison Congress prescribed. The Court should determine the legal question, whether the Government applied the requisite statutory comparison, before treating the asserted consequences as sufficient to trigger the delegated power.

In addition, the alcohol proclamation cites actions by Canadian provincial governments that are not actually restrictions on U.S. imports at all. Proclamation No. 11046 ¶¶ 4–7, 91 Fed. Reg. 46,639, 46,639–40 (July 23, 2026). These actions are

decisions by Canadian provincial governments to stop purchasing U.S. alcoholic beverages for their government-owned liquor stores. Consumer decisions not to purchase a given product are not actions that "discriminate . . . against the commerce of the United States." 19 U.S.C. § 1338(a)(2). Otherwise, such "discrimination" would occur anytime a foreign government chooses to buy any product from a non-American producer when there are U.S. producers that sell similar goods.

Each proclamation must satisfy its own statutory predicate and the independent offset requirement. The alcohol and motor-vehicle measures concern 2025 purchasing restrictions and surtaxes. Proclamation No. 11046 ¶¶ 4–7, 91 Fed. Reg. 46,639, 46,639–40 (July 23, 2026); Proclamation No. 11048 ¶¶ 2–6, 91 Fed. Reg. 46,663, 46,663–64 (July 23, 2026). Each requires a connection between the identified foreign measure, the resulting statutory disadvantage, and the response selected to counterbalance it. Adding cheese to a covered-product list does not itself supply that connection.

### D. "Offset" requires a counterbalancing relationship, not merely a permissible rate level.

Section 338(d) asks whether the selected duties serve the counterbalancing task Congress authorized, not simply whether 50 percent falls within the permissible range. Plaintiff identifies maximum-rate duties imposed in response to distinct Canadian measures without explaining the relationship between the covered trade, selected rate, and identified burdens. Compl. ¶ 56; Pl.'s Mem. 38–40 (PDF pp. 53–55). The rate ceiling cannot do the work of the remedial condition. The statute requires both.

The ordinary verb "offset" mean "[t]o set off; to place over against; to balance" before enactment. Offset, *Webster's Revised Unabridged Dictionary* (1913), https://www.websters1913.com/words/Offset. Congress used "offset" as a verb in the phrase "offset such burden or disadvantage." Congress therefore required a relationship between the response and the identified commercial harm. Retaliatory pressure cannot substitute for the counterbalancing purpose Congress specified.

*Citizens Bank of Maryland v. Strumpf* describes setoff, "also called 'offset,'" as applying mutual debts against each other. 516 U.S. 16, 18 (1995). The counterbalancing concept is instructive: an offset takes its reference point from the burden it addresses. Section 338 applies that concept to commercial burdens and disadvantages. That remedial relationship governs; the existence of a grievance does not authorize a tax for a different policy objective.

Section 338's statutory structure makes the remedial relationship concrete. Section 338(d) refers back to the burden caused by the qualifying unequal impositions or discriminations; Section 338(e) separately authorizes rates determined to "offset such benefits" accruing to foreign industry, subject to its own predicates. 19 U.S.C. § 1338(d)–(e). In each provision, the specified consequence supplies the reference point. Section 338(b)'s separately conditioned exclusion authority further demonstrates Congress's use of distinct predicates for distinct responses.

Congress's policy governs the President's judgment. Section 338(d) directs that judgment to offsetting the identified disadvantage. *Id.* § 1338(d). The burden, covered trade, and selected rate are components of that task; the 50-percent ceiling is an

additional constraint, not its replacement. Discretion to implement a counterbalancing response is not discretion to choose an unrelated protectionist objective.

Congress permitted duties "on any products" of the foreign country while directing the rates to "offset such burden or disadvantage." *Id.* § 1338(d). Product-selection authority and remedial purpose must be read together. The response as a whole must bear the required relationship to the identified disadvantage. Broad product coverage does not establish that relationship, and amendment of a product list does not suspend it.

The proclamations' offset recitals place the meaning of that term squarely before the Court. The dairy proclamation states that the duties will offset the burden; the September amendments state that both the original and revised lists would do so. Proclamation No. 11047 ¶ 8; Proclamation No. 11064 ¶¶ 5–7, 91 Fed. Reg. 58,331, 58,331–32 (Sept. 14, 2026); Proclamation No. 11065 ¶¶ 5–7, 91 Fed. Reg. 58,339, 58,339–40 (Sept. 14, 2026). Those recitals must represent the statutory judgment Congress required. Repetition of "offset" cannot establish that public interest, domestic protection, or negotiating leverage alone fulfills the separate remedial condition.

The Court should determine whether the construction advanced to sustain these duties preserves an operative offset requirement. The question is antecedent to selecting among economic estimates: what response did Congress authorize? A construction permitting any duty below 50 percent for any trade-policy purpose

severs the link created by the phrase "such burden or disadvantage." *See* 19 U.S.C. § 1338(d). Enforcing that link preserves the limits on the delegation Congress enacted. *HMTX Industries LLC v. United States* does not authorize a different result. 156 F.4th 1236, 1252–55 (Fed. Cir. 2025). *HMTX* sustained modifications of discretionary Section 301 actions directed to eliminate investigated unfair practices. It recognized that those discretionary actions are not subject to the proportionality rule applicable to mandatory Section 301 actions. *Id.* at 1251–54. Section 338, by contrast, expressly requires duties that "offset" the identified burden. *HMTX*'s refusal to import a restriction into one statute is no reason to delete an express restriction from another.

### E. The thirty-day requirement provides a distinct, narrower ground for relief.

Plaintiff separately demonstrates that Section 338(d) ties collection to thirty days after the proclamation enumerating the goods. Its September 8/September 15 challenge is set out in the Complaint, paragraphs 109–114, and its memorandum, pages 46–48 (PDF pp. 61–63). Section 338(c)'s amendment authority does not expressly dispense with that protection for newly enumerated articles. Cato supports that construction without repeating Plaintiff's presentation.

Collection began before the protection Congress prescribed had run. The Court can enforce that requirement independently of its resolution of the continuing-authority and offset questions. Relief on that ground should preserve, not displace, Plaintiff's broader statutory challenges.

### F. Review concerns the statutory authority exercised, not the label attached to the findings.

The Court's task is to enforce the prerequisites to delegated tariff authority. *Corus Group PLC v. International Trade Commission* reviewed whether the qualifying ITC determination necessary to authorize presidential action had occurred. 352 F.3d 1351, 1358–60 (Fed. Cir. 2003). The proclamation's validity depended on satisfaction of that statutory condition. The same distinction between an authorized exercise of judgment and the legal boundaries of the delegation informs the inquiry here.

Section 338 requires the Court to determine what legally satisfies its conditions. Does "unreasonable" retain meaning independent of inequality? Does the finding identify the comparison Congress specified? Does the response remain directed to offsetting the identified disadvantage? Those questions concern the authority exercised, not a judicial preference among competing trade forecasts. *Corus* addressed an independent Commission trigger; the question here is whether the President's own determinations apply Section 338's governing conditions.[3]

*Maple Leaf Fish Co. v. United States* expressly preserves intervention for "a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority." 762 F.2d 86, 89 (Fed. Cir. 1985). This case involves both a "clear misconstruction" and "action outside delegated authority."

[3] *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1347–48 (Fed. Cir. 2018), rejected record-support review of a presidential substantial-share determination; *United States v. George S. Bush & Co.*, 310 U.S. 371, 379–80 (1940), addressed presidential factual judgment under Section 336. *Corus* also recognized restrictions on reviewing presidential factual findings. 352 F.3d at 1361. Those decisions distinguish review of factual judgment from the statutory-boundary inquiry presented here. Cato's focus is a genuine error in construing or applying the delegation's legal conditions, not a request to select a preferred economic estimate.

Calling a determination factual cannot resolve the meaning of the statutory condition it purports to satisfy. Nor can a recital enlarge the policy Congress authorized or eliminate the waiting period Congress imposed. The Court should decide those legal questions and direct appropriate relief against the implementing defendants. *See V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312, 1329 n.10 (Fed. Cir. 2025).

### G. Section 338 is no longer operative because it was superseded by later legislation.

As Plaintiff explained in their submissions, Section 338 is no longer operative because it was superseded by later laws enacted in 1962 and 1974. *See* Compl. ¶ 56; *see also* Philip Zelikow, *Does the Smoot-Hawley Act Justify the Trump Tariffs?*, REASON, June 3, 2025, https://reason.com/volokh/2025/06/03/does-the-smoot-hawley-act-justify-the-trump-tariffs-no-says-philip-zelikow/ (noting a prominent trade policy expert and former Bush administration official elaborates on the superseded notion). We do not recapitulate this point in detail here. But it provides an additional reason to rule for Plaintiff in the present case.

## II. THE MAJOR QUESTIONS DOCTRINE FORECLOSES A TRANSFORMATIVE EXPANSION OF SECTION 338.

The major questions doctrine requires Congress to "speak clearly" when it delegates to the executive "decisions of vast 'economic and political significance.'" *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014); *see also Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021) (per curiam) (the Supreme Court "expect[s] Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance"). As the Federal Circuit held in *V.O.S. Selections*, the major questions doctrine applies to delegations of tariff

authority, and "when Congress delegates this power in the first instance, it does so clearly and unambiguously." 149 F.4th at 1332. Express authority to impose some tariffs does not authorize abandoning the statutory predicates and remedial policy.

The boundaries defining the tariff delegation control. Chief Justice Roberts identified Section 338's express duties authority and rate cap as features of bounded tariff legislation in *Learning Resources, Inc. v. Trump*, 607 U.S. 229, 243–44 (2026) (opinion of Roberts, C.J.). The Court reserved the validity of hypothetical actions under other tariff statutes but emphasized that "[w]hen Congress grants the power to impose tariffs, it does so clearly and with careful constraints." *Id.* at 251 & n.4. Those boundaries must therefore be applied, not invoked as a reason to disregard the operative conditions accompanying them.

The relevant question is whether Congress clearly authorized the power asserted here: maximum-rate duties triggered by ordinary trade disagreements or differences in reciprocal preferences, without an operative relationship to an identified discriminatory burden. That asserted expansion requires clear congressional authorization. Neither the rate cap nor the word "duties" authorizes a departure from the conditions defining the delegation. *HMTX* sustained modifications remaining within an established statutory mission. *HMTX Industries LLC v. United States*, 156 F.4th at 1254–55. Enforcing Section 338's operative comparison and offset requirement likewise preserves implementation within the delegation rather than general-purpose economic coercion.

### A. The magnitude of the asserted authority matters beyond the particular entries before the Court.

According to the Complaint, Section 338 had not been used to impose tariffs during the 96 years preceding July 2026. Compl. ¶¶ 4, 40, 46. The extraordinary breadth now claimed for that long-unused authority warrants seeking attention to its statutory limits. A construction reaching broad categories of imports whenever trading partners negotiate different preferences requires clear congressional authorization, not an inference that statutory silence eliminates the delegation's express limits. The Federal Circuit held that the IEEPA tariffs ran afoul of the major questions doctrine in part because they were "both 'unheralded' and 'transformative.'" *V.O.S. Selections*, 149 F.4th at 1334 (quoting *West Virginia v. EPA*, 597 U.S. 697, 722, 724 (2023)). Those factors led three Supreme Court Justices to reach the same conclusion. *Learning Res.*, 607 U.S. at 231 (opinion of Roberts, C.J.) (emphasizing the "transformative" impact of the authority the executive claimed). The Section 338 tariffs imposed here are similarly unheralded and transformative, claiming sweeping authority under a statute that has never before been used to impose tariffs, and is likely inoperative.

The asserted rule extends beyond cheese. If every differing preference supplies a trigger, while "offset" imposes no constraint beyond 50 percent, ordinary trading relationships become continuing occasions for extraordinary taxation. Section 338(b)'s separately conditioned exclusion power reinforces the need to enforce the initial predicate.

In *West Virginia v. EPA*, the Supreme Court held that EPA's claim of authority to regulate greenhouse gas emissions raised a major question even though the agency did not, at that point, have the specific regulatory plan it sought to implement. 597 U.S. 697 (2022). What matters is the magnitude of the authority claimed, not just the specific details of how that authority is deployed in a particular case. The question is whether the executive has laid claim to a "highly consequential power," even if how much of that power it intends to use remains unclear. *Id.* at 723–25. The sweeping nature of the power claimed here is similarly decisive.

**B. Tariffs are not exempt from the major questions doctrine by virtue of being "foreign affairs" powers.**

Defendants cannot evade application of the major questions doctrine by claiming that tariffs are matters of foreign affairs. There is no general foreign affairs exception to the major questions doctrine. Even if there were, tariffs are not purely a foreign affairs issue, because first and foremost they are taxes imposed on Americans.

As noted earlier, the Federal Circuit has held that the major questions doctrine applies to tariffs, and that holding binds this Court. *V.O.S. Selections*, 149 F.4th at 1332–34. In *Learning Resources*, three Justices in the majority likewise held that the doctrine applies to tariffs and that no "foreign affairs" exception applies to the tariff power. *Learning Res.*, 607 U.S. at 247. Chief Justice Roberts emphasized that "the President and Congress *do not* 'enjoy concurrent constitutional authority' to impose tariffs during peacetime" and that "[t]he Framers gave that power to 'Congress alone'—notwithstanding the obvious foreign affairs implications of tariffs." *Id.* At 248 (quoting *Merritt v. Welsh*, 104 U.S. 694, 700 (1882)).

The Supreme Court has repeatedly applied the major questions doctrine to policies with significant foreign affairs implications. In *Biden v. Nebraska*, the Court rejected a claim of authority to forgive student loans based on a national emergency declaration, even though the asserted authority in question was based on the 2003 HEROES Act, legislation aimed largely at war and foreign policy emergencies. 600 U.S. 477, 494 (2023) (noting that "[t]he HEROES Act authorizes the Secretary to 'waive or modify any statutory or regulatory provision applicable to the student financial assistance programs under title IV of the [Education Act] as the Secretary deems necessary in connection with a war or other military operation or national emergency'" (quoting 20 U.S.C. § 1098bb(a)(1))).

In *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, the Court applied the doctrine to invalidate a nationwide eviction moratorium meant to curb the spread of COVID-19, even though the statute authorized measures against the "spread of communicable diseases from foreign countries into the States or possessions, or from one State or possession into any other State or possession." 594 U.S. at 761 (quoting 42 U.S.C. § 264(a)). The possibility that the eviction moratorium could inhibit the spread of COVID-19 "from foreign countries" did not prevent application of the major questions doctrine. *Id.* Moreover, the widespread death and economic disruption inflicted by the COVID-19 emergency quite obviously impacted U.S. foreign policy and national security[4], yet that did not prevent the Supreme Court from applying the

[4] *See* Off. of the Dir. of Nat'l Intel., *National Intelligence Estimate: Economic and National Security Implications of the COVID-19 Pandemic Through 2026* (Apr. 2022), https://www.dni.gov/files/ODNI/documents/assessments/NIE-Economic_and_National_Securtiy_Implications_of_the_COVID-19_Pandemic_Through_2026.pdf (outlining the foreign policy implications in detail).

major questions doctrine to policies intended to mitigate the pandemic. Similarly, in *West Virginia v. EPA*, the Court ruled that an assertion of power to impose environmental regulations intended to combat climate change qualify as a major question, even though climate change is a major international problem, with obvious foreign affairs implications. 597 U.S. at 723–32.

In addition, tariffs are obviously not purely or even primarily matters of foreign affairs. They are, in fact, taxes imposed on Americans. Studies consistently find that 90 percent or more of the cost imposed by the IEEPA tariffs mandated by the President was paid by American businesses and consumers. *See* Ilya Somin, *How the Supreme Court Spared America*, Atlantic (Feb. 21, 2026), https://www.theatlantic.com/ideas/2026/02/tariffs-trump-supreme-court/686093/ (citing multiple studies on this point); Scott Lincicome & Nathan Miller, *The White House Still Can't Grasp That Americans Pay US Tariffs*, Cato Inst. (Feb. 19, 2026), https://www.cato.org/blog/white-house-still-cant-grasp-americans-pay-us-tariffs (noting additional citations to multiple studies on this point). There is no reason to expect the Section 338 tariffs to be any different.

Foreign-affairs responsibility concerns execution of lawful trade policy; it does not supply a separate power to tax imports. The authority Congress granted, and the conditions Congress attached to the authority, control.

Further, the point is institutional, not partisan. A President may pursue a different trade policy within delegated authority or seek new authority from

Congress. He may not obtain the equivalent of new legislation by construing away the limitations attached to an old delegation.

## III. THE GOVERNMENT'S BROAD CONSTRUCTION OF SECTION 338 WOULD RENDER THE STATUTE AN UNCONSTITUTIONAL DELEGATION OF LEGISLATIVE POWER TO THE EXECUTIVE.

If this Court concludes that Section 338 grants the executive the power to impose the tariffs at issue, it must invalidate the statute under the nondelegation doctrine. "Supreme Court jurisprudence, from the early days of the Republic, evinces affirmation of the principle that the separation of powers must be respected and that the legislative power over trade cannot be abdicated or transferred to the Executive." *Am. Inst. for Int'l Steel, Inc. v. United States*, 376 F. Supp. 3d 1335, 1347 (Ct. Int'l Trade 2019) (Katzmann, J., dubitante). In *V.O.S. Selections*, this Court rightly applied the nondelegation doctrine to tariffs, emphasizing that "[t]he separation of powers is always relevant to delegations of power between the branches." *V.O.S. Selections*, 772 F. Supp. 3d at 1371–72. That principle applies here as well.

### A. The Section 338 tariffs violate the nondelegation doctrine.

The Supreme Court has long held that the nondelegation doctrine requires Congress to supply an "intelligible principle" to constrain executive discretion. *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928). "[I]n examining a statute for the requisite intelligible principle, we have generally assessed whether Congress has made clear both 'the general policy' that the agency must pursue and 'the boundaries of [its] delegated authority.'" *FCC v. Consumers' Research*, 606 U.S. at 673 (quoting *Am. Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946)). Congress must also "provide[] sufficient standards to enable both 'the courts and the public [to]

ascertain whether the agency' has followed the law." *Id.* (quoting *Opp Cotton Mills, Inc. v. Adm'r of Wage & Hour Div., Dep't of Labor*, 312 U.S. 126, 144 (1941)).

It is especially important to constrain delegations of tariff authority. "The power to impose tariffs is 'very clear[ly] . . . a branch of the taxing power,'" and the Framers "[r]ecogniz[ed] the taxing power's unique importance, having just fought a revolution motivated in large part by 'taxation without representation.'" *Learning Res.*, 607 U.S. at 240 (opinion of Roberts, C.J.) (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 201 (1824)). As the Supreme Court has emphasized, Alexander Hamilton wrote in the Federalist Papers that the power to tax was "the most important of the authorities proposed to be conferred upon the Union." *Id.* (quoting *The Federalist* No. 33 (Alexander Hamilton)).

Last year, in *FCC v. Consumers' Research*, the Supreme Court held that a delegation of authority to impose taxes or fees must have a "floor" and a "ceiling," and that the "guidance" Congress must give is greater "when an agency action will 'affect the entire national economy' than when it addresses a narrow, technical issue." 606 U.S. at 673. The power to impose up to 50 percent tariffs on virtually any trading partners unquestionably affects the entire national economy.

Even a fixed numerical ceiling is not constraining enough if it leaves the executive with what amounts to "boundless power." *Id.* at 680. As the Court explained, a hard $5 trillion limit on the "contributions" the FCC could levy would not suffice, because "[t]he purpose of the nondelegation doctrine is to enforce limits on the 'degree of policy judgment that can be left to those executing or applying the

law,'" and "[t]he anywhere-up-to-$5-trillion tax statute would not do that." *Id.* (quoting *Mistretta v. United States*, 488 U.S. 361, 416 (1989) Scalia, J., dissenting)). Such a permissive approach violates nondelegation constraints because it "effectively leaves [the] agency with boundless power." *Id.* Here, if the executive can use Section 338 to impose up to 50 percent tariffs whenever a trading partner imposes any restrictions at all on U.S. imports, it wields almost boundless tariff authority—enough to impose trillions of dollars in taxes on Americans—and no effective limit constrains its "degree of policy judgment." *Id.* A 50 percent tariff rate—like that imposed in this case—is more than enough to massively suppress trade in virtually any import. This Court recognized as much when it recently rejected the Defendants' Section 122 tariffs, in part on nondelegation grounds. In that case, the relevant tariffs included a statutory maximum of 15 percent. *See Oregon v. United States*, 835 F.Supp. 3d 1307, 1334 (Ct. Int'l Trade 2026), *appeal docketed*, No. 26-1804 (Fed. Cir. May 8, 2026) (holding that "[s]uch an expansive reading of the statute would raise a non-delegation issue").

The power Defendants claim violates virtually any plausible theory of the nondelegation doctrine. In a well-known 1825 decision, Chief Justice Marshall wrote that Congress cannot delegate power over "important subjects." *Wayman v. Southard*, 23 U.S. (10 Wheat.) 1, 43 (1825). Although "the line has not been exactly drawn which separates those important subjects which must be entirely regulated by the legislature itself from those of less interest," it is undeniably true that the power to impose sweeping, unlimited tariffs on products from every nation in the world

qualifies as important. *Id.* at 43. Modern precedent requires an "intelligible principle," but also insists that delegations of the taxing power carry clear, stringent limits, especially in cases where the policy in question will affect the "entire national economy." *FCC v. Consumers' Research*, 606 U.S. at 673. Delegations of the taxing power must also have both a floor and a ceiling. *Id.* at 681. Defendants' interpretation of Section 388 meets none of these requirements.

Justice Gorsuch has argued that nondelegation requires Congress to "make . . . the policy decisions when regulating private conduct," leaving the executive to "fill up the details" and engage in appropriate fact-finding. *Gundy v. United States*, 588 U.S. 128, 157–59 (2019) (Gorsuch, J., dissenting). Sweeping authority to impose unlimited tariffs on imports from any nation at almost any time is clearly a delegation power over private conduct. *FCC v. Consumers' Research* upheld the delegation at issue there because qualitative standards meaningfully guided and constrained the FCC, imposing both a floor and a ceiling. 606 U.S. at 674–83. Its treatment of "sufficient" funding illustrates how a statutory term can impose real limits without specifying every implementation detail. *Id.* at 681–83. The operative guidance supplied by the statutory terms "unreasonable" and "offset," and the statute's comparative predicate, must likewise be applied in practice, rather than displaced by the mere existence of a numerical maximum.

The *FCC v. Consumers' Research* holding supplies a powerful analogy. Just as "sufficient" limited the FCC to collecting what the authorized program required, "offset" limits Section 338 duties to their prescribed remedial purpose. Genuine

comparative discrimination identifies the trigger; the resulting burden supplies the reference point; the offset requirement directs the response; and the cap sets an additional maximum. Taken together, those provisions can distinguish implementation from presidential lawmaking.

The constitutional problem arises when the qualitative conditions cease to constrain the executive's policy choices. A rate ceiling does not determine which foreign practices justify taxation, what relationship the tax must bear to those practices, or why the response serves Congress's remedial policy. *FCC v. Consumers' Research* cautioned that a numerical cap can still leave effectively boundless policy discretion. *Id.* at 680–81. The constitutional question is who selects the occasions and purposes of taxation, not solely the highest rate permitted.

*J.W. Hampton* itself involved a tariff delegation, confirming that tariff authority remains subject to the intelligible principle framework. *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. at 409. And *HMTX* sustained modification authority because the original statutory purpose and investigation continued to constrain permissible actions. *HMTX Industries LLC v. United States*, 156 F.4th at 1253–54. Neither decision authorizes severing a delegation from the policy that makes it intelligible. The Federal Circuit distinguished *HMTX* from *V.O.S. Selections*, where the major questions doctrine was implicated because "the government had 'never previously claimed powers of th[at] magnitude' under the relevant statute." *Id.* (quoting *V.O.S. Selections*, 149 F. 4th at 1336). The tariffs in the present case are

indeed of a magnitude never previously claimed under Section 338, which has never previously been used at all.

### B. Tariff delegations are not exempt from nondelegation constraints on the grounds that they are "foreign affairs" issues.

Just as claimed delegations of tariff authority are not exempt from the major questions doctrine on the grounds that they are "foreign affairs" issues, neither are they exempt from normal constitutional constraints on delegation on that basis. Many of the reasons why tariffs are not exempt from the major questions doctrine also apply to nondelegation. *See supra* §II.B. Most notably, tariffs are not pure exercises of powers related to foreign affairs; they are taxes imposed on Americans. While they also have an impact on foreign nations, the same thing is true of policies enacted under many other congressional powers. As Justice Gorsuch noted in his concurring opinion in *Learning Resources*, such powers "include not only the power to impose tariffs . . . but also the power to establish uniform rules of naturalization, . . . appropriate money for armies, . . . and define and punish offenses against the law of nations." *Learning Res.*, 607 U.S. at 286 (Gorsuch, J., concurring). If powers touching foreign affairs were largely exempt from nondelegation constraints, "all these legislative powers and more could be passed wholesale to the executive branch in a few loose statutory terms, no matter what domestic ramifications might follow." *Id.*

Tariffs are also part of the "core congressional power of the purse," over which the President holds no inherent authority of his own. *Id.* at 243 (opinion of Roberts, C.J.). That distinguishes tariff delegations from delegations of authority in areas

where the President does hold inherent power. *See Learning Res.*, 607 U.S. at 286 (Gorsuch, J., concurring) (emphasizing this distinction); *V.O.S. Selections*, 149 F.4th at 1346 (Cunningham, J., concurring) (distinguishing tariffs from the "traditionally executive embargo authority" on this basis); *cf.* Curtis A. Bradley & Jack L. Goldsmith, *Foreign Affairs, Nondelegation, and the Major Questions Doctrine*, 172 U. Pa. L. Rev. 1743, 1788–89 (2024) (explaining that "the President has no independent constitutional authority over international commerce" and that "a simple categorical determination that an area involves foreign affairs or national security cannot by itself suffice to address delegation concerns" when it comes to foreign trade issues). Moreover, "the idea that tariff delegations are subject to a lower non-delegation standard is incompatible with [the Supreme Court's ruling in] *J.W. Hampton*, which addressed a tariff statute while creating the intelligible principle standard." *V.O.S. Selections*, 149 F.4th at 1346–47 (Cunningham, J., concurring) (citing *J.W. Hampton*, 276 U.S. at 409).

### C. Under the canon of constitutional avoidance, this court should interpret the statute to avoid the constitutional problem here.

The Court need not invalidate Section 338 to decide this case. Constitutional avoidance permits a fairly available construction that avoids serious constitutional doubts; it does not permit rewriting an unambiguous statute. *See Jennings v. Rodriguez*, 583 U.S. 281, 286 (2018). Here the narrowing construction is the text's own: require qualifying discrimination, preserve an operative offset standard, and enforce the waiting period. If the Government instead obtains a construction under which the President independently decides the occasions and purposes for

extraordinary import taxes, the Court should hold that the delegation so construed cannot constitutionally sustain the challenged tariffs. In addition, the Court can avoid the constitutional issue simply by ruling that Section 338 is no longer operative, having been superseded by later statutes.

## IV. THE AGREED MECHANISMS DISTINGUISH ENFORCING THE BARGAIN FROM SEEKING BETTER TERMS.

The USMCA distinguishes different complaints. If Canada fails to provide promised access, Articles 31.2(a)–(b), 31.4, and 31.6 provide consultations and adjudication. Article 31.2(c) also addresses qualifying nullification or impairment of reasonably expected benefits even where a measure is not inconsistent with the agreement. If the United States wants greater concessions than it secured, Articles 34.3 and 34.7 provide amendment and joint-review mechanisms. These provisions distinguish between enforcing commitments, protecting justified expectations, and negotiating a different bargain.

The remedial structure reinforces the distinction between enforcing a bargain and demanding improvement. Articles 31.18–31.19 provide for resolution after adverse findings and, under specified conditions, suspension of benefits of equivalent effect, with review of a manifestly excessive suspension. Congress approved a relationship containing both reciprocal commitments and mechanisms for addressing their operation. Dissatisfaction with the access obtained cannot itself substitute for Section 338's independent statutory conditions.

Plaintiff separately challenges Section 338's continued availability in light of later trade legislation. Enforcing the original delegation's comparative predicates,

offsetting purpose, and waiting period supplies an additional ground for relief. Section 338's structured response to foreign practices reinforces the importance of distinguishing statutory implementation from general economic coercion. See 19 U.S.C. §§ 2411–2414; *HMTX*, 156 F.4th at 1240–41, 1251–52. The Court can enforce those restrictions without making the supersession question the sole basis of decision.

## CONCLUSION

The Court should reject a construction of Section 338 that nullifies its qualifying predicates and offset requirements, and violates the major questions and nondelegation doctrines. The Court should direct appropriate injunctive and refund relief against the implementing defendants, including relief for any properly certified class as Plaintiff establishes. Enforcing the limits Congress enacted resolves the challenged exercise of power while preserving Congress's control over import taxation.

Respectfully submitted,

Dated: November 13, 2026

*/s/ Weronika Bukowski*
Weronika Bukowski

Ilya Somin
Professor of Law
ANTONIN SCALIA LAW SCHOOL
GEORGE MASON UNIVERSITY
3301 Fairfax Dr.
Arlington, VA 22201
Phone: (703) 993-8069
lsomin@gmu.edu

*Of Counsel*

Daniel Cannistra
CROWELL & MORING LLP
600 Fifth St., NW
Washington, DC 20001
Phone: (202) 624-2902
dcannistra@crowell.com

Weronika Bukowski
CROWELL & MORING LLP
Two Manhattan West
375 Ninth Ave
New York, NY 10001

Phone: (212) 530-1930
wbukowski@crowell.com

*Attorneys to Amici Curiae*

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

Before: The Honorable Claire R. Kelly, Joseph A. Laroski, and Kara M. Westercamp, Judges

| | |
|---|---|
| GELLERT GLOBAL GROUP CORP.,<br>Plaintiff,<br>v.<br>DONALD J. TRUMP, *et al.*,<br>Defendants. | Case No. 26-cv-04636 |

**Certificate of Compliance**

Pursuant to the U.S. Court of International Trade's Standard Chambers Procedures, undersigned counsel certifies that the brief contains 7371 words excluding tables, signature blocks, and the statement of interest, and complies with all typeface and margin requirements.

Respectfully submitted,

*/s/ Weronika Bukowski*